1
2

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

3

```
┌─────────────────────────────┐
│          ENTERED            │        Priority  ✓
│  CLERK, U.S. DISTRICT COURT │        Send      ✓
│   ┌──────────────────┐      │        Enter     ✓
│   │   JUL 30 2007    │      │        Closed    ___
│   └──────────────────┘      │        JS-5/JS-6 ___
│ CENTRAL DISTRICT OF CALIFORNIA      JS-2/JS-3  ___
│ EASTERN DIVISION   BY DEPUTY│        Scan Only ___
└─────────────────────────────┘
```

```
┌─────────────────────────────┐
│           FILED             │
│  CLERK, U.S. DISTRICT COURT │
│   ┌──────────────────┐      │
│   │   JUL 27 2007    │      │
│   └──────────────────┘      │
│ CENTRAL DISTRICT OF CALIFORNIA
│ EASTERN DIVISION   BY DEPUTY│
└─────────────────────────────┘
```

JIM HOLMES

8                UNITED STATES DISTRICT COURT

9                CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10  JOANNE SIEGEL and LAURA SIEGEL<br>LARSON,  ) | |
| 11  ) | CASE NO. CV-04-8776-SGL (RZx) |
| 12  Plaintiffs,  ) | [Consolidated for pre-trial and discovery<br>purposes with CV-04-8000-SGL (RZx)] |
| 13  ) | |
| 14  v.  ) | ORDER GRANTING DEFENDANTS'<br>MOTION FOR RECONSIDERATION |
| 15  TIME WARNER INC., WARNER<br>COMMUNICATIONS INC., WARNER<br>BROS. ENTERTAINMENT INC.,  ) | |
| 16  WARNER BROS. TELEVISION<br>PRODUCTION INC., and D.C. COMICS,  ) | |
| 17  ) | |
| 18  Defendants.  ) | |

19

20          This case is the latest chapter in the continuing saga over who owns the

21    copyright to "Superboy," the youthful persona of the iconic comic book super hero

22    "Superman," spanning from the golden age of print media comics to the present-

23    day revolution in digital media.  Like the entire spectrum of graphics media

24    technology, the law governing ownership rights to copyrights has changed

25    dramatically, and it is precisely these changes in the law that bring this case to this

26    Court.

27          Although the story of how Superman and later Superboy came into being

28    has become the stuff of legend among comic book fans, the Court will recite it once

DOCKETED ON CM

JUL 30 2007

ORIGINAL

Dockets.Justia.com

more for those unfamiliar with the tale.

Jerome Siegel and Joseph Shuster are Superman's creators.  In 1933, Siegel conceived of the idea of a comic strip featuring a character who is sent to Earth from a distant planet and, with superhuman powers, performs daring feats for the public good.  Siegel named his character "Superman."  Siegel discussed his idea with Shuster, an artist, and together they crafted a comic strip consisting of several weeks worth of material (both dialogue and artwork, some of the latter being completely "inked in" and ready for publication, and some consisting of no more than black-and-white pencil drawings)  suitable for newspaper syndication embodying that idea.  The two shopped the character around for a number of years to numerous publishers but were unsuccessful in having it published.  In the meantime, Siegel and Shuster penned other comic book strips at their artist studio in Cleveland, Ohio, and sold them for publication, most notably "Slam Bradley" and "The Spy" to Nicholson Publishing Co., who purchased their material for resale to Detective Comics.  When Nicholson folded shop in 1937, Detective Comics acquired some of its magazine properties, including the comic book strips penned by Siegel and Shuster.

The two entered into an agreement with Detective Comics on December 4, 1937, whereby they agreed to furnish some of the existing comic strips for the next two years and further agreed "that all of these products and work done by [them] for [Detective Comics] during said period of employment shall be and become the sole and exclusive property of [Detective Comics] and [Detective Comics] shall be deemed the sole creator thereof . . . ."  The agreement further provided that any new or additional features by Siegel and Shuster were to be submitted first to Detective Comics, who was given the initial option (to be exercised within sixty days after submission) to publish the material.  Soon thereafter Detective Comics became interested in publishing Siegel and Shuster's now well-traveled Superman idea (but in an expanded 13-page comic book format), the interest eventually

2

1  culminating with Superman's release in April, 1938, in the first volume of <u>Action</u>

2  <u>Comics</u>, a new comic magazine issued by Detective Comics.  The Superman comic

3  strip became an instant success and Superman's popularity continues to endure to

4  this day as his depiction has been transferred to varying media formats.

5      On March 1, 1938, before Superman's publication, Siegel and Shuster

6  assigned to Detective Comics "all [the] good will attached . . . and exclusive right[s]"

7  to Superman in exchange for $130.  This assignment in ownership rights was later

8  confirmed in a September, 22, 1938, employment agreement in which Siegel and

9  Shuster acknowledged that Detective Comics was "the exclusive owners" of not

10  only the other comic strips they had penned earlier for Nicholson (and continued to

11  pen for Detective Comics) but Superman as well; that they would continue to supply

12  the art work and storyline (or in the parlance of the trade, the "continuity") for said

13  comics at varying per page rates depending upon the comic in question (Superman

14  being paid at the highest rate offered of $10 per page) for the next five years; that

15  Detective Comics had the "right to reasonably supervise the editorial matter" of

16  those existing comic strips; that Siegel and Shuster would not furnish "any art or

17  copy . . . containing the . . . characters or continuity thereof or in any wise similar" to

18  said comic strips to a third party; and Detective Comics would have the right of first

19  refusal (to be exercised within a six week period after the comic's submission) with

20  respect to any future comic strip creations conceived by Siegel or Shuster:

21              In the event you shall do or make any other art
              work or continuity suitable for use as comics or comic
22              strips, you shall first give us the right to first refusal
              thereof by submitting said copy and continuity ideas to
23              us.  We shall have the right to exercise that option for six
              weeks after submission to us at a price no greater than
24              offered to you by any other party.

25      Not long thereafter, on November 30, 1938, Siegel pitched the idea to

26  Detective Comics of serializing a comic concerning the exploits of Superman as a

27  young man.  Siegel called his character "Superboy."  As Siegel explained the

28  synopsis for the new comic strip:

3

1
2
3
4
5
6
7

> Superboy . . . would relate the adventures of Superman as a youth. . . . I'd like the strip to have a large number of pages, such as 13 so that I could develop it as well as Superman. . . . Tho the strip would feature super-strength, it would be very much different from the Superman strip inasmuch as Superboy would be a child and the type of adventures very much different. There'd be lots of humor, action, and the characters would be mainly children of about 12-years rather than adults. Also, inasmuch as this strip will probably be used as a newspaper feature, I should think that you would want to own all rights to it by having it first appear in your magazine.

8    Detective Comics, by a letter dated December 2, 1938, effectively declined

9    to publish Siegel's proposed Superboy comic.  Siegel later re-pitched the idea in

10   December, 1940, through the submission of a lengthy script containing the storyline

11   and dialogue for the proposed comic strip's first release or releases that fleshed out

12   in greater detail the outlines of the Superboy story arch.  Detective Comics again

13   effectively declined to publish Superboy.

14   Siegel entered the United States Army in July, 1943, to serve his country

15   during World War II.  In December, 1944, while Siegel was stationed abroad,

16   Detective Comics published, without notice to Siegel and without his consent, an

17   illustrated five- page comic strip entitled "Superboy" appearing as one among many

18   other comics strips in the body of volume 101 of its magazine More Fun Comics.

19   The illustrations for the first Superboy comic strip were done by Shuster at the

20   direction of Detective Comics.  When Detective Comics published volume 101 to

21   More Fun Comics it also secured a copyright in all the contents of the same under

22   Copyright Registration No. B653651.  Thereafter Detective Comics continued to

23   publish (and Shuster for a period of time continued to illustrate) "Superboy" comic

24   strips, first in its serialized magazine More Fun Comics, then in Adventure Comics,

25   and eventually as a stand-alone feature in the self-titled comic book Superboy.

26   Detective Comics' publication of Superboy increased an already growing rift

27   between the parties predicated largely upon Siegel and Shuster's conclusion that

28   Detective Comics had not paid them their fair share of profits generated from the

4

1  exploitation of their Superman creation, as well as the profits generated from

2  characters like Superboy, which had his roots in the original Superman character.

3  As a result, in 1947, Siegel and Shuster brought an action against Detective

4  Comics' successor, National Periodical Publications, Inc., in New York Supreme

5  Court, Westchester County, seeking to annul and rescind their previous

6  agreements with Detective Comics as void for lack of mutuality and consideration.

7  As part of the suit Siegel argued that Detective Comics had no right to publish his

8  "Superboy" creation.       Towards that end, the third cause of action in the New

9  York state court complaint asserted that the release of the Superboy comic strip in

10 More Fun Comics, no. 101, "was based entirely upon the synopsis submitted" by

11 Siegel to Detective Comics, "and contained in detail the same characters, incidents

12 and plot" in the synopsis. (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 at

13 ¶ 30).  The complaint further alleged that Detective Comics' publication of Superboy

14 was done "without the consent of" and without payment to Siegel. (Defs' App. of

15 Docs. in Supp. Mot. Recons., Ex. 7 ¶¶ 31, 33).  These points were important as the

16 third cause of action averred that Siegel's Superboy submissions belonged to him

17 alone in light of Detective Comics' failure to exercise its right of first refusal under

18 the parties' September, 1938, contract.   (Defs' App. of Docs. in Supp. Mot.

19 Recons., Ex. 7 ¶¶ 28-29).  Essentially, the third cause of action pled that Detective

20 Comics had stolen Siegel's Superboy idea. (Defs' App. of Docs. in Supp. Mot.

21 Recons., Ex. 7 ¶ 31 (averring that Detective Comic's publication of Superboy

22 "use[d] and was based upon the conception and idea as submitted in writing and

23 detail by the plaintiff, SIEGEL")).

24        In the alternative, the fourth cause of action in the complaint alleged that the

25 "plot, conception and incidents" contained in Detective Comics' Superboy

26 publication "were based upon and copied from the plot, conception and incidents"

27 of Siegel and Shuster's Superman character, and that such misassociation

28 between Siegel's Superman creation and Detective Comic's Superboy was

5

1    exacerbated by Detective Comics affixing, without Siegel's consent, his name as

2    the author to each of the Superboy releases.  (Defs' App. of Docs. in Supp. Mot.

3    Recons., Ex. 7 ¶¶ 36, 37).  In so publishing Superboy, it was alleged Detective

4    Comics had "deceived the public" into believing that Siegel "was the author of the

5    continuity dialogue and action of each of the individual releases" when in fact he

6    "was not the author."  (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶ 36).

7    Labeling such publication as "wrongful," the fourth cause of action alleged that such

8    unauthorized misassociation between the two was "injurious" to Siegel's reputation.

9    (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶ 38).

10        The complaint sought an accounting of the profits generated from

11    Superboy's publication and that further publication of Superboy be enjoined.  (Defs'

12    App. of Docs. in Supp. Mot. Recons., Ex. 7 at page 29-30).

13        After a trial, official referee J. Addison Young, in an opinion dated November

14    21, 1947, concluded that the March 1, 1938, assignment of the rights to Superman

15    to Detective Comics was valid and supported by consideration, and that, therefore,

16    Detective Comics was the exclusive owner of "all" the rights to Superman.  (Defs'

17    App. of Docs. in Supp. Mot. Recons., Ex. 8 at 371).  With respect to Superboy, the

18    referee found that it was solely Siegel's creation; that Superboy was a work distinct

19    from Superman (thus falling within the right of first refusal provision contained in the

20    parties' September 22, 1938, agreement); and that, on account of Detective

21    Comics' failure to exercise its option to publish Superboy when first presented with

22    the idea, the rights to Superboy belonged to Siegel.  As explained by the referee:

23            It is quite clear to me, however, that in publishing
            Superboy the Detective Comics, Inc. acted illegally.  I
24            cannot accept defendants view that Superboy was in
            reality Superman.  I think Superboy was a separate and
25            distinct entity.  In having published Superboy without
            right, plaintiffs are entitled to an injunction preventing
26            such publication and under the circumstances I believe
            the defendants should account as to the income
27            received from such publication and that plaintiffs should
            be given an opportunity to prove any damages they
28            have sustained on account thereof.

1  (Decl. Marc Toberoff, Ex. N at 323-24).

2        Shortly thereafter, on April 12, 1948, the referee signed a thirty-six page

3  findings of fact and conclusions of law expanding upon the statements contained in

4  the opinion he had tendered earlier.  The factual findings pertinent to Superboy

5  were as follows:

6        156.   On or about November 30, 1938, the plaintiff
       SIEGEL, in writing and by mail, submitted to DETECTIVE
7      COMICS, INC. for its consideration and acceptance or
       rejection, for publication, under the terms of the contract
8      dated September 12, 1938, . . . a synopsis or summary of
       the idea and conception and plan of a new comic strip to
9      be known as SUPERBOY[, which would narrate the
       adventures of SUPERMAN as a youth] .

10     157.   On December 2, 1938, DETECTIVE COMICS,
       INC. deferred consideration of a SUPERBOY comic strip
11     until some future time.

12     158.   DETECTIVE COMICS, INC. did not within six
       weeks indicate its election to publish the said new comic
13     strip SUPERBOY.

14     159.   DETECTIVE COMICS, INC. on or about
       December 2, 1938, by its letter in writing to the plaintiff
15     SIEGEL did elect not to publish the said comic strip
       SUPERBOY under the terms of the contract dated
16     September 22, 1938, . . . .

17     160.   During the month of December, 1940, the plaintiff
       SIEGEL submitted to DETECTIVE COMICS, INC. for its
18     further consideration a complete script or scenario,
       containing the continuity, plan and dialogue for the first
19     "release" or "releases" of the proposed new comic strip
       SUPERBOY, and that the said synopsis contained within
20     itself the entire plan for the future publication of the said
       comic strip SUPERBOY and the conception of the
21     character SUPERBOY, all set forth with detail and
       particularity.
22
       162.   DETECTIVE COMICS, INC. did not within six
23     weeks after the submission of the said script or scenario
       indicate its election to publish the said comic strip
24     SUPERBOY.
25
       163.     Thereafter and during December of 1944
26     DETECTIVE COMICS, INC. did publish a certain comic
       strip release entitled SUPERBOY in a magazine entitled
27     "More Fun Comics."

28     164.     The said comic strip release entitled
       SUPERBOY embodied and was based upon the idea,

plan and conception contained in the plaintiffs,
SIEGEL's letter to DETECTIVE COMICS, INC. dated
November 30, 1938    . . . .

165.    The said release of the said comic strip
SUPERBOY published in December of 1944 embodied
and was based upon the idea, conception and plan
contained in the script or scenario submitted by the
plaintiff SIEGEL to DETECTIVE COMICS, INC. in
December of 1940 . . . .

166.    Said first thirteen pages of SUPERMAN material
[in <u>Action Comics</u> no. 1] did not contain the plan,
scheme, idea or conception of the comic strip
SUPERBOY as it was later submitted by the plaintiff
SIEGEL to DETECTIVE COMICS, INC. [in the 1938
pitch or the later 1940 script].

167.    Said first thirteen pages of SUPERMAN material
[in <u>Action Comics</u> no. 1] did not contain the plan,
scheme, idea or conception of the comic strip
SUPERBOY as published by DETECTIVE COMICS,
INC. . . . from December, 1944, until the date of the trial
herein.

168.    The said publication was without the permission
of the plaintiff SIEGEL.

171.    All of the comic strip material published under the
title SUPERBOY was based upon the idea, plan, conception
and direction outlined in the [1938 pitch].

172.    All of the comic strip material published under the
title SUPERBOY was based upon the idea, plan,
conception and direction contained in the scenario or
script . . . submitted by the plaintiff SIEGEL to DETECTIVE
COMICS, INC. [in 1940].

173.    The publication of all comic strip material entitled
SUPERBOY was at all times without the permission of
the plaintiff SIEGEL.

174.    Plaintiff SIEGEL has received no payment on
account of the publication of any of the material entitled
SUPERBOY.

175.    All publications of SUPERBOY by DETECTIVE
COMICS, INC. from April, 1945 until . . . the date of the trial
herein, contained affixed thereto the name of the plaintiffs
SIEGEL and SHUSTER.

176.    The use of the name of the plaintiff SIEGEL . . .
was without the consent of the plaintiff SIEGEL.

179.    Defendant INDEPENDENT NEWS CO., INC.
knowing of the rights of the plaintiff SIEGEL, under the

[September 22, 1938, contracts], sold and distributed to newsdealers for resale to the public throughout the United States, magazines containing the material entitled SUPERBOY as hereinafter described and set forth.

180.   All the art work for the SUPERBOY releases was prepared by plaintiff SHUSTER under the direction of DETECTIVE COMICS, INC.

181.   Plaintiff SHUSTER was paid in full by DETECTIVE COMICS, INC. or defendant NATIONAL COMICS PUBLICATIONS, INC. for all the art work furnished by him in connection with said SUPERBOY comic strip releases.

182.   At the time that publication of the SUPERBOY comic strip was commenced, plaintiff SIEGEL was unavailable to furnish any of the continuity therefor being absent in military service.

183.   Upon the return of plaintiff SIEGEL to civilian status in January, 1946, DETECTIVE COMICS, INC. entered into negotiations with him regarding SUPERBOY, proposing certain payments to him and affording him the opportunity of supplying the continuity for SUPERBOY releases.

184.   No agreement was reached between Detective COMICS, INC. and plaintiff SIEGEL as a result of the aforesaid negotiations; however, defendant NATIONAL COMICS PUBLICATIONS, INC. has offered to pay plaintiff SIEGEL for SUPERBOY releases heretofore published, the same rate as he was paid for SUPERMAN magazine releases for which he did not furnish the continuity, i.e., at the rate of $200 per release of standard length of thirteen pages.

(Decl. Marc Toberoff, Ex. O at 355-58).

In conjunction therewith, the referee also made the following conclusions of law: "Plaintiff Siegel is the originator and the sole owner of the comic strip feature SUPERBOY, and . . . that the defendants . . . are perpetually enjoined and restrained from creating, publishing, selling or distributing any comic strip material of the nature now and heretofore sold under the title SUPERBOY. . . . Plaintiff Siegel, as the originator and owner of the comic strip feature SUPERBOY has the sole and exclusive right to create, sell and distribute comic strip material under the

1    title SUPERBOY." (Id. at 365-66). Thereafter both sides filed an appeal from the

2    referee's findings of fact and conclusions of law. (Decl. Marc Toberoff, Ex. Q at

3    379).

4        While the matter was still on appeal, the parties reached a settlement on

5    May 19, 1948, and signed a stipulation which called for the payment of over

6    $94,000 to Siegel and Shuster. In addition, the stipulation provided that the

7    referee's findings were to be vacated in all respects; reiterated the referee's earlier

8    determination that Detective Comics owned the rights to Superman; and contained

9    the following proviso concerning the ownership rights to Superboy: "Defendant

10   NATIONAL COMICS PUBLICATION, INC. is the sole and exclusive owner of and

11   has the sole and exclusive right to the use of the title SUPERBOY and to create,

12   publish, sell and distribute and to cause to be created, published, sold and

13   distributed cartoon or other comic strip material containing the character

14   SUPERBOY . . . ." (Decl. Marc Toberoff, Ex. P at 374).

15       Two days later, on May 21, 1948, the referee entered a final consent

16   judgment that, among other things, vacated the referee's findings of fact and

17   conclusions of law entered on April 12, 1948, and expressly acknowledged that

18   Detective Comics is the "sole and exclusive owner of and has the sole and

19   exclusive right to the use of the title SUPERBOY." (Decl. Marc Toberoff, Ex. Q at

20   379, 382).

21       The expiration of the initial copyright term for Superman in the mid-1960s led

22   to another round of litigation between the parties.[1] In 1969 Siegel and Shuster filed

23   suit in federal district court in New York seeking a declaration that they, and not

24   _____

25       [1] Under the Copyright Act of 1909 (the "1909 Act"), in effect at the time of
     Siegel and Shuster's creation of Superman and later assignment of the same to
26   Detective Comics, an author was entitled to a copyright in his work for twenty-eight
     years from the date of its publication. See 17 U.S.C. § 24, repealed by Copyright
27   Act of 1976, 17 U.S.C. § 101 et seq. Upon expiration of this initial twenty-eight
     year term, the author could renew the copyright for a second twenty-eight year
28   period (the "renewal term").

1  Detective Comics' successor, National Periodical Publications, Inc., were the

2  owners of the copyright renewal rights to Superman. See Siegel v. National

3  Periodical Publications, Inc., 364 F.Supp. 1032 (S.D.N.Y. 1973), aff'd by, 508 F.2d

4  909 (2nd Cir. 1974). In the process of analyzing their claim, both the federal district

5  court and later the Second Circuit made mention of both the referee's April, 1948,

6  vacated findings as well as the parties' May, 1948, final consent judgment. See

7  364 F.Supp. at 1035; 508 F.2d at 912-13. The courts, however, diverged as to

8  which of the various court documents coming out of the Westchester action should

9  have binding effect.

10      The district court found both the referee's vacated findings as well as the

11  final consent judgment to be binding upon it, see 364 F.Supp. at 1035 ("we note

12  that the findings of the State Supreme Court in the Westchester action are binding

13  upon us here. The terms of the stipulation of settlement in that action, and the

14  consent judgment are also binding"), whereas the Second Circuit only made

15  mention of the binding effect that the final consent judgment had on the case. See

16  508 F.2d at 913 ("There is no doubt that the [May 21, 1948,] judgment of the state

17  court is binding in this subsequent federal action"). Both courts, however,

18  concluded, in conformity with Supreme Court precedent at the time, see Fred

19  Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643, 656-59 (1943) (holding that

20  renewal rights were assignable by an author during the initial copyright term, before

21  the renewal right vested), that, in transferring "all their rights" to Superman to

22  Detective Comics pursuant to the final consent judgment, Siegel and Shuster had

23  assigned not only Superman's initial copyright term but the renewal term as well,

24  even though those renewal rights had yet to vest when the consent judgment was

25  entered. See 364 F. Supp. at 1037-38; 508 F.2d at 913-14.

26      Thus ended the tale of the battle over the ownership to the copyrights to

27  Superman and, by extension, Superboy. Or at least that was what everyone

28  believed at the conclusion of the Second Circuit litigation.

1    With the passage of the Copyright Act of 1976 (the "1976 Act"), Congress

2  changed the legal landscape concerning author's transfers of their copyrights in

3  their creations. The 1976 Act expanded the duration of the renewal period for

4  existing works already in their renewal term at the time of the Act for an additional

5  nineteen years, see 17 U.S.C. § 304(b), and, more importantly for this case, gave

6  authors the ability to terminate any prior grants of the rights to their creations that

7  were executed before January 1, 1978, irrespective of the terms contained in such

8  assignments, e.g., that all the rights (the initial and renewal) belonged exclusively to

9  the publisher. Specifically, section 304(c) to the Act provides that, "[i]n the case of

10  any copyright subsisting in either its first or renewal term on January 1, 1978, other

11  than a copyright in a work made for hire, the exclusive or nonexclusive grant of a

12  transfer or license of the renewal copyright or any right under it, executed before

13  January 1, 1978, . . . is subject to termination. . . . notwithstanding any agreement

14  to the contrary . . . ."

15    It is this right to termination that Joanne Siegel, Jerome Siegel's widow, and

16  Laura Siegel Larson, his daughter, now seek to employ in this case. In November,

17  2002, they served a notice of termination to defendants[2] directed solely at works

18  featuring Superboy, claiming to undo as of November 17, 2004, any grant provided

19  by Jerome Siegel to defendants' predecessors in interest contained in the May 19,

20  1948, stipulation.[3] The present suit by Joanne Siegel and Laura Siegel Larson

21  seeks a declaration from this Court that the Superboy termination notice is valid

22  _____

23    [2] The defendants consist of Detective Comics' successor in interest, DC
Comics, and DC Comics' parent company, Time Warner, Inc., ("Time"), and

24  Time's subsidiaries, Warner Communications, Inc., Warner Brothers
Entertainment, Inc., and Warner Brothers Television Production, Inc. (collectively

25  "defendants").

26    [3] Plaintiffs have also brought an action, Joanne Siegel, et al. v. Warner
Brothers Entertainment, et al., CV-04-8400-SGL (RZx), seeking the Court to

27  declare that they have effectively terminated and recaptured the assignment of the
Superman copyrights to defendants that took place by operation of the 1938

28  agreements executed by Siegel and Shuster with Detective Comics.

and that they have recaptured all of the copyright to Superboy since the effective date of the termination.

This question – the validity of the termination notice – was addressed in a March 24, 2006, Order, by the Honorable Ronald S.W. Lew of this Court, which held: (1) The referee's findings from the 1948 Westchester action were binding, notwithstanding their vacatur; (2) the referee's findings conclusively determined certain unique and exclusive copyright issues, namely, that Siegel's Superboy submissions were later "published" (as that term is used in copyright law) in Detective Comics' More Fun Comics #101, and that the Superboy submissions were neither a "work for hire," a "derivative work" of Superman, or a "joint work" between Siegel and Shuster; and (3) the termination notice was otherwise valid pursuant to the terms of the 1976 Act and the regulations promulgated thereunder. The end result of the March 24, 2006, Order was that Joanne Siegel and Laura Siegel Larson had recaptured the copyright to Superboy, leaving for trial whether defendants (notably, by producing and broadcasting the successful WB television series Smallville) had infringed Superboy's copyright since the effective termination date and the scope of accounting for the profits defendants had reaped in exploiting the copyright subsequent to the termination date. Thereafter, defendants' request to certify the Order for an interlocutory appeal was denied.

On October 30, 2006, the matter was reassigned to the present judicial officer, and defendants promptly sought reconsideration of the March 24, 2006, Order, and the decision to deny certifying the matter for an interlocutory appeal. For the reasons set forth below, the Court **GRANTS** defendants' motion for reconsideration of the March 24, 2006, Order.

The legal questions at stake in the present motion are two-fold:

(1) Whether the referee's vacated findings from the Westchester action have

1    any binding effect in this case as a matter of judicial or collateral estoppel;[4] and,

2        (2)  If they do have a preclusive effect, whether those findings foreclose

3    further consideration of or otherwise impact, certain questions at issue in this case

4    that are unique to copyright law.  More to the point, the issue focuses on whether

5    the referee's findings preclude further litigation on whether, as a matter of copyright

6    law, (a) Siegel's submissions outlining the idea (and indeed the storyline and

7    dialogue) for Superboy were later "published" in volume 101 of More Fun Comics;

8    (b) the submissions were done under the auspices of a "work for hire"; (c) the

---

10       [4]  Notably, the related doctrine of res judicata (or claim preclusion) has no
application in this case given the claim for terminating prior copyright grants
11   contained in the 1976 Act did not exist at the time of the Westchester action.  See
Marvel Characters, Inc. v. Simon, 310 F.3d 280, 287-88 (2nd Cir. 2002).  In
12   Simon, the publisher argued that the co-creator of the late Captain America was
barred, as a matter of res judicata, from exercising his termination right under the
13   1976 Act because, in a settlement agreement reached between the parties during
a prior action in New York state court in the 1960s, the co-creator acknowledged
14   his contribution was done as work for hire.  According to the publisher, there was
"no meaningful distinction between the authorship issue raised in the prior action
15   and the termination right at issue."  Id. at 286.  The Second Circuit disposed of the
publisher's argument, commenting that neither "the termination right" contained in
16   the 1976 Act nor the relief requested in the current case (termination of a prior
valid grant of a copyright in one's creation) existed at the time of the prior state
17   court action.  Id. at 287.  The court did acknowledge, however, that although res
judicata could not bar the co-creator from exercising the claim to terminate rights
18   under the 1976 Act, principles of collateral estoppel (or issue preclusion) may still
apply to bar litigation of certain issues that were actually decided in the prior
19   action, including whether the co-creator's contribution to the comic was done as a
work for hire:
20

21
         Marvel also argues, correctly, that despite the
22       enactment of the 1976 Act, the 1909 Act governs the
         authorship of the Works at issue here.  However, it
23       does not follow, as Marvel suggests, that since the
         Work's authorship was at issue in the previous actions,
24       Simon's termination claim is precluded here.  While
         Simon's assertion of authorship is the sine qua non of
25       both his prior claim to renewal rights and his present
         claim to termination rights, it is merely an issue that
26       determines the validity of each claim.

27

28   Id. at 288 (emphasis in original).

1  submissions are nothing more than a derivative work based upon Superman with

2  no original copyrightable elements contained therein; and (d) Siegel is the sole

3  author of the work or whether the work is a "joint work" containing Siegel's storyline

4  and Shuster's illustrations.

5  Ultimately, the Court concludes that, in conformity with the March 24, 2006,

6  Order, the referee's findings must be given preclusive effect, but as a matter of

7  collateral estoppel rather than judicial estoppel; however, contrary to the March 24,

8  2006, Order, those findings are not necessarily determinative of all the issues

9  specified above, but require independent application of the governing body of

10  copyright law to those findings to render a decision about the same.

11  ### I.    ARE THE REFEREE'S VACATED FINDINGS

12  ### BINDING AS A MATTER OF JUDICIAL ESTOPPEL?

13  In the process of passing on the plaintiffs' motion for partial summary

14  judgment, the Court's March 24, 2006, Order held that the referee's vacated

15  findings should be given preclusive effect on account of defendants' predecessors

16  taking an inconsistent position as to those findings' binding nature during the 1970s

17  Superman litigation in the Second Circuit:

18  Defendants' current argument that Judge Young's
   findings are not binding contradicts the position taken by
19  their predecessors in interest in the 1973 litigation and
   the 1974 Second Circuit appeal regarding Superman. In
20  applying the doctrine of res judicata in favor of
   defendants, Judge Lasker precluded, and the Second
21  Circuit affirmed, plaintiffs from litigating the issue of
   ownership of the renewal period of the Superman
22  copyrights.

23  Having relied on Judge Young's findings for
   previous favorable determinations regarding Superman,
24  defendants now take the inconsistent position that this
   Court is not bound by the state court findings, as they
25  relate to Superboy. Defendants attempt to raise
   genuine issues of material fact, where the facts were
26  clearly determined by Judge Young after the opportunity
   to take evidence and hear testimony on that evidence
27  from the parties directly involved in creating this
   relationship.

28

Contrary to defendants' assertions now, both the

1
2
3

> Southern District of New York and the Second Circuit
> looked directly to, even citing to, Judge Young's findings
> of fact. This Court holds that it is consistent to continue
> this position and will look to Judge Young's findings as
> binding where relevant.

4  (Decl. Marc Toberoff, Ex. A at 9-10).  Although not explicitly using the term, the

5  Court's March 24, 2006, Order clearly invoked the doctrine of judicial estoppel.  The

6  Order specifically pointed to the fact that defendants' predecessor had sought to

7  utilize the preclusive effect of the referee's vacated findings in connection with the

8  1970s Superman litigation and noted that such a position is fundamentally

9  inconsistent with their present position that those same findings have no preclusive

10  effect with respect to Superboy.  Such a concern — preventing parties from seeking

11  to take inconsistent legal positions in subsequent proceedings from those taken in

12  earlier ones — is the hallmark feature of judicial estoppel.  See New Hampshire v.

13  Maine, 532 U.S. 742, 749-750 (2001); Rissetto v. Plumbers & Steamfitters Local

14  343, 94 F.3d 597, 600 (9th Cir. 1996).  As one respected treatise noted, "Judicial

15  estoppel is an equitable concept  intended to prevent the perversion of the judicial

16  process.  It is to be applied where intentional self-contradiction is being used as a

17  means of obtaining unfair advantage."  18 JAMES WM. MOORE, MOORE'S FEDERAL

18  PRACTICE § 134.30 at 134-63 to 134-64 (3rd ed. 2006) (internal quotation marks

19  and citations omitted).

20      That the doctrine is equitable in nature does not mean its application is

21  unlimited.  The Supreme Court has set out three questions to guide a court's

22  decision whether to apply the doctrine in a given case:  (1) Is the party's later

23  position clearly inconsistent with its earlier position?; (2) Did the party succeed in

24  persuading a court to accept its earlier position?; and (3) Would the party derive an

25  unfair advantage or impose an unfair detriment on the opposing party were the

26  court to allow it to pursue its now inconsistent position?  New Hampshire, 532 U.S.

27  at 750-51.

28      Applying this test here, the Court readily finds that defendants' present

1  position is clearly inconsistent with the one taken in the 1970s Superman litigation.

2  Defendants unquestionably sought to have the federal courts in that litigation bar

3  Siegel and Shuster's claim to the renewal rights to the Superman copyright by

4  reference, in part, to the referee's vacated findings.  Now they argue that those very

5  findings have no preclusive effect.  The first factor, therefore, weighs in favor of

6  application of judicial estoppel.

7       The second factor, whether defendants succeeded in having those courts

8  accept their position, is more problematic.  Although at least one of those courts did

9  conclude that the referee's vacated findings were binding, see 364 F. Supp. at

10  1035; the difficulty lies in the fact that this particular legal point was not material to

11  the outcome in the case.  Given that the referee's vacated findings and the parties'

12  final consent judgment were consistent with one another as to the ownership of

13  Superman, the federal courts during the 1970s Superman litigation were not called

14  upon to take a position, one way or the other, over the legally binding nature of the

15  referee's vacated findings separate and apart from the parties' final consent

16  judgment.  Both the findings and the consent judgment supported those courts'

17  decisions that defendants were the owners of the renewal term to the Superman

18  copyright.

19       Here, in contrast, the separate legally binding nature of the referee's vacated

20  findings is very much in dispute because those findings are in direct conflict with the

21  parties' final consent judgment over the ownership rights to Superboy.  In light of

22  the fact that the federal courts in the earlier Superman litigation did not have to

23  accept (and one in fact did not accept) defendants' earlier inconsistent position in

24  order to rule in defendants' favor in the manner in which they did, it is hard to

25  fathom how allowing defendants to now take a contrary position in this litigation

26  somehow operates to create the perception that either of the courts deciding the

27  1970s Superman litigation, or this Court for that matter, have been misled through

28  defendants inconsistent positions.  See New Hampshire, 532 U.S. at 750 (noting

1   that result sought to be avoided by second factor is the creation of "the perception

2   that either the first or the second court was misled"). As one court explained:

3        [J]udicial estoppel is an "extraordinary remed[y] to be
invoked when a party's inconsistent behavior will

4        otherwise result in a miscarriage of justice." It is not
meant to be a technical defense for litigants seeking to

5        derail potentially meritorious claims, especially when the
alleged inconsistency is insignificant at best and there is

6        no evidence of intent to manipulate or mislead the
courts. Judicial estoppel is not a sword to be wielded by

7        adversaries unless such tactics are necessary to "secure
substantial equity."

8

9   Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 365 (3rd Cir.

10   1996).

11        The third factor weighs against application of judicial estoppel for much the

12   same reason. No miscarriage of justice or substantial inequity would take place

13   from allowing defendants to now take a position inconsistent with that taken during

14   the 1970s Superman litigation precisely because the prior contrary position was

15   itself immaterial to the outcome in those prior proceedings. See New Hampshire,

16   532 U.S. at 750-51 ("Absent success in a prior proceeding, a party's later

17   inconsistent position introduces no 'risk of inconsistent court determinations' and

18   thus poses little threat to judicial integrity"). No matter how the federal courts in the

19   Superman litigation parsed the matter, be it pursuant to the referee's vacated

20   findings, the parties' final consent judgment, or both, the conclusion reached would

21   be the same: Defendants were the owners to the renewal term to the Superman

22   copyright. It is not inequitable to allow defendants to now take a position

23   inconsistent with one taken in a prior litigation if the conclusion reached in that prior

24   litigation would have been the same regardless of the defendants' advocated

25   position.

26        Judicial estoppel is guided by pragmatic considerations geared towards "the

27   facts of the particular dispute in mind"; it is not meant as "a set of hard and fast

28   rules that might be circumvented by a clever litigant, on the one hand, or serve as a

1  trap for an unwary litigant, on the other." 18 JAMES WM. MOORE, MOORE'S FEDERAL

2  PRACTICE § 134.31 at 134-72 (3rd ed. 2006). Just because defendants took an

3  inconsistent position in the past on a point that was not material to the outcome of

4  that litigation does not mean they are bound to that position forevermore.

5  Accordingly, the Court finds the March 24, 2006, Order's reliance on the doctrine of

6  judicial estoppel is misplaced.

7  ## II. ARE THE REFEREE'S VACATED FINDINGS BINDING

8  ## AS A MATTER OF COLLATERAL ESTOPPEL?

9  This leaves whether the referee's vacated findings are binding through

10  operation of collateral estoppel.

11  Federal courts must give a state court judgment the same preclusive effect

12  as would be given to that judgment "under the law of the State in which the

13  judgment was rendered." Migra v. Warren City Sch. Dist. Bd. of Ed., 465 U.S. 75,

14  81 (1984); see also Marrese v. American Academy of Orthopaedic Surgeons, 470

15  U.S. 373, 380 (1985) ("a federal court should determine the preclusive effect of a

16  [earlier] state court judgment [through reference] to the law of the State in which

17  judgment was rendered"); Pension Trust Fund v. Triple A Mach. Shop, 942 F.2d

18  1457, 1460 (9th Cir. 1991) (examining California law for purposes of determining

19  res judicata effect of an earlier California state court judgment). Thus, in

20  determining the preclusive effect of the vacated findings from the 1948 Westchester

21  action, the Court must look to New York law.

22  Under New York law, collateral estoppel applies when (1) the identical issue

23  was raised in a previous proceeding; (2) the issue was actually litigated and

24  decided in the previous proceeding; (3) the party had a full and fair opportunity to

25  litigate the issue; and (4) the resolution of the issue was necessary to support a

26  valid and final judgment on the merits. See Mercantile & General Reinsurance Co.

27  v. Colonial Assurance Co., 147 Misc.2d 804, 805-806 (N.Y. Sup. Ct. 1989)

28  ("Collateral estoppel . . . requires that there have been a final, binding

1    determination in a prior action in which there was a full and fair opportunity to

2    litigate the issue involved"); see also Marvel, 310 F.3d at 288-89 (setting forth the

3    above elements for collateral estoppel under New York law).  The result achieved

4    through invocation of collateral estoppel is to prevent parties or their privies, such

5    as defendants in this case, from re-litigating in a subsequent action an issue of fact

6    or law that was fully and fairly litigated in a prior proceeding.

7        Defendants position on this point is fairly straightforward:  The referee's

8    findings were vacated by the parties' May, 19, 1948, stipulation and the subsequent

9    entry of the final consent judgment; with this vacatur, so too lapsed the binding

10   effect of the referee's findings because no final judgment was left in place to

11   enforce.  Defendants correctly note that, under New York law, a judgment that has

12   been vacated loses its preclusive effect.  See Ruben v. American and Foreign Ins.

13   Co., 592 N.Y.S.2d 167, 169 (N.Y. App. Div. 1992) ("Because the judgment was

14   vacated, the jury verdict lacks finality and cannot be given collateral estoppel

15   effect"); Church v. New York State Thruway Authority, 791 N.Y.S.2d 676, 679 (N.Y.

16   App. Div. 2005) ("when the judgment is subsequently vacated, collateral estoppel is

17   inapplicable"); see also Universal City Studios, Inc. v. Nintendo Co., 578 F.Supp.

18   911, 919 (S.D.N.Y. 1983) ("A judgment that has been vacated, reversed, or set

19   aside on appeal is thereby deprived of all conclusive effect, both as res judicata and

20   as collateral estoppel").

21       That said, courts outside of New York have recognized an exception to this

22   rule and have given preclusive effect to vacated judgments if those judgments were

23   the product of a trial and there is a significant lapse of time between the

24   proceedings.  See Aetna Casualty & Surety Co. v. Jeppeson & Co., 440 F. Supp.

25   394, 405 (D. Nev. 1977); Angstrohm Precision, Inc. v. Vishay Intertechnology, Inc.,

26   567 F. Supp. 537, 541 (E.D.N.Y. 1982) (construing Virginia law); see also Ringsby

27   Truck Lines v. Western Conference of Teamsters, 686 F.2d 720, 722 (9th Cir.

28   1982) (noting that the answer to whether to give preclusive effect to a trial court's

1  judgment after the parties settle the case while the matter is on appeal "may be

2  different in different cases as equities and hardships vary the balance between the

3  competing values of right to relitigate and finality of judgment" citing RESTATEMENT

4  (SECOND) OF JUDGMENTS § 28 (1982)).

5      There appears to be no authority conclusively determining whether such an

6  exception exists under New York law. In one New York state case, Mercantile &

7  General Reinsurance Co. v. Colonial Assurance Co., 147 Misc.2d 804 (N.Y. Sup.

8  Ct. 1989), the court did, however, make mention of the possibility of giving such

9  preclusive effect to vacated judgments in circumstances not all that different from

10  those in this case.

11      Then Justice (now federal district court judge) Harold Baer, Jr., issued a

12  comprehensive ruling examining the very question now in dispute in this case. In

13  Mercantile, a reinsurer sought a declaratory judgment that it was not bound to

14  provide reinsurance with respect to certain insurance policies. Id. at 805. The

15  reinsurer's obligations had been previously litigated in a prior New York state court

16  action involving the same insurance and reinsurance contracts, which resulted in

17  the grant of partial summary judgment against it. Id. While the matter was on

18  appeal the parties settled. Id. As an element of the settlement, the trial court

19  issued an order vacating the judgment and sealing the record. Id.

20      The question before Justice Baer was whether the vacated judgment from

21  the prior action collaterally estopped the reinsurer from seeking to relitigate those

22  issues in the case before him. He began his analysis by noting the general rule

23  that "a judgment that has been vacated will not provide a basis for collateral

24  estoppel." Id. at 806. The court then noted that some courts outside of New York,

25  while recognizing this general rule, had recognized that it may not "apply when the

26  vacatur has occurred after 'the expenditure of the court's resources in a jury trial.'"

27  Id. at 807. Although the expenditure of such judicial resources had not occurred in

28  the case before him, Justice Baer nonetheless chose to address the question,

explaining that it appeared to be one of "first impression" under New York law. Id.

In examining this question Justice Baer recognized that competing considerations affected the analysis. On the one hand, weighing in favor of continuing to afford preclusive effect to the vacated judgment, was the public's interest in the conservation of judicial resources. The more "resources of a hard-pressed judicial system [are] expended in resolving a matter," the more significant this factor becomes in preserving the results generated by that system. Id. at 808.

On the other hand, weighing against giving preclusive effect to a vacated judgment, is not only the private interest expressed by the parties themselves not to be bound by that judgment, but the court's similar conclusion in the prior action as well. As Justice Baer observed, "[h]ad the judge wished to allow preclusion, he could have dismissed [the case] rather than vacat[ing the findings as well]." Id. at 808. Additionally, there is the public interest in facilitating settlement by the parties, an interest which would be undermined if the effects of such settlement (notably, the agreement to vacate earlier court orders) was negated. Id. at 809 ("There M&G gave up its appeal on the basis of the settlement. It did so in reasonable reliance on the basic principle that a vacated judgment is of no effect"). The negative result of undermining the ability of parties to effectively settle their disputes would also spill over into parties litigating every possible issue in any "case in which there was any chance of a later suit."

> Every move possible and every countermove imaginable would become imperative. Every appealable ruling would have to be appealed. The system--and therefore the public interest--would suffer from this increase in the volume and ferocity of litigation.

Id. at 809.

In the end, Justice Baer returned to where he began his analysis, finding that none of the "exceptional circumstances" that may weigh in favor of giving preclusive effect to a vacated judgment existed in the case before him. The expenditure of judicial resources in the prior action was limited, as the prior

1    judgment was entered as a result of a partial summary judgment motion, not a trial.

2    Id. at 809-810. Moreover, given the relatively short gap in time between the two

3    proceedings, critical evidence (be it testimonial or documentary) still remained

4    available. Id. For these reasons Justice Baer left it for another occasion whether to

5    "carve out an exception to the rule that the vacatur of a judgment is not a

6    meaningless act for the purposes of issue preclusion." Id. at 809.

7         Despite defendants' protestations to the contrary, Justice Baer did not

8    find that under no set of circumstances could the general rule against affording

9    preclusive effect to vacated judgments give way. Justice Baer expressly left open

10   the possibility that an exception may exist where certain circumstances were

11   present. Id. at 810. The Mercantile court's decision not to categorically foreclose

12   application of collateral estoppel to vacated judgments is consistent with the

13   recognition in New York law that application of collateral estoppel is not a rigid and

14   inflexible concept, but one which produces varied results in different cases based

15   on how particular circumstances in those case tilt the equities and/or hardships.

16   See Juan C. v. Cortines, 89 N.Y.2d 659, 667 (1997) (describing collateral estoppel

17   as a "equitable doctrine" that is "grounded on concepts of fairness and should not

18   be rigidly or mechanically applied"). Such recognition is reflected by a long line of

19   New York cases citing approvingly to section 28 of the Restatement (Second) of

20   Judgments which allows courts to avoid applying the collateral estoppel doctrine

21   when otherwise warranted if special circumstances exist.[5] This is the very section

22   that the Ninth Circuit in Ringsby described as epitomizing the principal under

23   collateral estoppel that the "answer may be different in different cases as equities

24   and hardships vary the balance between the competing values of right to relitigate

25   and finality of judgment." 686 F.2d at 722. Thus, after Mercantile, there remains

26   _____

27   [5]  See Hodes v. Axelrod, 70 N.Y.2d 364 (1987); Juan C. v. Cortines, 89
     N.Y.2d 659 (1997); Augustine v. Sugrue, 779 N.Y.S.2d 515 (2004); People v.
28   Roselle, 602 N.Y.S.2d 50 (1993); Goldstein v. Consolidated Edison Co. of New
     York, Inc., 462 N.Y.S.2d 646 (1983).

1  the possibility that a vacated judgment could be afforded preclusive effect if

2  exceptional circumstances are present to warrant it. See Mercantile,147 Misc.2d at

3  810 (observing that whether such an exception should apply in a future case "may

4  well require consideration of factors that the parties have not briefed or discussed

5  and that might necessitate reflection not available to me as this trial approaches"

6  (citing Ringsby)).

7       The exceptional circumstances noted in Mercantile are present here.

8  Mercantile approvingly noted the district court decisions in Aetna and Angstrohm as

9  worthy exemplars of when application of such an exception is warranted. In both

10  cases, a judgment was entered after a trial, the judgment was later vacated by the

11  court after the parties reached a settlement, and, at least in Aetna, a significant

12  period of time (more than eight years) then passed before a separate proceeding

13  was instituted where the preclusive effect of the earlier vacated judgment became

14  an issue. Here, the vacated referee's findings were made following a trial that was

15  conducted more than sixty years ago; all of the material witnesses to the

16  transactions in question are now deceased; and some of the documents from that

17  time are now lost. These facts fundamentally alter the balance of interests

18  observed in Mercantile.

19       Failure to give preclusive effect to the referee's vacated findings here would

20  seriously compromise the conservation and efficient use of judicial resources. The

21  referee's findings were tendered after that court's expenditure of numerous

22  resources in conducting a trial, listening to testimony, parsing over the record, and

23  then rendering a judgment. All of those hard-pressed resources will simply be

24  squandered were the Court not to afford those findings preclusive effect. This by

25  itself, however, would probably not be enough to give preclusive effect to the

26  referee's findings. See Ruben, 592 N.Y.S.2d at 171 (refusing to afford collateral

27  estoppel effect to a vacated judgment that had been tendered following a trial and a

28  verdict returned by a jury). But there is more: Absent reliance on the referee's

24

1  vacated findings, the lengthy passage of time since the trial and decision would

2  seriously threaten the reliability of any judgment handed down in the present case.

3  To believe that the factual issues actually litigated before the referee in the 1947

4  Westchester action could be relitigated in the present proceeding without a

5  significant degradation of the reliability of the conclusions reached in this

6  proceeding would give this Court and the parties' counsel too much credit.  Here, all

7  the Court has is some, but not all, the documents from the relevant period;

8  additionally, there are no witnesses who could testify to give life and context to

9  those documents still in existence.  Some of the copyright questions under

10  examination in this proceeding will require much more understanding than a partial

11  paper trial could provide.  Understanding the meaning of a document is oftentimes

12  the product of much more than simply looking at its words; live witness testimony

13  provides color, understanding, and context of the document's existence and

14  meaning.  The only court with the opportunity to assess the credibility of such live

15  testimony in connection with this legal dispute was presided over by the referee in

16  the Westchester action.  To refuse to afford the findings the referee made after

17  consulting all the documents, and hearing all the live testimony on the topic would

18  to be to deprive the record of the permutations, nuances, and subtleties those

19  witnesses' recollections placed on the meaning of those documents now brought

20  before this Court to examine.  If the eight-year gap in Aetna was sufficient to

21  warrant a finding that exceptional circumstances existed to give preclusive effect to

22  a vacated judgment due to the "dimmed" memories of those witnesses who could

23  still be found and the loss of documents that occurred in the interim, 440 F. Supp.

24  at 405, a sixty-year gap certainly suffices.

25        All that defendants can point to in rebuttal is that the parties bargained for

26  wiping the evidentiary slate clear, replacing it with their settlement agreement and

27  the final consent judgment.  Admittedly, this fact does weigh against giving

28  preclusive effect to the referee's findings, but the significance of the parties'

25

1    expectations is diminished by the particular concerns implicated in this case.  To fail

2    to give preclusive effect to the referee's findings in a case with such a lengthy gap

3    between proceedings may very well make it extremely difficult, if not impossible, to

4    create any reliable findings in the present litigation over plaintiffs' attempt to

5    terminate the grants conferred to defendants shortly after those referee's findings

6    were made.  See Aetna, 440 F. Supp. at 405.  Focusing solely on the parties'

7    expressed intent as the lodestar for deciding whether collateral estoppel applies or

8    not in this case would be to place the thumb too heavily on the side of the scale

9    against preclusion without sufficiently taking account of the serious concerns that

10   have arisen weighing in favor of preclusion due to the passage of time since the

11   Westchester action took place.

12        This leads to another significant issue:  The scope of the parties' private

13   interest.  Although it is undoubtedly true that the parties sought to avoid giving the

14   referee's vacated findings preclusive effect, it must be remembered the context in

15   which that private interest was expressed.  The parties' sought to bar the further

16   relitigation of claims relating to the scope of the grant itself to Superman's and

17   Superboy's copyright (the ownership question); the stipulation and consent

18   judgment served to end further debate on that point.[6]  See Siegel, 508 F.2d at 913

19

20        [6] The parties' consent judgment would not have estopped further litigation
21   of the issues related to the ownership question, such as work for hire status, etc.,
     because neither the consent judgment nor the stipulation contain any findings with
22   respect to those issues; instead, the consent judgment simply declares that
     Detective Comics was the sole and exclusive owner of Superman and Superboy,
23   and leaves it at that.  See Marvel, 310 F.3d at 289 ("where a stipulation of
     settlement is 'unaccompanied by findings,' it does 'not bind the parties on any
24   issue . . . which might arise in connection with another cause of action.  Here,
     although the Settlement Agreement contained detailed findings on the authorship
25   issue, neither of the stipulations filed in the Prior Actions contain any specific
     findings as to whether Simon authored the Works independently or whether the
26   Captain America character was created as a work for hire.  Nor do the stipulations
     reference the Settlement Agreement in any way.  Therefore, the stipulations do
27   not collaterally estop Simon from litigating the issue of authorship underlying his
     termination claim in this action").
28

1  (noting that effect of parties' stipulation and final consent judgment was to "finally

2  determine[] that Detective . . . owned all rights to Superman without limitation").

3  Neither side, however, had any inkling of the existence of the current copyright

4  claim at issue in this case — namely, the 1976 Act's creation of the right to

5  terminate grants to copyrights.  Reference to the private parties' interest as a

6  means to defeat giving preclusive effect to the referee's vacated findings in this

7  case, therefore, would be to stretch the parties' intentions to cover the litigation of

8  issues in a cause of action (the termination of ownership) they themselves had no

9  idea would exist or that they even sought to safeguard against.  Cf. Marvel, 310

10 F.3d at 288 (refusing to afford res judicata to parties' earlier pre-1976 Act

11 settlement agreement concerning nature of grant of copyright in subsequent suit

12 seeking to litigate termination of that grant).

13        Undoubtedly some of the factual questions considered in the present effort

14 to terminate the grant of rights to the Superboy copyright will touch upon the same

15 facts as litigated in the state action over ownership to that same copyright.

16 Nonetheless, the point remains that those issues are brought in the context of a

17 legal right that was not conferred until decades later in the 1976 Act.  Without giving

18 preclusive effect to the referee's vacated findings in this case, the right Congress

19 sought to give to artists and their heirs would be seriously (if not, fatally)

20 undermined simply through the passage of time, leaving in its wake nothing but a

21 partial documentary record, uncolored or given context by live testimony,

22 concerning factual questions critical in exercising that right to terminate prior grants.

23 Again, there are no detailed findings contained in the parties' stipulation or final

24 consent judgment to which the Court could otherwise defer, leaving the evidentiary

25 slate clean in this case save for the referee's vacated findings.

26        Indeed, the concern with the passage of time is invariably present with the

27 exercise of the termination rights conferred by the 1976 Act; through passage of

28 section 304 Congress effectively resurrected ownership to copyrights that had

1  otherwise long ago been thought to belong to the publisher since the Supreme

2  Court's 1943 decision in <u>Fred Fisher Music</u>.  Here, concerns with the effectiveness

3  of the 1976 Act termination remedy are alleviated to some extent with the presence

4  of the referee's vacated findings.  Those findings essentially encapsulate the

5  perception and recollection of the key participants to many of the factual questions

6  now at issue in this case.  This point is important to keep in mind as it further

7  diminishes the weight of the interest against giving preclusive effect to the referee's

8  findings.

9        When the private interest of the parties from the Westchester action is

10  compared to the substantial concerns weighing in favor of continuing to give

11  preclusive effect to the referee's vacated findings — preventing the loss of the

12  considerable judicial resources expended in the Westchester action that will

13  otherwise not be effectively replicated in the present proceeding with as much

14  assurance as the prior proceeding due to the loss of critical witnesses and

15  documents over the ensuing sixty year period — it is clear to this Court that

16  exceptional circumstances exist to give continuing preclusive effect to the referee's

17  findings despite their later vacatur.

## III. INTERSECTION OF COLLATERAL ESTOPPEL DOCTRINE
## WITH CONCEPTS UNIQUE TO COPYRIGHT LAW

20        Although the vacatur of the referee's findings does not, <u>ipso facto</u>, defeat

21  treating those findings as an estoppel, there remains a complicating wrinkle that

22  affects the scope and contours of the estoppel effect of those findings — the

23  longstanding Congressional grant of exclusive jurisdiction over copyright to the

24  federal courts.  <u>See</u> 28 U.S.C. § 1338(a) ("The district courts shall have original

25  jurisdiction of any civil action arising under any Act of Congress relating to . . .

26  copyrights . . . .  Such jurisdiction shall be exclusive of the courts of the states in . . .

27  copyright cases"); <u>see also</u> 28 U.S.C. §§ 41(7), 371(5) (repealed).  This legal reality

28  is important to this case as a number of the issues that must be addressed in

determining the validity of the Superboy termination notice are unique to federal

copyright — specifically, whether the copyrightable material, if any, contained in

Siegel's Superboy submissions was ever "published," done as a "work for hire,"

done as a "joint work" with Shuster, or as "derivative work" of Superman.

To begin, there is little question that state law matters are inextricably

intertwined with many of the issues that arise in copyright disputes, whether it be

matters involve the interpretation of contracts or concern the legal effects flowing

from the formation of various business associations.  It is well-established in the

case law that state courts can determine matters of state law, the subject of which

is a copyright, and federal courts must afford preclusive effect to those findings,

even if giving such preclusive effect impacts, in whole or in part, consideration of

matters peculiar to copyright law. See Vanderveer v. Erie Malleable Iron Co., 238

F.2d 510, 513 (3rd Cir. 1956) ("Although the bringing of actions arising under the

patent laws is admittedly restricted to the federal courts, it has long been

established that actions brought to enforce contracts of which a patent is the

subject [may] . . . be brought in the state courts.  The Supreme Court has held that

a state court is empowered to determine questions, as distinguished from cases,

arising under the patent laws, . . . and the court has given no indication that the

conclusive effect between the parties of the determination of these questions is to

be limited to the state courts"); T.B. Harms Co. v. Eliscu, 339 F.2d 823, 826 (2nd

Cir. 1964) ("copyright has not been thought to infuse with any national interest a

dispute as to ownership . . . turning on the facts or on ordinary principles of contract

law"); Knickerboker Toy Co. v. Faultless Starch Co., 467 F.2d 501, 509 (C.C.P.A.

1972) ("Although 28 U.S.C. § 1338(a) provides that the federal district courts'

original jurisdiction over copyright actions 'shall be exclusive of the courts of the

states,' the state courts clearly may pass on the validity of a copyright . . . in the

course of deciding a case over which they do have jurisdiction"); Murphy v.

Gallagher, 761 F.2d 878, 886 (2nd Cir. 1985) (giving preclusive effect to state court

1  resolution of the dissolution of a corporation even though such resolution
2  conclusively determined later federal securities fraud claim); Jasper v. Bovina
3  Music, Inc., 314 F.3d 42, 46 (2nd Cir. 2002) ("if the case concerns a dispute as to
4  ownership of a copyright, and the issue of ownership turns on the interpretation of a
5  contract, the case presents only a state law issue"); see also Note, The Collateral
6  Estoppel Effect of Prior State Court Findings in Cases Within Exclusive Federal
7  Jurisdiction, 91 HARV. L. REV. 1281, 1285 (1978) (noting that exclusiveness of
8  federal jurisdiction does not upset "the interests of the state courts in the integrity of
9  their findings on matters of state law within the normal sphere of their
10 competence").

11      That said, a state court's direct findings on matters peculiar to copyright law
12 itself would not be entitled to preclusive effect, either because such findings are not
13 necessary to the resolution of the case or, if necessary, then the state court's
14 finding exceeds its jurisdiction.[7] See Note, 91 HARV. L. REV. at 1287 ("[F]ederal
15 courts should give preclusive effect to state determinations of state questions
16 pleaded in the complaint, even if such issues arise in a subsequent action within
17 exclusive federal jurisdiction.  No preclusive effect, however, should be given to
18 state court determinations of federal [questions] arising under laws whose
19 enforcement is within the exclusive jurisdiction of the federal courts").  Nor should a
20 state court's findings on matters of state law be neatly and uncritically translated
21 verbatim as a finding on a legal concept unique to copyright law simply because it
22 used the same phrase as the concept in question.  See Music Sales Corp. v.
23 Morris, 73 F.Supp.2d 364, 377-78 (S.D.N.Y. 1999) ("Finally, the issues raised in this
24 dispute and in the 1989 [state court l]itigation are different and are governed by
25 different principles of law. This difference violates the estoppel requirement that the

26  _____

27      [7] This principle would not, however, hold true of state court decisions
    concerning unpublished material made during the time the 1909 Act was effective.
28 Such "copyright" decisions were expressly left by the 1909 Act for state courts to
    determine under the common law.

1  issues be identical in <u>fact and law</u>.  In the first action, Morris and the Strayhorn

2  Estate, then plaintiffs, sought, inter alia, the rescission of the 1962 Agreement and

3  1965 Amendment based upon Tempo's nonperformance.  They did not raise the

4  terminability or invalidity of those contracts under copyright law, the issues raised in

5  this dispute. These different issues are governed by entirely different law. Issues

6  are not identical where the statutes, legal principles, or legal standards governing

7  them differ — even when the different issues rest on the same facts" (emphasis in

8  original)).  However, even in such situations where a state court's proper and

9  legitimate findings necessarily impact a matter of peculiar copyright law, those

10  factual findings by the state court, save for the ultimate legal conclusion on a matter

11  exclusively of copyright law, are entitled to preclusive effect.  <u>See</u> Note, 91 HARV. L.

12  REV. at 1289 ("the federal court can give preclusive effect only to those specific

13  findings which can be deduced from the state mixed finding of fact and law").

14        The present case and that decided in the Westchester action concern

15  discrete and separate legal claims:  The latter involved state law claims for

16  misappropriation of property while the former involves federal copyright claims.  To

17  be sure, these claims have significant factual overlap, but the resolution of the legal

18  claims in the Westchester action are not necessarily determinative of the purely

19  copyright legal claims in the present action.

20        The best illustration of this point is the Supreme Court's decision in <u>Becher v.</u>

21  <u>Contoure Laboratories, Inc.</u>, 279 U.S. 388 (1929).  In that case, Becher, a

22  machinist, was employed to construct Oppenheimer's invention as well as the

23  improvements he made to his invention from time to time.  As part of his

24  employment, Becher agreed to keep secret and confidential the information he

25  obtained from his employment and to not use it for his own benefit or for that of

26  anyone else.  Contrary to his employment agreements, Becher obtained a patent

27  for himself based on information he learned from making instruments for

28  Oppenheimer.  Oppenheimer obtained a judgment in a state court suit against

1  Becher for breaches of contract and fiduciary duty, that determined that Becher's

2  attainment of the patent was without Oppenheimer's knowledge and was done "in

3  violation of his agreement" with Oppenheimer, and required Becher to, among other

4  things, deliver "an assignment of the . . . patent and give up instruments similar to

5  the invention." Instead of abiding by the state court judgment, Becher brought a

6  federal suit for patent infringement, arguing that the earlier state court judgment

7  should be disregarded because, if it was sustained, it would serve to establish the

8  invalidity of his patent, and questions concerning the validity of patents are

9  questions for the federal courts alone.

10      Justice Holmes, writing for a unanimous court, affirmed the lower court's

11  ruling that the state court determinations precluded relitigation of those factual

12  issues in the patent case in federal court. The opinion began by noting that the

13  validation of Oppenheimer's claims in state court did not arise under or require the

14  consultation of the patent laws, but were purely state law determinations

15  independent of patent. Id. at 391 ("Oppenheimer's claim was an undisclosed

16  invention which did not need a patent to protect it from disclosure by breach of

17  trust"). Turning to the argument that, in establishing Oppenheimer's state law claim

18  that a breach of fiduciary duty and a breach of contract occurred, the state

19  judgment necessarily invalidated Becher's patent, Justice Holmes reasoned that

20  the grant of exclusive jurisdiction "does not give sacrosanctity" to questions of fact

21  which might also be conclusive of the federal claim. Id. Again, the state court

22  proceedings addressed only state law matters "independent of the patent law." Id.

23  Though giving preclusive effect to the state court's factual findings led to the legal

24  conclusion of an invalid patent, "that is not the effect of judgment. Establishing a

25  fact and giving a specific effect to it by judgment are quite distinct." Id. "A fact is

26  not prevented from being proved in any case in which it is material, by the

27  suggestion that if it is true an important patent is void . . . ." Id. at 391-92.

28      The principle to be culled from Becher is that federal courts are to give

preclusive effect to earlier state determinations of state questions pleaded in the complaint, even if such state law issues arise in a subsequent action within the federal court's exclusive jurisdiction, like copyright or patent. Such estoppel, however, only operates as to the purely state law claims (and attendant facts) decided by the state court. A federal court cannot simply transplant a state court's finding as including the legal conclusions of the purely and exclusively federal issues before it; although in some instances, those state findings may prove "material" to the resolution of the exclusively federal law claim, such resolution of that federal question must involve the application of those state findings to the governing federal law on the topic in question before making the legal conclusion concerning the exclusively federal issues.

The boundaries established by the Supreme Court in <u>Becher</u> were highlighted in the Second Circuit's influential decision in <u>Lyons v. Westinghouse Electric Corp.</u>, 222 F.2d 184 (2nd Cir. 1955). There Westinghouse brought suit in state court arguing that Lyons had breached a contract "made with it as its agents for the sale of electric lamps." <u>Id</u>. at 185. Lyons interposed as a defense that the contract was unenforceable as it was the product of a conspiracy between Westinghouse and General Electric "to restrain competition in the marketing of such lamps" by requiring agents to "observe uniform price schedules" and prohibiting them "from competing among each other," all in violation of the federal anti-trust laws. <u>Id</u>. at 186. After a trial, the state court found the federal defense without merit and awarded judgment to Westinghouse. While the matter was on appeal, Lyons filed an action in federal district court alleging the same conspiracy to violate the federal anti-trust laws. The district court stayed the federal proceedings pending resolution of the state appeal. The Second Circuit granted Lyons a writ of mandamus and ordered the district court to vacate the stay.

In granting mandamus relief, Judge Learned Hand, writing for the majority, made clear that, absent such relief, the state proceedings would be allowed to

1   culminate in final settlement of the matter, leaving Westinghouse "in a position to

2   plead the [state court] judgment as an estoppel, and, if it is successful, that will

3   dispose of the action at bar without a trial." Id. at 186.  Judge Hand explained that

4   such estoppel will "in substance" end the federal proceedings as it "will conclude

5   any future consideration of the existence of the conspiracy" upon which "all else

6   depends" for Lyons' federal suit. Id.  Such a result would thus threaten the

7   Congressional grant to federal courts of exclusivity over jurisdiction of the federal

8   anti-trust laws.  Acknowledging that the state court "had undoubted jurisdiction . . .

9   to decide the merits of" Lyons' defense, Judge Hand nonetheless reasoned that the

10  existence of exclusive federal jurisdiction over federal anti-trust claims required a

11  more limited preclusive effect be given to state court judgments when later litigating

12  such federal claims in federal court.  Towards that end, Judge Hand analyzed

13  Becher, and relying on section 71 of the Restatement of Judgments,[8] distilled the

14  following principal from the Supreme Court's decision: "[There is a] distinction . . .

15  between the finding of one of the constituent facts that together make up a claim

16  and the entire congeries of such facts, taken as a unit; an estoppel is good as to

17  the first but not as to the second." Id. at 188; see also Red Fox v. Red Fox, 564

18  F.2d 361, 365 n.3 (9th Cir. 1977) (citing with approval quoted proposition from

19  Lyons).  "The distinction between 'constituent' facts and 'congeries' of facts is

20  generally equated with the distinction between findings of fact and the application of

21  law to fact."  Note, 91 HARV. L. REV. at 1284.

22          This principal has found expression in modern cases' reliance on state laws

23  that deny giving preclusive effect to an earlier state court judgment where such

24  estoppel would be a bar to litigating a claim within the exclusive jurisdiction of the

25  federal courts.  See Marrese, 470 U.S. at 381-82 ("To be sure, a state court will not

26

27          [8]  That section provided that "[w]here a court has incidentally determined a
    matter which it would have had no jurisdiction to determine in an action brought

28  directly to determine it, the judgment is not conclusive in a subsequent action
    brought to determine the matter directly."

have occasion to address the specific question whether a state judgment has issue

or claim preclusive effect in a later action that can be brought only in a federal

court. Nevertheless, a federal court may rely in the first instance on state

preclusion principles to determine the extent to which an earlier state judgment bars

subsequent litigation. . . . a federal court can apply state rules of issue preclusion to

determine if a matter actually litigated in state court may be relitigated in a

subsequent federal proceeding"). Thus, courts have found that an earlier state

court judgment did not preclude litigation of issues within the exclusive jurisdiction

of federal courts because (citing to state law preclusion principles) of the lack of

identity between the state law claims and the federal ones at issue. See RX Data

Corp. v. Department of Social Servs., 684 F.2d 192, 197-98 (2nd Cir. 1982)

(refusing to afford preclusive effect from prior state court action because there was

a lack of identity of issues between the state and federal suits).

Collateral estoppel has also been found not to apply because (under state

law preclusion principles) the particular federal issue could not be addressed by the

state court (or, if it was, the state court's judgment was a nullity) as it was beyond

its jurisdiction. Id. at 198 (refusing to afford preclusive effect to earlier New York

Court of Claims decision because a claim for copyright infringement was beyond its

jurisdiction to decide). Indeed, the Supreme Court itself has noted that fresh

consideration of most issues peculiar to a matter of exclusive federal jurisdiction

would not be barred by earlier state court rulings that purported to address those

same issues, because the matter would lie beyond the state court's jurisdiction to

decide and hence not be entitled to preclusive effect under state law. See Marrese,

470 U.S. at 382 ("we note that claim preclusion generally does not apply where 'the

plaintiff was unable to rely on a certain theory of the case or to seek a certain

remedy because of the limitations on the subject matter jurisdiction of the courts.' If

state preclusion law includes this requirement of prior jurisdictional competency,

which is generally true, a state judgment will not have claim preclusive effect on a

1 cause of action within the exclusive jurisdiction of the federal courts").[9]

2 These same limits to collateral estoppel and related doctrines are present in

3 New York law.  See Gramatan Home Investors Corp. v. Lopez, 46 N.Y.2d 481, 485

4 (1979) (noting that collateral estoppel analysis of whether state court judgment is

5 entitled to preclusive effect is determined, in part, by whether there exists "a

6 judgment on the merits by a court of competent jurisdiction"); Mural Arts v.

7 Sonsandi, 82 N.Y.S.2d 153, 154-55 (N.Y. Sup. 1948) ("no judgment may be held to

8 be res judicata as to an issue over which there was no jurisdiction in the Court

9 rendering the judgment"); see also Accolla v. Ladestri, 1989 WL 129484 *2

10 (S.D.N.Y. Oct. 26, 1989) ("Under New York law, it is clear that 'a claim is not barred

11 by res judicata if the court in which the first action was brought lacked subject

12 matter jurisdiction to adjudicate the claim'").

13 In the final analysis, then, when confronted with the effect of a prior state

14 court judgment on the present litigation of an issue that is uniquely within the

15 exclusive jurisdiction of the federal courts, federal courts must focus on what the

16 particular matters at issue in the state suit were and analyze the potential preclusive

17 effect of that state court's judgment through that lens.  When viewed in this context,

18 many of the matters resolved by the state court will not address directly the unique

19 federal issues, leaving it to the parties in the federal suit to present evidence and for

20 the federal court to resolve the federal issue.  Although many of the state court's

21 findings may properly bear on the analysis of the federal issue, in the end, the

22 federal court's conclusion must be the product of the application of federal law to

23 those state court findings and any additional evidence properly considered by the

24 federal court.

25

26 [9] Again, the matter would be much more difficult if the Westchester action involved a state law that was a mirror image of federal copyright law or involved

27 ownership to unpublished material as such matters were generally left for state courts to resolve under the 1909 Act. Here, however, the parties suit concerned

28 state common law tort claims involving the alleged "wrongful publication" of Siegel's idea clearly implicating the governing body of federal copyright law.

Here, many of the conclusions contained in the Court's March 23, 2006,
Order were not the result of such a careful consideration and comparison of what
was (and what was not) decided in the state court to resolve the state law claims
there and of the federal questions at issue in the present case.  Instead, the
conclusions were the product of the Court simply treating (and then transcribing)
the referee's findings en masse (especially those that contained the same phrases
as those at issue in the present copyright matter), as if the Westchester action was
a copyright case that conclusively settled issues unique to copyright.  The Order's
analysis failed to apply the governing body of copyright law to the referee's findings
as is required under Lyons and the collateral estoppel doctrine under New York law.
Although the referee's findings are relevant to some of the copyright issues in this
case (most notably, whether Superboy was a work for hire), they are not wholly
dispositive.

The March 26, 2006, Order missteps near its beginning when it
characterizes defendants' arguments as an "attempt to relitigate issues determined
in the 1947 state court case," (Order at 6) suggesting that the copyright issues at
stake in the present litigation were litigated and resolved in the Westchester action.
This perspective is reflected in the Order's treatment of the previously mentioned
copyright issues.  For instance, the Order observes that the referee "specifically
determined that Detective Comics published the Superboy comic strip based upon
the idea, plan, and conception of Siegel, in a magazine entitled *More Fun Comics*."
(Order at 8).  Notably absent from the Court's analysis was any indication whether
such printing of the idea or concept of Superboy envisioned by Siegel necessarily
meant that Siegel's submissions themselves (as opposed to the general idea
embodied within) was published as a matter of federal copyright law, or whether
such printing of general ideas contained in an otherwise detailed submission is
sufficient to count as a publication.  Instead, the finding was accepted as if the
referee engaged in this detailed analysis in making that finding because the finding

1    contained the term "published." If that was what the referee did, he exceeded his

2    jurisdiction to do so.

3         When speaking of the joint work issue, the Order simply notes that the

4    referee found that Siegel was the sole originator and owner of Superboy, and

5    concludes that this finding means Superboy could not be a joint work. (Order at

6    14). Again, the Order does not apply governing federal copyright law to the

7    referee's findings so as to independently reach a conclusion whether Superboy was

8    a joint work nor does it examine the nature of the Westchester action to determine

9    what was being decided when the referee made that finding; instead, recitation of

10   the referee's finding alone is used to directly perform that function.

11        On whether Superboy is a derivative work of Superman, the Order simply,

12   without any analysis, states that litigation of such a question would be inconsistent

13   with the referee's findings that Siegel owned Superboy and the payment for the

14   subsequent transfer of the same per the parties' settlement agreement. (Order at

15   11-12).

16        Given all this, the Court finds defendants' motion for reconsideration of the

17   Order well taken. Accordingly, the Court turns its attention to determining whether

18   and to what extent the referee's vacated findings compel any conclusions as to the

19   peculiar federal copyright issues before it; specifically, whether those findings

20   impact the issues of whether Siegel's Superboy submissions were "works for hire,"

21   whether they were the product of a "joint authorship," whether they were

22   subsequently "published," and whether they were a "derivative work."

23   **A.    Work Made For Hire**

24        Under the 1976 Act, an author's (or his or her heirs') ability to terminate a

25   prior grant in the copyright to his or her creation does not apply to a "work made for

26   hire" because the copyright in such a creation never belonged to the artist in the

27   first instance to grant. See 17 U.S.C. § 304(c). This proscription naturally raises

28   the important question of whether Siegel's Superboy submissions were a "work

1  made for hire." If so, then Siegel's heirs cannot seek to terminate his earlier grant

2  of the Superboy copyright to defendants' predecessors in interest, such a grant

3  being merely a superfluous act that did not alter the pre-existing ownership rights to

4  that copyright. See Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554 (2nd Cir.

5  1995) ("Once it is established that a work is made for hire, the hiring party is

6  presumed to be the author of the work").

7       Resolution of this question, as with all the copyright questions presented in

8  this case, is controlled by the governing body of law in existence at the time Siegel

9  submitted his Superboy material to Detective Comics, that is, the 1909 Act and the

10  precedent developed thereunder. See Self-Realization Fellowship v. Ananda

11  Church, 206 F.3d 1322, 1325 (9th Cir. 2000) ("Because all of the copied works

12  were created before 1978, the Copyright Act of 1909 governs the validity of the

13  initial copyrights"); Twentieth Century Fox Film Corp. v. Entertainment Distributing,

14  429 F.3d 869, 876 (9th Cir. 2005) ("We first consider Twentieth Century Fox

15  Parties' infringement claims under the now repealed Copyright Act of 1909 because

16  Crusade in Europe was published before the . . . effective date of the 1976

17  Copyright Act").

18       The 1909 Act provided that, "[i]n the interpretation and construction of this

19  title[,] . . . the word 'author' shall include an employer in the case of works made

20  for hire." 17 U.S.C. § 26 (repealed). "Thus, with respect to works for hire, the

21  employer is legally regarded as the 'author,' as distinguished from the creator of the

22  work, whom Learned Hand referred to as 'the "author" in the colloquial sense.'"

23  Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of

24  Contemporary Dance, Inc., 380 F.3d 624, 634 (2nd Cir. 2004). Nowhere did the

25  1909 Act define what was meant by "work made for hire" or "employer"; only the

26  consequences flowing from such a designation were spelled out. The task of giving

27  meaning to these terms fell to the courts. The Ninth Circuit eventually formulated

28  the "instance and expense test" to determine whether a work is one made for hire

1    under the 1909 Act.  As explained by the Ninth Circuit:

2            [W]hen one person engages another, whether as
             employee or as an independent contractor, to produce a
3            work of an artistic nature, that in the absence of an
             express contractual reservation of the copyright in the
4            artist, the presumption arises that the mutual intent of
             the parties is that the title to the copyright shall be in the
5            person at whose instance and expense the work is
             done.

6

7    Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300 (9th Cir. 1965).  The

8    test sought to match the concept of a work made for hire with the purpose of the

9    Copyright Act.  As one court explained:  "[T]he law directs its incentives towards the

10   person who initiates, funds and guides the creative activity, namely, the employer,

11   but for whose patronage the creative work would never have been made.

12   Copyright law 'is intended to motivate the creative activity of authors . . . by the

13   provision of a special reward.'"  Estate of Hogarth v. Edgar Rice Burroughs, Inc.,

14   2002 WL 398696, at *19 (S.D.N.Y. March 15, 2002) (quoting Sony Corp. v.

15   Universal City Studios, Inc., 464 U.S. 417, 429 (1984)).  Toward that end, the

16   instance and expense test requires the evaluation of three factors:  (1) At whose

17   instance was the work prepared; (2) whether the hiring party had the power to

18   accept, reject, modify, or otherwise control the work; and (3) at whose expense was

19   the work created.  See Twentieth Century, 429 F.3d at 879, 881.  Such an inquiry is

20   a mixed question of law and fact.  See id. at 877.

21          Because such an inquiry requires the application of facts to the law, the

22   parties spar over whether the referee's vacated findings did (or could) conclusively

23   determine whether Siegel's Superboy submissions were a work made for hire.

24          Plaintiffs begin by arguing that the referee's finding that Siegel was the

25   "originator and sole owner" of Superboy conclusively establishes that his

26   submissions were not a work made for hire and that defendants are estopped from

27   seeking to relitigate that finding.  The Court disagrees.  Nowhere in his findings did

28   the referee once speak of work for hire (and plaintiffs, to their credit, acknowledge

1  that the referee "did not mention the phrase").  Certainly, the referee made findings

2  dealing with the parties' business and contractual relationship concerning Siegel's

3  Superboy submission, factual issues that touch upon the work made for hire

4  question, but that was as far as the referee went.  Whether those findings, when

5  applied to the governing body of law under the 1909 Act, establish that those

6  submissions were made as a work for hire is a question left for this Court to answer

7  in the first instance.

8         Perhaps the best and most important example of this point is found in the

9  Second Circuit's decision in Siegel.  One of the issues pressed by the parties in that

10  case was whether the referee's findings conclusively resolved the issue of whether

11  Superman was a work made for hire.  The district court found that it did because

12  the parties' business dealings demonstrated the "existence of an arrangement

13  going beyond an assignor-assignee relationship" to one more akin to a "classic

14  employment relationship."  364 F.Supp. at 1036.  In reaching this conclusion, the

15  district court pointed to the referee's findings that Siegel and Shuster were under a

16  contract of employment with Detective Comics at the time Superman was

17  published; that Detective Comics's required Siegel and Shuster to return their

18  original 1933 Superman material for revision and expansion before it could be

19  published in Action Comics; and that the resubmitted material constituted the

20  formula for the continuing Superman series.  See Id. at 1036-37.  The district court

21  further concluded that Siegel and Shuster were barred by res judicata from seeking

22  to relitigate the factual basis of the work made for hire question.  Id. at 1037.

23         For its part, the Second Circuit disagreed with the district court's invocation

24  of res judicata.  The court of appeals noted that, "[w]hile it is evident that the state

25  court concluded as a matter of law that the plaintiffs conveyed all their rights in

26  Superman to the defendants," there was "no conclusion of law in the state court

27  that the comic strip was a work for hire so as to create the presumption that the

28  employer was the author.  That issue was not litigated at all in the state court."  508

1  F.2d at 914. That said, the Second Circuit did note that several of the referee's
2  findings were <u>relevant</u> to the question of whether Superman was a work for hire,
3  but, unlike the district court, concluded that those findings pointed against a
4  determination that Superman was a work made for hire as a matter of federal
5  copyright law. <u>Id</u>. The Second Circuit seized on the referee's findings concerning
6  the nature of the 1933 Superman material as indicating that "Superman and his
7  miraculous powers were completely developed long before the employment
8  relationship was instituted," and further diminished the significance of the revisions
9  called for by Detective Comics as "simply to accommodate Superman to a
10 magazine format." <u>Id</u>. Given these facts, the Second Circuit concluded that
11 Superman did not meet the "instance and expense" test under the 1909 Act. <u>Id</u>. In
12 essence, by looking to and applying those specific <u>factual</u> findings by the referee to
13 the relevant body of copyright law on works made for hire, the Second Circuit
14 concluded that the original renderings of Superman constituted the original works,
15 later elaborations of which constituted, at most, derivative works. <u>Id</u>. at 914; <u>see</u>
16 <u>also</u> 1 Nimmer § 5.03[B][1][b] at 5-31 n.92.

17        Thus, to say that the referee's findings conclusively held one way or the
18 other on the question is mistaken. Rather, resolution of the issue requires this
19 Court to do exactly what the Second Circuit in its time did — apply the governing
20 body of copyright law under the 1909 Act to those findings made by the referee that
21 are relevant to the question, and render a legal judgment. Such an undertaking is
22 not, as plaintiffs argue, an attempt to "re-litigate" the nature of the parties'
23 relationship, but rather to litigate, for the first time, that which was not addressed in
24 the Westchester action — given the parties' business relationship as determined by
25 the referee, was the submission of Superboy to Detective Comics a work made for
26 hire. It is to that question that the Court now turns, with initial reference to the
27 instance and expense test set forth above.

28        The "expense" requirement is met where a "hiring party simply pays an

1  [employee or] independent contractor a sum certain for his or her work." <u>Playboy</u>

2  <u>Enterprises</u>, 53 F.3d at 555. Such regular, periodic payments of a sum certain bear

3  the hallmark of the wages of an employee required to produce the work in question

4  for his or her employer, and not that of a party who is free to engage those other

5  than the commissioning party in marketing his or her work. <u>See</u> <u>Donaldson</u>

6  <u>Publishing Co. v. Bregman, Vocco & Conn, Inc.</u>, 375 F.2d 639, 642-43 (2nd Cir.

7  1967). "In contrast, where the creator of a work receives royalties as payment, that

8  method of payment generally weighs against finding a work-for-hire relationship."

9  <u>Playboy Enterprises</u>, 53 F.3d at 555; <u>see</u> <u>also</u> <u>Twentieth Century</u>, 429 F.3d at 881

10  (finding that "expense" requirement met when publisher agreed to pay the author "a

11  lump sum for writing the book, instead of negotiating a royalty deal").

12      Here, it is true that none of the costs or expenses incurred in creating the

13  Superboy material (the paper on which the dialogue and story elements was

14  printed, the typewriter used to put into concrete form the author's concepts of the

15  same, <u>etc.</u>,) was borne by Detective Comics. The material was created at Siegel

16  and Shuster's artist studio in Cleveland, Ohio, using office supplies and other

17  materials bought and paid for by Siegel for the studio. Nothing from Detective

18  Comics' offices in New York City was utilized in the creation of the Superboy

19  material. All that said, nothing in the referee's findings or in the materials submitted

20  by the parties in this case would suggest that this was not also the case for the

21  other comic strips (Superman included) that Siegel and Shuster penned for

22  Detective Comics pursuant to the September, 1938, employment contract. In

23  addition, courts employing the instance and expense test have discounted reliance

24  on the circumstances and the cost borne for the production of the work. Such

25  consideration relates to the question of whether "an artist worked as an

26  independent contractor and not as a formal employee," a distinction that has "no

27  bearing on whether the work was made at the hiring party's expense." <u>Playboy</u>

28  <u>Enterprises</u>, 55 F.3d at 555.

1      Moreover, Siegel was also paid nothing by Detective Comics when he

2  submitted his Superboy material to it, and it rejected the material for publication.

3  Nor was Siegel paid when Detective Comics ultimately published the material

4  (assuming that Siegel's Superboy submissions were "published" in the magazine,

5  see infra III.C.) in More Fun Comics, no. 101 four years later.  The lack of payment

6  of any kind for the material itself would ordinarily negate a finding that the expense

7  requirement was met.  This lack of payment for the Superboy material itself is

8  particularly glaring considering that the referee found that Detective Comics would

9  periodically pay Siegel and/or Shuster at their regular per page rate for editions of

10  the Superman comic strip (a work for which they were employed to provide) even

11  when neither of them had contributed any of the continuity (Siegel) or illustrations

12  (Shuster) for the strip.  A reasonable inference to draw from this practice would be

13  that Detective Comics paid artists at least something for work they were employed

14  to produce even if the material submitted ultimately was not published; however,

15  with Superboy, no payments were ever made, regular or otherwise, leading to the

16  clear legal conclusion that Siegel was not employed by Detective Comics to create

17  the Superboy comic strip.

18      Defendants seek to downplay the absence of payment by noting that

19  Detective Comics ultimately did pay Siegel over $90,000 in settlement of the

20  Westchester action.  This fact, however, only bolsters the finding that the Superboy

21  submissions were not made at the expense of Detective Comics; instead, this

22  payment was made only after Detective Comics had been publishing Superboy for

23  a number of years.  If the material was part of a work made for hire arrangement,

24  such payment would have occurred at a time more contemporaneous with its

25  creation and submission, not years later and only then after the publisher had been

26  sued by the author for the unauthorized publication of the same (and not for breach

27  of an employment contract or agreement).  There is simply no evidence indicating

28  that the parties had a business understanding or contractual relationship allowing

1  for lengthy gaps in time between the creation of a work and payment for the same.

2       In the end, the complete lack of any periodic payment of a sum certain for

3  Siegel's Superboy material leads the Court to find that the expense requirement

4  has not been met in this case.

5       The "instance" component of the test inquires into "whether 'the motivating

6  factor in producing the work was the employer who induced the creation."

7  <u>Twentieth Century</u>, 429 F.3d at 879. That the commissioning party be the

8  motivating factor is not a "but for" test — that is, but for the artist's employment the

9  work would not have been created — but instead is a more narrow inquiry focused

10  on the nature and scope of the parties' business relationship. As one court

11  explained:

12          No doubt Graham was a self-motivator, and
perhaps she would have choreographed her dances

13  without the salary of Artistic Director, without the
Center's support and encouragement, and without the

14  existence of the Center at all, but all that is beside the
point.

15

16          . . . .

17          . . . . There is no need for the employer to be the
precipitating force behind each work created by a

18  salaried employee, acting within the scope of her regular
employment. Many talented people . . . are expected by

19  their employers to produce the sort of work for which
they were hired, without any need for the employer to

20  suggest any particular project. 'Instance' is not a term of
exclusion as applied to specific works created within the

21  scope of regular employment. It may have more
significance in determining whether an employee's work

22  somewhat beyond such scope has been created at the
employer's behest or to serve the employer's interests

23          . . . .

24  <u>Martha Graham</u>, 380 F.3d at 640-41. Thus, "under the 1909 Act a person could be

25  an employee yet create a work 'as a special job assignment, outside the line of the

26  employee's regular duties.' In that event, the work is not a work for hire." <u>Id.</u> at 635

27  (citing <u>Shapiro Bernstein & Co. v. Jerry Vogel Music Co.</u>, 221 F.2d 569, 570 (2nd

28  Cir. 1955)). The critical factor is what, if any, employment relationship (be it as an

1 | employee-employer or an employer-independent contractor) existed between the

2 | parties beforehand, and whether the work in question fell within the scope of those

3 | job duties. Toward that end, the "instance" requirement is also "shaped in part by

4 | the degree to which the hiring party had the right to control or supervise the artist's

5 | work," a circumstance reflective of the work being created within the confines of an

6 | employment relationship. <u>Twentieth Century</u>, 429 F.3d at 879 (internal quotation

7 | marks and citations omitted). Although it is not critical that the commissioning party

8 | actually exercise its right of control and supervision in the creation of the work in

9 | question, it is necessary that the party <u>have</u> the right to direct, control, or otherwise

10 | edit the artist's work. <u>See Martha Graham</u>, 380 F.3d at 635 ("The <u>right</u> to direct and

11 | supervise the manner in which the work is created need never be exercised"

12 | (emphasis in original)).

13 |      Plaintiffs rely heavily on the referee's finding that Siegel submitted Superboy

14 | pursuant to the right of first refusal provision in the parties' September, 1938,

15 | agreement, and therefore it was not material Siegel was otherwise obligated to

16 | provide to Detective Comics (unlike the comic strips for Superman, Slam Bradley,

17 | the Spy, <u>etc.</u>,) in the course of his regular employment with the publisher. Given

18 | that the publisher had yet to agree to publish the material when Siegel submitted

19 | Superboy to Detective Comics, plaintiffs argue that Detective Comics could not

20 | possibly be seen as owning the material at the inception, something which it claims

21 | is a predicate for a work for hire.

22 |      Deciding not to publish material and owning the material beforehand are not

23 | mutually exclusive propositions. A publisher could own the material from its

24 | inception, but decline to publish it. Publication (or lack thereof) is not dispositive;

25 | what is critical, however, is the referee's finding that the creation of Superboy fell

26 | outside the scope of Siegel's regular job duties. The parties' contract called for

27 | Siegel (and Shuster) to provide Detective Comics the continuity and illustrations for

28 | certain specified comic strips in exchange for remuneration at a specified sum

1  certain; Superboy was not among the comics Siegel was required to perform work

2  for per the parties contract. The referee found that "Superboy was a separate and

3  distinct entity" apart from Superman for purposes of the scope of the parties'

4  September, 1938, agreement. It was for this reason that the referee thereafter

5  analyzed the claims relating to Superboy through the lens of the right of first refusal

6  provision. Siegel's presentation of Superboy to Detective Comics (rather than

7  some other comic publisher) therefore was the result of the provision in the parties'

8  contract requiring Siegel and Shuster to "first give [Detective Comics] the right to

9  first refusal" for "any other art work or continuity suitable for use as comics or comic

10  strips." Siegel's creation of the Superboy submissions was thus independent —

11  entirely separate and apart — of his regular job duties with Detective Comics.

12     This then leads to the question of whether Siegel necessarily made his

13  Superboy submissions specifically for the publisher, Detective Comics.

14     Here, there is no evidence that Siegel attempted to pitch his Superboy

15  submissions to any other comic book publisher after Detective Comics initially

16  turned him down. In fact the precise opposite is true. A little more than a year later

17  he re-pitched the idea to Detective Comics, but in a more fully developed format.

18  When this, too, was turned down by Detective Comics, there is no indication that

19  Siegel went elsewhere to pitch his idea. Instead, it appears (much like with his

20  original 1933 Superman material) Siegel tabled the material and continued to work

21  on other, existing projects. Shortly thereafter, Siegel joined the United States

22  armed forces and fought in World War II. When he returned home from his service

23  to the country, the opportunity to pitch the Superboy submissions to other comic

24  publishers was gone; Detective Comics had already been publishing a Superboy

25  comic for a period of time in Siegel's absence. Nothing in the parties' papers or in

26  the referee's findings shed any light as to whether Siegel only envisioned Detective

27  Comics as the publisher for his material, or if in fact other publishers were also

28  considered by him. Instead, the Court is left simply with the nature and structure of

1  the parties' contractual relationship in formulating a decision as to whether Siegel's

2  Superboy submissions were works made for hire.

3      Viewed from this perspective, the situation is akin to a specially-

4  commissioned work, rather than one produced in the regular course of an

5  employee's job duties. Nimmer has drawn the same parallels for situations not that

6  different than the present one:

7      [A] situation may arise where the employer finds
       the employee's work unsuitable . . . . It seems probable

8      that such unused material belongs to the employer, <u>at
       least if the contract of employment contains language</u>

9      <u>purportedly [conveying to the employer] 'all' material
       [created by the employee]</u>.  Even when there is an

10     agreement between employer and employee that
       employer shall own certain material to be created by the

11     employee, if in the creation of such material, the
       employee is to work as an independent contractor (even

12     if for other duties he is an employee), then the employer
       must claim such ownership by virtue of an assignment,

13     rather than by virtue of his status as an employer.

14  1 Nimmer § 5.03[B][1][b] at 5-37 (emphasis added). Here, nothing in the parties'

15  contract purported to convey to Detective Comics ownership to <u>all</u> the material

16  Siegel and Shuster ever created; rather, the contract conveyed only the material

17  created with respect to certain specified comic strips of which Superboy was not

18  one. With respect to works other than those enumerated comic strips, the most

19  Detective Comics had was a one- time opportunity to lay claim to Siegel's Superboy

20  material. <u>See</u> <u>Broadcasting Corp. v. Metromedia Inc.</u>, 74 N.Y.2d 54, 56 (1989) ("a

21  right of first refusal merely provides . . . a chance to buy"). The right of first refusal

22  (and especially one that is not exercised) is fundamentally incompatible with a

23  finding that a work falling within its provisions is a work made for hire. <u>Cf</u>. 1 Nimmer

24  § 5.03[B][2][d] at 5-56.8 ("[A] commission relationship may not exist, even if the

25  work is prepared at the request of another, and even if such other person bears the

26  costs of its creation, where the person requesting the work is expressly granted only

27  a one-time use"). Such a contractual provision is predicated upon the assumption

28  that the material being submitted for the exercise of the option to publish belongs to

1   the artist at the outset. See LIN v. Metromedia, Inc., 74 N.Y.2d 54, 56 (1989)

2   (noting that, under New York law, a "right of first refusal" requires the "owner, when

3   and if he decides to sell, to offer the property first to the party holding the

4   preemptive right so that he may meet a third-party offer or buy the property at some

5   other price" (emphasis added)). If this were not so, there would be no need for the

6   publisher to have the first opportunity at publishing the material; rather, it would

7   already belong to the publisher, regardless of whether it publishes the material or

8   not. Because material that is a work made for hire belongs at the inception to the

9   publisher, having that same material submitted to the publisher in the first instance

10  under a right of first refusal strongly suggests that it did not belong to the publisher

11  when it was created.

12          A case illuminating this point is Playboy Enterprises, Inc. v. Dumas, 960 F.

13  Supp. 710 (S.D.N.Y. 1997). Among the paintings at issue in that case were several

14  that the artist had submitted to but were turned down by Playboy. Although it

15  turned down publishing the paintings, Playboy nonetheless paid the artist a "turn-

16  down" fee for the work. The parties squabbled over the impact these turned-down

17  paintings had on whether the paintings that were accepted for publication were

18  works made for hire. Playboy argued that its payment for paintings that it did not

19  publish bolstered the impression that creation of the paintings (whether they were

20  used or not) was due to it "request[ing] a submission from [the artist] each month,"

21  and undermined any argument that payments to the artist for those paintings were

22  only for a one-time use. Id. at 715. The court agreed with Playboy, finding that the

23  payments for unused works "show[ed] that it at least implicitly requested [the artist]

24  to submit at least one painting a month and that it therefore was the motivating

25  factor in the creation of those paintings." Id. As the district court elaborated: "The

26  fact that Playboy made payments for unused work undercuts [the argument] that

27  [those payments] must have been for the right to one-time use of the disputed

28  works because [it] is all that Playboy required. But if Playboy never published a

49

1    work at all, there would have been no reason to pay anything for it absent a for-hire

2    relationship, as it would have had no need for any rights in such a case." Id. at 716.

3        The converse would also be true.  The failure to pay for unused work,

4    notably those falling outside the artist's regular job duties, supports the conclusion

5    that the parties understood that such works fell outside the confines of any for-hire

6    relationship between them and were created at the artist's instance.  While

7    payment demonstrates an acknowledgment on the publisher's part that the work

8    was being done for their benefit, the <u>absence</u> of such payment creates just the

9    opposite impression. <u>Cf</u>. <u>id</u>. ("The logical conclusion, and the one to which this

10    Court comes, is that Playboy paid Nagel for works it did not use because he

11    created them at its instance").

12        Thus, it appears that, at least viewed through the prism of the parties'

13    business and contractual relationship, Siegel's submission of Superboy to Detective

14    Comics was not a work made for hire.  Defendants' attempt to cloud the issue by

15    focusing on the derivative or non-derivative status of the Superboy material itself, a

16    separate question on which the Court at this point reserves its ruling (<u>see</u> <u>infra</u>

17    III.D.).  If any of Siegel's Superboy material is derivative of Superman, then,

18    defendants argue, use of that material would require the consent of Detective

19    Comics, as the owner to the Superman copyright, before it is published.  It is this

20    required prior consent for publication that defendants contend impacts the work

21    made for hire question.  Such control over the material, it is argued, translates into

22    Detective Comics holding the right to direct and supervise Siegel's Superboy

23    material, something which they contend is sufficient by itself to render the material

24    a work made for hire.  In this regard defendants cite to <u>Estate of Burne Hogarth v.</u>

25    <u>Edgar Rice Burroughs, Inc.</u>, 342 F.3d 149, 163 (2nd Cir. 2003) and <u>Picture Music,</u>

26    <u>Inc. v. Bourne, Inc.</u>, 457 F.2d 1213, 1216-17 (2nd Cir. 1972).

27        Defendants argument sweeps too broadly.  Were the Court to adopt

28    defendants' approach, every derivative work would also be considered a work

1  made for hire.  The ramifications of such a holding would be contrary to the 1909

2  Act's statutory scheme concerning derivative works, and is also unsupported by the

3  case law construing the Act.

4          As noted earlier, the copyright to a work made for hire is owned at its

5  inception by the commissioning party.  If a derivative work is always a work made

6  for hire, then there would be nothing left for the creator of the additional

7  copyrightable material contained in the derivative work to own; the artist would have

8  no copyright to that material, it instead being owned by the copyright holder to the

9  pre-existing work.  The 1909 Act, however, recognized that such additional material

10  contained within a derivative work was itself "subject to copyright" protection.  17

11  U.S.C. § 7 (repealed).  Indeed, the 1909 Act specifically noted that "publication of

12  any such new works" would not undermine the validity of the copyright in the pre-

13  existing work.  Id.  For this reason, cases decided under the 1909 Act recognized

14  that "[t]he aspects of a derivative work added by the derivative author are that

15  author's property, but the element drawn from the pre-existing work remains on

16  grant from the owner of the pre-existing work."  Stewart v. Abend, 495 U.S. 207,

17  223 (1990).  If, as defendants contend, derivative works are always the property of

18  the copyright holder of the pre-existing work owing to their work for hire status,

19  there would be no need for the 1909 Act's concern with whether publication of that

20  derivative work implied that the derivative author had "an exclusive right to such use

21  of the original works," or, on the other hand, that "consent" of the owner to the pre-

22  existing work must be obtained before adaptations to that work are produced by the

23  derivative author.  17 U.S.C. § 7 (repealed).  Those concerns would be internally

24  inconsistent as a matter of logic and common sense.  The copyright holder to the

25  "original works" would necessarily be the owner of the additional material contained

26  in the derivative work; its prior consent would be unnecessary as it would own the

27  material for which consent is sought, and any such waiver would be logically

28  inconsistent as the material for which such waiver would be sought would also be

1   owned by the same entity.

2        Nor does the case law under the 1909 Act support defendants' position.  In

3   all the cases cited by defendants, the copyright holder of the pre-existing work

4   approached the artist and specifically requested for the artist to create a work

5   derived from that pre-existing material and then paid the artist for the derivative

6   work in question, facts notably absent here.  See Hogarth, 342 F.3d at 151-52;

7   Picture Music, 457 F.2d at 1217.  It was these additional elements of requesting

8   and paying for specific derivative works that served to demonstrate that the creation

9   of the derivative work was at the instance of the commissioning party, not the

10  simple fact that the work itself was derivative.  Nimmer in his treatise similarly

11  distinguishes the principal case cited by defendants on that very basis.  See 3

12  Nimmer § 9.03[D] at 9-28.3 ("Picture Music is limited to the situation where the

13  commissioning party supplies to the independent contractor an underlying work

14  upon which the independent contractor [then] fashions a derivative work" (emphasis

15  in original)).

16       Here, in contrast, Detective Comics never requested that Siegel create

17  Superboy nor did it approach him to utilize the pre-existing material from Superman

18  for some unspecified derivative work.  Instead, the idea for creating Superboy

19  occurred while Siegel was talking to a Mr. Nimis (whose relationship to the parties is

20  not disclosed in the pleadings or the referee's findings) about what "'top' [comic]

21  strip to use on the Sunday [newspaper] page of Superman," and Siegel suggested

22  using "a strip named Superboy" relaying "the adventures of Superman as a youth."

23  (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 4).  Nowhere did Mr. Nimis (even

24  assuming he is affiliated with defendants' predecessors in interest) approach,

25  request, or suggest that Siegel use the pre-existing Superman copyright material as

26  a launching point for creating the comic strip to be placed at the top of Superman's

27  Sunday comic strip.  That idea was Siegel's creation alone.

28       All that said, the Court agrees with defendants that, if Siegel's Superboy

                                        52

1    submissions were a derivative work, such a designation would have vested

2    Detective Comics with the right to control that material (Detective Comics' consent

3    being necessary for the material's production).  The Court finds that this right to

4    control, however, is not sufficient to conclude that Siegel's Superboy submissions

5    were a work made for hire.  Those submissions were neither prepared at Detective

6    Comics' instance nor at its expense, points the Court finds more weighty in

7    resolving the work made for hire question in this case.  Those points are predicated

8    upon the particular circumstances of the parties' relationship and the creation of the

9    works in question, something that is not as particularized with respect to a statutory

10   right inherent in all derivative works regardless of the relationship of the parties.

11        Accordingly, the Court finds that Siegel's Superboy submissions were not

12   works made for hire.

13   **B.    Joint Work**

14        Defendants next argue that Siegel's Superboy submissions were

15   contributions to a joint work with Shuster.  The effort to characterize the

16   submissions as part of a joint work is understandable.  Under the 1909 Act, each

17   joint author of a copyrightable work is a co-owner of the same and possesses "an

18   undivided ownership in the entire work, including all of the contributions contained

19   therein." 1 Nimmer § 6.03, at 6-7; see also Davis v. Blige, 419 F.Supp.2d 493, 500

20   (S.D.N.Y. 2005) ("a co-owner has a legal right to grant a license in a work without

21   another co-owner's permission or to transfer his rights in the copyright freely.

22   Absent an agreement to the contrary, one joint owner may always transfer his

23   interest in the work to a third party").  Given that Shuster provided the illustrations to

24   Superboy at the direction of and was paid for the same by Detective Comics, those

25   illustrations are arguably provided as a work for hire for the publisher, thus giving

26   ownership over the same to Detective Comics.[10]  If Superboy is determined to be a

27

28        [10] The question of whether the illustrations Shuster provided for More Fun
     Comics no. 101 were in fact prepared as a work made for hire is not argued in the

53

1    joint work, Detective Comics would own half of the copyright either as the author of

2    Shuster's alleged work for hire artwork or as a consequence of the reversion of

3    Shuster's half to them given his or his heirs failure to timely exercise the right to

4    termination, thereby allowing it to continue to exploit the copyright to Superboy

5    subject only to having to provide an accounting to plaintiffs for any profits gained

6    therefrom. See 1 Nimmer § 6.10; see also Oddo v. Ries, 743 F.2d 630, 632-33

7    (9th Cir. 1984).

8         The 1976 Act, which codified the principles for joint authorship established in

9    the case law under the 1909 Act, see 1 Nimmer § 6.01 at 6-3 n.1, does not provide

10   a definition for an "author" or "joint authors" in a copyright, but instead defines a

11   "joint work" as one "prepared by two or more authors with the intention that their

12   contribution be merged into inseparable or interdependent parts of a unitary

13   whole."[11] 17 U.S.C. § 101.  Components of a unitary work are "inseparable" when

14   they have little or no meaning standing alone, such as paragraphs in a novel, and

15   the components are considered "interdependent" when they could stand alone but

16   achieve a greater effect when combined, such as the lyrics and melody of a song.

17   See H.R. Rep. No. 94-1476, at 120 (1976), reprinted in 1976 U.S.C.C.A.N. 5659,

18   5736.  Here, the copyright to Superboy (if a joint work) would be considered

19   comprised of interdependent parts — Siegel's dialogue and storyline (as contained

20   in his submissions) and Shuster's artwork giving life and color to those words.  The

21   parties do not dispute that Shuster's illustrations for the Superboy comic released in

---

parties' papers. This is understandable given Shuster or his heirs failure to join in
or file separately a notice of termination related to either the Superman or
Superboy copyright.  Given that the time to exercise the termination right has
passed, ownership over Shuster's half of the copyrights reverts to defendants.

[11] Nimmer in his treatise has commented that the 1976 Act's definition for a
"joint work" actually defines "joint authorship" and is simply designated incorrectly
in the Act. 1 Nimmer on Copyright § 6.01 at 6-3. Regardless, courts have utilized
the statutory definition for "joint works" in delimiting the parameters of whether
someone was a joint author of a copyright. See Aalmuhammed v. Lee, 202 F.3d
1227, 1231 (9th Cir. 2000).

More Fun Comics would otherwise qualify for joint authorship status. Anyone looking at the Superboy comic contained in that magazine would know that it owed its existence to both Shuster's illustrations and Siegel's words (assuming that the submissions were published in More Fun Comics, no. 101). See Aalmuhammed, 202 F.3d at 1232 ("It is . . . easy to apply the word ['author'] to two people who work together in a fairly traditional pen-and-ink way, like, perhaps, Gilbert and Sullivan. In the song, 'I Am the Very Model of a Modern Major General,' Gilbert's words and Sullivan's tune are inseparable, and anyone who has heard the song knows that it owes its existence to both men, Sir William Gilbert and Sir Arthur Sullivan, as its creative originator").

Rather, the central question with respect to the joint authorship issue in this case is whether Siegel prepared the Superboy submissions with the knowledge and intent that the comic strip would be a joint work, with Shuster providing illustrations to the comic strip if it were published. As far as the joint preparation and intention of the authors, the Senate Committee Report submitted with the passage of the 1976 Act states as follows:

> [A] work is "joint" if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as "inseparable or interdependent parts of a unitary whole." The touchstone here is the intention, at the time the writing is done, that the parties be absorbed or combined into an integral unit . . . .

S. Rep. No. 94-473, at 103 (1975).

Here, the referee's findings make clear that Shuster had collaborated in the past on all the other comic strips conceived by Siegel; he did the illustrations for not only Superman, but for Siegel's other comic strip incantations, such as The Spy and Slam Bradley. With respect to Superboy, however, the two did not engage in the usual collaborative effort of the past. Siegel submitted the conception, including a script of the dialogue, for the Superboy comic to Detective Comics, but then a

1  four-year hiatus occurred before Shuster drew the illustrations for the same. When

2  Shuster created those illustrations, Siegel was abroad serving in the military. There

3  is absolutely no information submitted by the parties or contained in the referee's

4  findings suggesting that Siegel brainstormed with Shuster in their studio when

5  drafting his Superboy submissions.

6      However, contemporaneous and coordinated action between Siegel and

7  Shuster is not required.  As Judge Learned Hand explained, "it makes no

8  difference whether the authors work in concert, or even whether they know each

9  other; it is enough that they mean their contributions to be complimentary in the

10  sense that they are to be embodied in a single work . . . ." Edward B. Marks Music

11  Corp. v. Jerry Vogel Music Co., 140 F.2d 266, 267 (2nd Cir. 1944).  That said, there

12  are indications that, when Siegel created the Superboy submissions, he envisioned

13  those submissions as part of a unitary comic strip incorporating Shuster's artwork.

14  The proposed script Siegel submitted for the Superboy comic itself, in the same

15  way as all the other Siegel and Shuster comics were presented, contained the by-

16  line crediting its authorship to "Jerry Siegel and Joe Shuster."  Such shared billing in

17  Siegel's submission is strong evidence of the intent to create a joint work. See

18  Aalmuhammed, 202 F.3d at 1234 ("putative coauthors make objective

19  manifestations of a shared intent to be coauthors, as by denoting the authorship of

20  The Pirates of Penzance as 'Gilbert and Sullivan'"); Childress v. Taylor, 945 F.2d

21  500, 508 (2nd Cir. 1991).

22      Moreover, the audience appeal of Siegel's Superboy, as with all the other

23  comic strips he helped conceive, was tied to Shuster's contribution of the

24  illustrations. See Aalmuhammed, 202 F.3d at 1234 (citing as an objective

25  manifestation of parties' mutual intent to create a joint work as whether "the

26  audience appeal of the work turns on both contributions").  Superboy's appeal to

27  the public was not only in reading the harrowing tales of the superhero's exploits

28  but also in the colorful imagery Shuster provided to grip the reader's imagination.

1    See generally Maurel v. Smith, 220 F. 195, 200 (S.D.N.Y. 1915) (Learned Hand, J.)

2    (characterizing the separately provided dialogue, plot, and music contributions to a

3    comedic opera as being "like mosaics from which, though you may lift a stone, it

4    loses the significance of its setting").  This evidence also supports a conclusion that

5    Superboy is a joint work.  See Aalmuhammed, 202 F.3d at 1234.

6        Plaintiffs make no effort to deny that any of this objective evidence would

7    otherwise lead to the conclusion that Siegel's Superboy submissions were

8    envisioned by Siegel as part of a unitary work comprised with Shuster's illustrations.

9    Instead, their argument is more nuanced.

10       First, they seek to side-step the issue by arguing that the referee's finding

11   that Siegel was "the originator and sole owner" of Superboy forecloses further

12   discussion of whether the copyright to the creation of the same was a joint work.

13   Plaintiffs' reliance on the referee's finding is misplaced.  The referee was simply

14   signifying that, as between Siegel and Detective Comics, Siegel was the sole owner

15   and originator to the same.  The question (and the ramifications flowing from the

16   same) as to Shuster's authorship of the Superboy material was not presented to the

17   referee to decide.  Plaintiffs make mention that Detective Comics noted in its

18   answer filed in the Westchester action that "substantial artwork for said comic strip

19   entitled 'SUPERBOY' was performed by . . . SHUSTER and paid therefor by"

20   Detective. (Reply Decl. Marc Toberoff in Supp. Mot. Partial Summ. J., Ex. A ¶ 14 at

21   6).  Plaintiffs read into this averment that Detective Comics was seeking to utilize

22   Shuster's illustrations as a basis to lay claim to partial ownership in Superboy itself,

23   by labeling Shuster's contribution as a work for hire.  The Court disagrees with this

24   reading.  To begin, the Second Circuit in Siegel held that the work for hire issue

25   was not litigated in the Westchester action. 508 F.2d at 914 ("That issue was not

26   litigated at all in the state court").  If the issue was not litigated directly before the

27   referee, it certainly was not done indirectly through the guise of a joint authorship

28   argument, which itself was predicated upon there being a work made for hire.

1    Moreover, the averment in question was interposed by Detective Comics in

2    connection with Siegel and Shuster's fourth cause of action.  (Id. ¶ 14 at 5 ("Deny

3    each and every allegation contained in paragraphs 'THIRTY-SIXTH', 'THIRTY-

4    SEVENTH', 'THIRTY-EIGHTH', and 'THIRTY-NINTH' of the complaint").  The fourth

5    cause of action was plaintiffs' alternative claim for "the wrongful publication" of

6    Superboy in which it argued that its "plot, conception and incidents were based

7    upon and copied from the plot, conception and incidents of the plaintiff's comic strip

8    Superman" (which the complaint argued in the first two causes of action belonged

9    to Siegel and Shuster), and further argued that Detective Comics mislead the public

10   into believing that Siegel was "the author of the continuity dialogue and action of

11   each of the individual releases" for Superboy by affixing his name to the strip as its

12   author.  (Defs' App. of Docs. in Supp. Mot. Recons., Ex. 7 ¶¶ 36-37, at 10).  It was

13   in this context that Detective Comics sought to divine meaning from Shuster's

14   illustrations and their payment for the same to him.  Detective Comics stated in its

15   answer that those facts indicated Shuster's tacit consent to the publication of

16   Superboy (thereby negating that Detective Comics utilized Superman elements

17   without the plaintiffs' consent, as one of the purported co-owners of Superman

18   approved said publication) and also as constituting approval for the publisher to use

19   Siegel and Shuster's by-line on the comic strip.  (Reply Decl. Marc Toberoff, Ex. A

20   ¶ 14, at 6 ("affixing of the name of plaintiff SIEGEL to some of said 'SUPERBOY'

21   releases was with the knowledge and approval of plaintiff SHUSTER").  Thus,

22   defendants' noting that Shuster had done the illustrations for the Superboy

23   illustrations and paid for the same had nothing to do with the work made for hire

24   nature of that contribution; rather, it merely countered the factual allegations in

25   plaintiffs' fourth cause of action.

26        Nothing submitted by the parties conclusively shows the purpose for

27   Detective Comic's representation that Shuster provided the illustrations for the

28   comic was otherwise.  Indeed, plaintiffs themselves note that Detective Comics'

1   recitation of Shuster's participation signified that it "claimed <u>or could have claimed</u>

2   in the 1947 Action that they co-own 'Superboy' by virtue of co-owning the artwork."

3   (Pls' Reply in Supp. Mot. Partial Summ. J. at 16 (emphasis added)).  This tacit

4   admission by plaintiffs undercuts their argument that, in making the finding that

5   Siegel was the originator and "sole owner" of Superboy, the referee <u>did find</u> that

6   Shuster was not a joint author of the work.  Undoubtedly, were this Court to hold

7   that Superboy was a "joint work" between Siegel and Shuster, this would effectively

8   undermine the referee's finding that Siegel was the "sole owner" of Superboy and

9   could, assuming that Shuster's artwork is considered a work for hire, negate the

10  injunction the referee placed against Detective Comics from exploiting Superboy.

11  That this would be the result from such a ruling does not mean that the referee

12  therefore must have considered and ruled on any potential question that could

13  unravel his decision.  Rather, it simply underscores the potential pitfalls in litigating

14  cases that touch on the subject matter of copyright in state court, a forum where not

15  all the issues that could impact rights to a copyright are, or can, be litigated.

16          Switching gears, plaintiffs next argue that, regardless of whether or not

17  Siegel intended for his material to be part of a joint work with Shuster, this intention

18  was fundamentally altered when Detective Comics later published his material

19  without his consent. (Pls' Reply in Supp. Mot. Partial Summ. J. at 17-18).  Plaintiffs

20  argue that consent to publication is necessary for the material to be treated as a

21  joint work.  The Court disagrees.  What the case law does suggest is that a

22  contributor's consent is required for the use or inclusion of his or her material as

23  part of a joint work, but not that, absent a contractual provision to the contrary, his

24  or her consent to publication of the joint work is required once that author has

25  already intended for the material to be part of a joint work.  In each of the cases

26  cited to by plaintiffs, the consent issue addressed was the author's consent for his

27  or her material to be used in a joint work, not consent to the joint  work's later

28  publication.

In <u>Szekely v. Eagle Lion Films, Inc.</u>, 242 F.2d 266 (2nd Cir. 1957), a license-holder approached Szekely to write the screen play based on a novel for which the license-holder had the motion picture rights. <u>Id</u>. at 267. The parties' contract contained a provision contemplating that there may be a need for collaboration on Szekely's screenplay, but conditioned such collaboration on Szekely's consent. <u>Id</u>. at 268. Furthermore, the parties' contract specifically provided that "all rights and title in the manuscript [were] to remain in Szekely until he received the agreed minimum compensation for his effort [of] $35,000." <u>Id</u>. at 267. The movie producer never paid Szekely the minimum compensation required under the contract, even after he "presented the final draft of his script," informing Szekely "that his screen play was not being used in the movie." <u>Id</u>. The movie producer's statement to Szekely was false. Instead, owing to financial constraints, the movie producer, without any notification to or obtaining of consent from Szekely, found another screenwriter to make revisions to Szekely's script, presumably for an amount less than that owed to Szekely under the contract. <u>Id</u>. After the movie was finished and released for distribution, Szekely sued, arguing that his rights to script were infringed. Defendants argued that Szekely "was merely a joint owner" with the other screenwriter, and that screenwriter's subsequent license of his rights to the script to the film producer entitled him to publish it without Szekely's consent. <u>Id</u>. at 268.

The Second Circuit disagreed. The court noted that the other screenwriter's "adaptation of [Szekely's] screen play . . . was not contemplated at the inception of the work, which was not planned as a joint work." In fact, Szekely specifically contracted with the movie producer that such collaboration (which could transform his screenplay into a joint work) could only happen "on [Szekely's] consent, which was not sought or obtained" before the other screenwriter was brought in to revise Szekely's screenplay. <u>Id</u>. The rule to be drawn from <u>Szekely</u> is simply that consent to inclusion of an author's separate material into a joint work is necessary; where

1  the author never intended for his material to be part of a joint work, he retains the

2  rights to that material, particularly where, as in <u>Szekely</u>, there exists a contractual

3  provision requiring the author's consent before adaption or other contribution to his

4  material can occur.  Those circumstances are not present here.  When Siegel

5  prepared his Superboy submissions, he clearly contemplated Shuster's contribution

6  of artwork to his material.  Moreover, there is absolutely no evidence presented by

7  the parties or contained in the referee's findings demonstrating an understanding or

8  arrangement between Siegel and Shuster that such prior consent was necessary

9  before the other contributed his material to their comic strips.

10      Plaintiffs argue that to hold that Superboy was a joint work would be for the

11  Court to sanction a publisher's theft of an author's work without fear of copyright

12  infringement "so long as the author initially intended that his work be included in a

13  joint or collective work." (Pls' Reply in Supp. Mot. Summ. J. at 17).  Plaintiffs'

14  argument collapses two different concepts, and ignores the consequences flowing

15  from the fact that Siegel intended from the beginning for his Superboy submissions

16  to be part of a joint work.  Whether Detective Comics (or its successors in interest)

17  should fear a suit for infringement of Siegel's material turns exclusively on the

18  heretofore unlitigated question of whether Shuster's artwork was a work made for

19  hire.  Absent a finding that this was so, Detective Comics would remain liable for its

20  publication of Superboy in <u>More Fun Comics</u>, no. 101 and subsequent thereto

21  (assuming, of course, that the strip in <u>More Fun Comics</u> published the copyrightable

22  material, if any, in Siegel's Superboy submissions).  The absolution plaintiffs seek

23  to give to Detective Comics from an infringement claim is thus premature.  Similarly,

24  the "theft" spoken of by plaintiffs is puzzling.  Siegel intended all along to share the

25  profits realized from his contribution to Superboy, the only difference being that he

26  thought he would be sharing those profits with Shuster and now he (or rather his

27  heirs) may have to share it with Detective Comics (or rather its successors).  The

28  only party who could possibly be seen as having something stolen would be

1    Shuster. Indeed, were the Court to hold that <u>Siegel</u> alone is entitled to the

2    copyright to and all the profits realized from Superboy because of Detective

3    Comic's "theft" from <u>Shuster</u>, the Court would be placing Siegel — the party whose

4    copyright rights  were unaffected by the publisher's conduct — in a superior position

5    than that which even he envisioned to possess, all to the denigration of the

6    contribution (and the rights thereto) Shuster supplied to the joint work.

7         The one factor preventing the Court from finding that Siegel's Superboy

8    submissions were contributions to a joint work with Shuster's illustrations in the

9    Superboy comic is the unresolved issue (<u>see</u> <u>infra</u> III.D.) of whether there was in

10   fact any original copyrightable material in Siegel's Superboy submissions. The rule

11   in this circuit is that something is a joint work only if each contribution to that work,

12   standing alone, was independently copyrightable material. <u>See</u> <u>Ashton-Tate Corp.</u>

13   <u>v. Ross</u>, 916 F.2d 516, 521 (9th Cir. 1990) ("joint authorship requires each author to

14   make an independently copyrightable contribution"); <u>but see</u> <u>Gaiman v. McFarlane</u>,

15   360 F.3d 644, 658-59 (7th Cir. 2004) (refusing to apply above rule to situations

16   "where two or more people set out to create a character jointly in such mixed media

17   as comic books and motion pictures and [through their efforts] succeed in creating

18   a copyrightable character"); 1 Nimmer § 6.07[A][3][a], at 6-22 ("if authors A and B

19   work in collaboration, with A contributing sparkling plot ideas and B weaving them

20   into a completed screenplay, it cannot be doubted that both have made more than

21   a <u>de minimis</u> contribution to the resulting script. On that basis, both A and B should

22   be considered joint authors of the work even though, standing alone, plot ideas may

23   not be copyrightable"). At a minimum, there must be some copyrightable material

24   in Siegel's Superboy submissions, otherwise that material could not have formed a

25   predicate contribution to render Superboy a joint work. If, however, the Court were

26   to find that those submissions were completely derivative of Superman, then there

27   was no independently copyrightable material within those submissions and

28   Superboy is not a joint work.

## C.    Publication

"Under the 1909 Act, it was necessary to publish the work with proper notice to obtain copyright [protection]." Stewart, 495 U.S. at 233; see also 17 U.S.C. § 10 ("Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title"). Publication was an important concept under the 1909 Act as the act of publication "constituted the dividing line between" common law copyright protected under state law and statutory copyright protected under federal law; publication of the work by itself divested an author of common law copyright protection, leaving the federal copyright statute as the only means to keep the work from becoming a part of the public domain. See Stewart, 495 U.S. at 233 ("Publication of a work without proper notice automatically sent a work into the public domain"). "The concept of publication was of immense importance under the 1909 Act. It became a legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term." 1 Nimmer § 4.01, at 4-3.

Although this line of demarcation was erased with the 1976 Act's pre-emption of common law copyright, see 17 U.S.C. § 301, the concept retains importance even under the 1976 Act. Specifically, section 304(c) only grants the right to terminate earlier grants to those "copyright[s] subsisting in either its first or renewal term on January 1, 1978." The only copyright subsisting in either its first or renewal term before the effective date of the 1976 Act were those protected under the 1909 Act, that is, those that had been published (as opposed to unpublished material protected by state common law) and registered. See 3 Nimmer § 11.02[A][1] at 11-12 ("the termination provisions of Section 304(c) apply only if the work in question was the subject of statutory copyright prior to the effective date of the current Act").

The 1909 Act, unlike the present governing statute, contained no definition for when a work was considered "published." Nonetheless, the definition for

63

publication contained in section 101 to the 1976 Act is seen as generally codifying the meaning of the concept as developed by the case law under the 1909 Act. <u>See</u> 1 Nimmer § 4.04, at 4-20.1 (observing that the 1976 Act's definition for publication "in general constitutes a codification of the definition evolved by case law prior to adoption of the present Act"). The 1976 Act defined "publication" as "the distribution of copies . . . of a work to the public by sale or other transfer of ownership . . . ." Thus, under the 1909 Act publication occurred "when by consent of the copyright owner the original or tangible copies of a work are sold . . . or otherwise made available to the general public." 1 Nimmer § 4.04 at 4-21.

Defendants contend that Siegel's Superboy submissions "were never [separately] published or registered as unpublished works as of January 1, 1978." (Defs' Opp. to Pls' Mot. Partial Summ. J. at 20). Plaintiffs counter that the copyrightable material contained in Siegel's Superboy submissions were later "published" in the Superboy comic strip found in volume 101 of Detective Comic's <u>More Fun Comics</u>, to which Detective Comics contemporaneously registered a copyright. The copyright to the magazine, it is contended, secured statutory copyright protection to all its constituent parts, namely all the comic strips contained in that volume of the magazine including Superboy. <u>See</u> <u>Self-Realization</u>, 206 F.3d at 1329 ("A blanket copyright on a periodical protects its constituent parts"); <u>see also</u> <u>Batjac Prods., Inc. v. Goodtimes Home Video Corp.</u>, 160 F.3d 1223, 1233-35 (9th Cir. 1998) (holding that, to the extent copyrightable material in an unpublished work "is incorporated" in a published derivative work based thereon and actually becomes a "component" thereof, it will be considered published by the later work). Defendants do not dispute this legal point, but argue that none of the copyrightable material contained in Siegel's Superboy submissions (assuming that there were any contained therein) was printed in the Superboy comic strip published in volume 101 to <u>More Fun Comics</u>. The point raised by defendants' argument stems from the fact that the Superboy comic strip in <u>More Fun Comics</u> no. 101 does not track

1  verbatim the script, dialogue or storyline contained in Siegel's Superboy

2  submissions, in particular his 1940 proposed script.  Given the discrepancy

3  between the two, the question becomes not so much whether Detective Comics'

4  issuance of <u>More Fun Comics</u> no. 101 constituted a publication, as it clearly did, but

5  whether any of the copyrightable material in Siegel's Superboy submissions was

6  published through the same.

7      Plaintiffs argue that the question of publication was conclusively determined

8  by the referee's finding that Detective Comics' "comic strip release entitled

9  SUPERBOY published [in <u>More Fun Comics</u> no. 101] in December of 1944

10  embodied and was based upon the idea, plan and conception contained in" Siegel's

11  Superboy submissions.  The problem for plaintiffs is that the referee's factual

12  finding does not go far enough.  The referee's findings do not stand for the

13  proposition that everything (copyrightable or otherwise) contained in Siegel's

14  Superboy submissions was reprinted in <u>More Fun Comics</u> volume 101, but, instead,

15  only that the Superboy comic in <u>More Fun Comics</u> made concrete the "idea, plan

16  and conception" for a Superboy comic that was pitched and elaborated upon in

17  Siegel's submissions.  This distinction is important as an "idea" as such is not

18  copyrightable, either under the 1909 Act or the 1976 Act.  <u>See</u> <u>National Comics</u>

19  <u>Publication, Inc. v. Fawcett Publications, Inc.</u>, 191 F.2d 594, 600 (2nd Cir. 1951) ("a

20  copyright never extends to the 'idea' of the 'work,' but only to its 'expression,' and

21  that no one infringes, unless he descends so far into what is concrete as to invade

22  that 'expression'").  Thus, the referee's finding leaves unanswered the critical point

23  for purposes of the question in this case:  Whether any of the copyrightable

24  material in Siegel's Superboy submissions was in fact later published.  Because the

25  question of whether and to what extent any copyrightable material was contained in

26  Siegel's Superboy submissions remains to be determined (<u>see</u> <u>infra</u> III.D.), the

27  Court is in no position at this time to make a final determination whether said

28  material, however characterized, was published in <u>More Fun Comics</u> no. 101.

**D.     Derivative Work**

Section 7 to the 1909 Act discussed derivative works as being the "[c]ompilations or abridgements, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter," and treated such additional material "as new works subject to copyright . . . ." 17 U.S.C. § 7 (repealed); see also Stewart, 495 U.S. at 231 (observing that section 7 to the 1909 Act signified "the types of works that may be derivative works"). Thus described, a derivative work is "any work based in whole, or in substantial part, upon a pre-existing work, if it satisfies the requirements of originality . . . and is not itself an infringing work, [and] will be separately copyrightable." 1 Nimmer § 3.01, at 3-3. If an author contributes additional original material to a pre-existing work so as to recast, transform or adapt that work, then that additional material is subject to copyright protection, that is, it is a protectable derivative work. See id. § 3.03, at 3-10; see also Asia Entertainment Inc. v. Nguyen, 40 U.S.P.Q.2d 1183, 1185 (C.D. Cal. 1996). The resulting work need not be a qualitative improvement over the prior work; rather, what is necessary is that "the additional material injected in a prior work, or the manner of rearranging or otherwise transforming a prior work, must constitute more than a minimal contribution." Id. at 3-11; see also Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 348 (1991); Grove Press, Inc. v. Collectors Publication, Inc., 264 F.Supp. 603 (C.D. Cal. 1967). "[T]he applicable standard in determining the necessary quantum of originality is that of a 'distinguishable variation' that is more than 'merely trivial.' Any variation will not suffice, but one that is sufficient to render the derivative work distinguishable from its prior work in any meaningful manner will be sufficient." 1 Nimmer, at 3-12 to 3-13.

Defendants contend that Siegel's Superboy submissions are almost completely derivative of Superman, contain no original copyrightable element within

1  them, and, therefore, are not a protectable derivative work. (Defs' Opp. to Pls' Mot.

2  Partial Summ. J. at 24 ("derivative works based upon and incorporating pre-existing

3  Superman elements and ideas that were previously published")).  To defendants,

4  "the submissions are based upon and, indeed dominated by, pre-existing,

5  published Superman elements . . . previously published by Detective at the time the

6  works were submitted by Siegel." (Defs' Mot. Summ. J. at 12).  When these pre-

7  existing elements are removed from Siegel's submissions, all that is left, according

8  to defendants, is the unelaborated concept of Superman as a youth, or as plaintiffs

9  deride it, "'Superboy' is merely 'Superman' in smaller tights." (Pls' Reply in Supp.

10  Mot. Partial Summ. J. at 1).  Viewing this singular additional material to be merely

11  trivial and insufficiently distinguishable, defendants argue that there is no

12  copyrightable material within Siegel's Superboy submissions.

13      Plaintiffs again respond by pointing to the referee's findings as conclusively

14  establishing that Superboy is not a completely derivative work.  In particular,

15  plaintiffs note the referee's observation in his November, 1947, opinion: "I cannot

16  accept defendants view that Superboy was in reality Superman . . . .  Superboy was

17  a separate and distinct entity"; this finding, plaintiffs argue, is fundamentally

18  inconsistent with a finding that Siegel's Superboy submissions is completely a

19  derivative work. (Pls' Reply in Supp. Mot. Partial Summ. J. at 18).  Plaintiffs

20  characterize the referee's statement as a conclusion that Siegel's Superboy

21  submissions were "sufficiently new and original to constitute a distinct work from

22  Superman." (Id. at 19).  Bolstering their view is the referee's separate finding that

23  Superman "did not contain the plan, scheme, idea or conception of the comic strip

24  Superboy."

25      The problem with this argument is two-fold.  First, such a pure finding

26  relating to copyright law — that Superboy is not a "derivative work" under the 1909

27  Act — would, for the reasons set forth above, be well beyond the referee's

28  jurisdiction to make.  There was no state law claim requiring consideration of

1  whether there was any original elements contained in Siegel's Superboy

2  submissions.  More importantly, the Court finds nothing in the referee's findings and

3  conclusions relied upon by plaintiffs that would preclude litigation in this proceeding

4  concerning the derivative nature, if any, of Siegel's Superboy submissions pursuant

5  to federal copyright law.

6         Although at first glance the referee's findings may appear to speak directly

7  and conclusively to the issue of whether Superboy is a derivative work, upon further

8  assessment that is not necessarily the case.  One must remember the context in

9  which the referee's statement was made:  The question for the referee to resolve

10  was whether Superboy was part and parcel of Superman for purposes of whether

11  the first refusal rights contained in the parties' September, 1938, agreement were

12  implicated.  The question resolved by the referee was a matter of contract

13  interpretation — what did the parties mean when they used the phrase "Superman"

14  in their contract —  not whether Superboy contained any original elements worthy

15  of copyright protection.  That Siegel's Superboy was distinct from Superman (even

16  assuming that the referee was speaking beyond the confines of the narrow contract

17  claim in dispute before him and making a larger observation of the two characters'

18  separateness) does not inform this Court's decision as to whether that which made

19  Siegel's Superboy distinct is also original (or more particularly, more than a merely

20  trivial variation from Superman) as that term is understood in federal copyright law

21  so as to render Siegel's creation subject to copyright protection.  In addition, even

22  more problematic is the fact that the referee nowhere identifies in what way or

23  manner Siegel's Superboy is distinct from Superman, such differentiation forming

24  the subject of any copyrightable material in this case.

25         By way of further argument, plaintiffs seek to describe, in the most general of

26  ways, the additional material supplied by Siegel:

27             Siegel's "Superboy" focuses on the character, family and
             social life of a youth growing up in a small rural town
28             who faces the challenges of adolescence while
             repressing who he really is.  Siegel's story is primarily

> devoted to the close relationship between "Superboy"
> and his earnest adoptive parents, and follows
> "Superboy's" small town adventures with his school
> classmates and townsfolk. . . . "Superboy" [is] a
> sufficiently original and distinct character and story from
> "Superman" to warrant independent copyright protection.

(Pls' Reply in Supp. Mot. Partial Summ. J. at 19, 20).

From this description it appears to the Court that, in addition to any argument that Superboy himself (or perhaps Ma and Pa Kent) was a separate copyrightable character, plaintiffs also argue that certain plot lines contained in Siegel's script were sufficiently distinct as to warrant separate copyright protection. (Pls' Opp. to Defs' Mot. Summ. J. at 12 ("The new elements in 'Superboy' authored by Siegel, including the themes, characters, relationships, mood, settings, locale and the interplay of such elements, are squarely protected by the Copyright Act")).

The Court is mindful that plaintiffs have never claimed that Siegel's Superboy is not derivative of Superman. Instead, they argue that his submissions contained original additional material that is itself entitled to copyright protection. (Pl's Opp. to Defs' Mot. Summ. J. at 11-12 ("Plaintiffs have never claimed that 'Superboy' is 'unrelated' to 'Superman' or that 'the Superboy character has nothing to do with the Superman character")). The problem the Court has with the parties' briefing on this issue is that, aside from seeking to delineate the "additional" material supplied by Siegel in his submissions, neither side has attempted to demonstrate how that material (whatever it may be, either by itself or when viewed as a whole) was more than a trivial variation from the pre-existing material in Superman, other comic book characters in general, or even more broadly with other fictional characters.

The Court, for example, has been presented with no evidence addressing whether other adolescent superhero comic book characters existed before Siegel conceived of Superboy in his submissions. Defendants make mention of a couple of panels in earlier Superman comic books where Superman was shown as an

1  infant, but nowhere have they pointed to comic strips where the storyline

2  delineating this aspect of the Superman character had been so fleshed out as to

3  comprise part of the pre-existing work.

4      Case law under the 1909 Act speaks to the issue of originality in the context

5  of fictional characters in general and Superman in particular.  The controlling

6  principle was stated by Judge Learned Hand long ago when he added that fictional

7  characters may be protected by copyright "quite independently of the 'plot' proper,"

8  but added such characters must be sufficiently developed beyond "stock

9  characters" to obtain protection:

> Upon any work . . . a great number of patterns of increasing generality will fit equally well, as more and more incident is left out.  The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected . . . .  If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress.  These would be no more than Shakespeare's "ideas" in the play, as little capable of monopoly as Einstein's Doctrine of Relativity or Darwin's theory of the Origin of Species.  It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for making them too indistinctly.

20  Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2nd Cir. 1930).

21      By the same token, the less developed a character in a prior work, the more

22  room for the addition of material that will comprise more than a trivial variation from

23  that character and, hence, be subject to copyright protection.  Thus, the relevant

24  question is how much, and to what extent, had the Superman character been

25  fleshed out by the time Siegel submitted his Superboy material to Detective

26  Comics.  A decision by the Second Circuit concerning the Superman copyright

27  contemporaneous with Siegel's submissions, Detective Comics, Inc. v. Bruns

28  Publications, Inc., 111 F.2d 432 (2nd Cir. 1940), sheds some light on the matter.

1   There the court described the protectable elements of the Superman character as:

2       "a man of miraculous strength and speed . . . [who] at
        times conceals his strength beneath ordinary clothing
3       but after removing his cloak stands revealed in full
        panoply in a skin-tight acrobatic costume. . . . [He] is
4       termed the champion of the oppressed. [He] is shown
        running toward a full moon 'off into the night,' and . . . is
5       shown crushing a gun in his powerful hands.
        'Superman' is pictured as stopping a bullet with his
6       person. . . . 'Superman' is shown as leaping over a
        twenty story building . . . [and is] endowed with sufficient
7       strength to rip open a steel door. [He] is described as
        being the strongest man in the world and . . . as battling
8       against 'evil and injustice.'

9   111 F.2d at 433; see also National Comics Publications, Inc. v. Fawcett

10  Publications, Inc., 191 F.2d 594, 600 (2nd Cir. 1951) (Learned Hand, J.) (describing

11  earlier decision in Bruns Publishing as "limit[ing] the copyright to the specific

12  exploits of 'Superman,' as each picture portrayed them"). It is thus the character's

13  traits and attributes, as well as the character's interaction with other characters

14  (notably compatriots and villains), that help define the boundaries of the copyright

15  to a character. As Nimmer has observed in his treatise, "a visual similarity

16  (although not completely identical in appearance) plus a similarity in character

17  traits, may prove sufficient to constitute an infringement, even where the names of

18  the plaintiff's and defendant's characters differ." 1 Nimmer § 2.12, at 2-178.29 to 2-

19  178.30; see also Warner Bros. v. American Broadcasting Cos., 720 F.2d 231, 241

20  (2nd Cir. 1983); Sapon v. DC Comics, 62 U.S.P.Q.2d 1691 (S.D.N.Y. 2002)

21  (examining whether author's additional material was sufficiently original as to be

22  considered a protectable derivative work of Batman).

23      Given the factually intensive nature of the question, and the lack of

24  elaboration in the parties' briefs on the topic, the Court finds that the better course

25  at this point is to allow the parties an opportunity to more fully explore and provide

26  their positions as to the derivative nature, if any, of Siegel's Superboy submissions,

27  bearing in mind the legal principles set forth in Nichols as expounded in Bruns

28  Publications, Warner Bros, and Sapon.

1    Accordingly, the Court finds that Siegel's Superboy submissions were not a
2    work made for hire. However, for the reasons set forth above, the Court finds that it
3    cannot, at this stage, make a determination whether Siegel's Superboy
4    submissions were completely derivative of Superman or, if not, to what extent those
5    submissions contained additional, original copyrightable material. Without resolving
6    this point, the Court cannot make a corresponding finding whether Siegel's
7    Superboy submissions were published in volume 101 of <u>More Fun Comics</u> or
8    whether those submissions were contributions to a joint work with Shuster. Given
9    the critical nature of the derivative work issue to this case, the Court hereby
10   **ORDERS** that the parties submit simultaneous competing briefs within thirty (30)
11   days from the date of this Order concerning that issue, and that issue alone.

### IV. CONCLUSION

13   As set forth herein, the Court **GRANTS** defendants' motion for
14   reconsideration. Consistent with this holding, the Court **VACATES** the following
15   portions of the March 23, 2006, Order: Page 4, line 23 through page 12, line 5;
16   page 14, line 2 through page 14, line 20; and page 15, line 1 through page 15, line
17   6. The portion of the March 23, 2006, Order denying defendants' motion for
18   summary judgment on the question of infringement remains in effect. The Court
19   also **VACATES** the portions of the plaintiffs' statement of facts, entered on March
20   27, 2006, that are inconsistent with this Order.

21   The Court finds that the referee's findings from the 1947 Westchester
22   County action must be given preclusive effect pursuant to the doctrine of collateral
23   estoppel. Based on the referee's findings, the Court has determined that Siegel's
24   Superboy submissions were not a work made for hire, but the Court is unable to
25   conclude whether the requisite "publication" of the Superboy submissions occurred
26   due to the unresolved matter regarding the submissions' derivative nature.
27   Similarly, the Court was unable to conclude whether the Superboy submissions
28   were part of a joint work, but only because the issue of whether the submissions

1    are a derivative work remains unresolved (and a subject of further court-ordered

2    briefing).

3          IT IS SO ORDERED.

4

5    DATE:  _7/27/07_____

6

7                                         STEPHEN G. LARSON
                                          UNITED STATES DISTRICT JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28