1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          CENTRAL DISTRICT OF CALIFORNIA

10   JOANNE SIEGEL and LAURA SIEGEL    )
     LARSON,                           )    CASE NO. CV-04-8400-SGL (RZx)
11                                     )
                                       )    [Consolidated for pre-trial and discovery
12              Plaintiffs,            )    purposes with CV-04-8776-SGL (RZx)]
                                       )
13   v.                                )    ORDER GRANTING IN PART AND
                                       )    DENYING IN PART PLAINTIFFS'
14   WARNER BROS. ENTERTAINMENT        )    MOTION FOR PARTIAL SUMMARY
     INC.; TIME WARNER INC.; and DC    )    JUDGMENT; ORDER GRANTING IN
15   COMICS,                           )    PART AND DENYING IN PART
                                       )    DEFENDANTS' MOTION FOR PARTIAL
16              Defendants.            )    SUMMARY JUDGMENT
     ─────────────────────────────    )
17

18        The termination provisions contained in the Copyright Act of 1976 have aptly

19   been characterized as formalistic and complex, such that authors, or their heirs,

20   successfully terminating the grant to the copyright in their original work of authorship

21   is a feat accomplished "against all odds."  2 WILLIAM F. PATRY, PATRY ON COPYRIGHT

22   § 7:52 (2007).

23        In the present case, Joanne Siegel and Laura Siegel Larson, the widow and

24   the daughter of Jerome Siegel, seek a declaration from the Court that they have

25   overcome these odds and have successfully terminated the 1938 grant by Jerome

26   Siegel and his creative partner, Joseph Shuster, of the copyright in their creation of

27   the iconic comic book superhero "Superman," thereby recapturing Jerome Siegel's

28   half of the copyright in the same.  No small feat indeed.  It requires traversing the

Dockets.Justia.com

many impediments — many requiring a detailed historical understanding both factually and legally of the events that occurred between the parties over the past seventy years — to achieving that goal and, just as importantly, reckoning with the limits of what can be gained through the termination of that grant.

Any discussion about the termination of the initial grant to the copyright in a work begins, as the Court does here, with the story of the creation of the work itself.

In 1932, Jerome Siegel and Joseph Shuster were teenagers at Glenville High School in Cleveland, Ohio. Siegel was an aspiring writer and Shuster an aspiring artist; what Siegel later did with his typewriter and Shuster with his pen would transform the comic book industry. The two met while working on their high school's newspaper where they discovered their shared passion for science fiction and comics, the beginning of a remarkable and fruitful relationship.

One of their first collaborations was publishing a mail-order fanzine titled "Science Fiction: The Advance Guard of Future Civilization."[1] In the January, 1933, issue, Siegel and Shuster's first superman character appeared in the short story "The Reign of the Superman," but in the form of a villain not a hero. The story told of a "mad scientist's experiment with a deprived man from the breadlines" that transformed "the man into a mental giant who then uses his new powers — the ability to read and control minds — to steal a fortune and attempt to dominate the world." (Decl. Michael Bergman, Ex. HH at 1126). This initial superman character in villain trappings was drawn by Shuster as a bald-headed mad man.

A couple of months later it occurred to Siegel that re-writing the character as a hero, bearing little resemblance to his villainous namesake, "might make a great comic strip character." (Decl. Michael Bergman, Ex. HH at 1126). Much of Siegel's desire to shift the role of his protagonist from villain to hero arose from Siegel's exposure to despair and hope: Despair created by the dark days of the Depression

---

[1] A fanzine is a publication, usually distributed at no or nominal cost, produced by fans of a particular topic (such as comic books, opera, murder mystery stories, etc.) for others who share their interest.

and hope through exposure to the "gallant, crusading heros" in popular literature and the movies.  (Decl. Michael Bergman, Ex. HH at 1126).  The theme of hope amidst despair struck the young Siegel as an apt subject for his comic strip: "Superman was the answer — Superman aiding the downtrodden and oppressed." (Decl. Michael Bergman, Ex. HH at 1126).

Thereafter, Siegel sat down to create a comic book version of his new character.  While he labored over the script, Shuster began the task of drawing the panels visualizing that script.  Titling it "The Superman," "[t]heir first rendition of the man of steel was a hulking strongman who wore a T-shirt and pants rather than a cape and tights."  (Decl. Michael Bergman, Ex. HH at 1129)  And he was not yet able to hurdle skyscrapers, nor was he from a far away planet; instead, he was simply a strong (but not extraordinarily so) human, in the mold of Flash Gordon or Tarzan, who combated crime.  Siegel and Shuster sent their material to a publisher of comic books —  Detective Dan — and were informed that it had been accepted for publication.  Their success, however, was short-lived; the publisher later rescinded its offer to publish their submission.  Crestfallen, Shuster threw into the fireplace all the art for the story except the cover (reproduced below), which Siegel rescued from the flames.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



EXHIBIT HH

17    Undaunted, Siegel continued to tinker with his character, but decided to try a

18  different publication format, a newspaper comic strip.  The choice of crafting the

19  material in a newspaper comic strip format was influenced both by the failure to get

20  their earlier incarnation of the Superman character published by <u>Detective Dan</u> in a

21  comic book format, and by the fact that, at the time, black-and-white newspaper

22  comic strips — not comic books — were the most popular medium for comics.  As

23  one observer of the period has commented:

24          It is worth noting the extent to which early comic books
        were conjoined with newspaper strips of the day.  The
25        earliest comic books consisted of reprints of those
        newspaper strips, re-pasted into a comic book page
26        format.  When original material began appearing in
        comic book format, it was generally because companies
27        that wished to publish comic books were unable to
        procure reprint rights to existing newspaper strips.  The
28        solution to this . . . was to hire young [comic strip artists]
        to simulate the same kind of newspaper strip material.

(Decl. Mark Evanier, Ex. A at 5-6).

On a hot summer night in 1934, Siegel, unable to sleep, began brainstorming over plot ideas for this new feature when an idea struck him:  "I was up late counting sheep and more and more ideas kept coming to me, and I wrote out several weeks of syndicate script for the proposed newspaper strip.  When morning came, I dashed over to Joe [Shuster]'s place and showed it to him."  (Decl. Michael Bergman, Ex. HH at 1129).  Siegel re-envisioned his character in more of the mythic hero tradition of Hercules, righting wrongs in present-day society.  His inspiration was to couple an exaggeration of the daring on-screen acrobatics performed by such actors as Douglas Fairbanks, Sr., with a pseudo-scientific explanation to make such fantastic abilities more plausible in the vein of Edgar Rice Burroughs' John Carter of Mars stories, and placing all of this within a storyline that was the reverse of the formula used in the Flash Gordon serials.  The end product was of a character who is sent as an infant to Earth aboard a space ship from an unnamed distant planet (that had been destroyed by old age) who, upon becoming an adult, uses his superhuman powers (gained from the fact that his alien heritage made him millions of years more evolved than ordinary humans) to perform daring feats for the public good.

Siegel named his character "Superman."  Unlike his previous incarnation, Siegel's new Superman character's powers and abilities were much more extraordinary and fantastic:  Superhuman strength; the ability to leap 1/8th of a mile, hurdle a twenty-story building, and run faster than an express train; and nothing less than a bursting shell could penetrate his skin.  Siegel placed his character in a very cosmopolitan environment that had the look and feel of mid-thirties America.  He also humanized his character by giving his superhero an "ordinary person" alter ego:  Mild-mannered, big-city newspaper reporter Clark Kent.  Siegel developed this concept of Superman's secret identity both as a means for his superhero to maintain an inconspicuous position in everyday society and as a literary device to

introduce a conflict — and the potential for story lines centered around that conflict — between the character's dual identities, a conflict played out no more dramatically than in the love "triangle" between the character's dual identities and another newspaper reporter, Lois Lane.

Shuster immediately turned his attention to giving life and color to Siegel's idea by drawing illustrations for the story. Shuster conceived of the costume for Siegel's Superman superhero — a cape and tight-fitting leotard with briefs, an "S" emblazoned on an inverted triangular crest on his chest, and boots as footwear. In contrast, he costumed Clark Kent in a nondescript suit, wearing black-rimmed glasses, combed black hair, and sporting a fedora. He drew Superman and his alter ego Clark Kent with chiseled features, gave him a hairstyle with a distinctive curl over his forehead, and endowed him with a lean, muscular physique. Clark Kent hid most of these physical attributes behind his wardrobe, which he could quickly doff revealing his Superman costume underneath when he was called to action by someone in need of his superpowers. One of the earliest of Shuster's sketches of Superman and Clark Kent from this 1934 or 1935 period are depicted below:



CLARK KENT          SUPERMAN

ONE AND SAME!

The two then set about combining Siegel's literary material with Shuster's graphical representations. Together they crafted a comic strip consisting of several weeks' worth of material suitable for newspaper syndication. Siegel typed the dialogue and Shuster penciled in artwork, resulting in four weeks of Superman comic strips intended for newspapers. (Decl. Michael Bergman, Ex. H at 1). The art work for the first week's worth "of daily [comic] strips was completely inked" and thus ready for publication. (Decl. Michael Bergman, Ex. H at 1). The "three additional weeks of 'Superman' newspaper comic strip material" differed from the first week's material "only in that the art work, dialogue and the balloons in which the dialogue appeared had not been inked," instead consisting of no more than black-and-white pencil drawings. (Decl. Michael Bergman, Exs. G at 2 & H at 1-2).

Siegel also wrote material to which Shuster provided no illustrations: A paragraph previewing future Superman exploits, and a nine-page synopsis of the storyline appearing in the three weeks of penciled daily Superman newspaper comic strips. (Decl. James Steranko, Ex. A at 4; Decl. Michael Bergman, Ex. H at

2).

The two shopped the character for a number of years to numerous publishers but were unsuccessful.  As Siegel later recalled:  One publisher "expressed interest in Superman," but preferred that it be "published in comic book form where it would be seen in color" rather than "a black-and-white daily strip," a suggestion to which he and Shuster balked given their earlier experience with the comic book publisher of Detective Dan.  (Decl. Michael Bergman, Ex. H at 2).

In the meantime, Siegel and Shuster penned other comic strips, most notably "Slam Bradley" and "The Spy," that were sold to Nicholson Publishing Company. When Nicholson folded shop in 1937, Detective Comics acquired some of its comic strip properties, including "Slam Bradley" and "The Spy."

On December 4, 1937, Siegel and Shuster entered into an agreement with Detective Comics whereby they agreed to furnish some of these existing comic strips for the next two years, and further agreed "that all of these products and work done by [them] for [Detective Comics] during said period of employment shall be and become the sole and exclusive property of [Detective Comics,] and [that Detective Comics] shall be deemed the sole creator thereof . . . ."  (Decl. Michael Bergman, Ex. A).  The agreement further provided that any new or additional features by Siegel and Shuster were to be submitted first to Detective Comics, who was given a sixty-day option to publish the material.

Soon thereafter Detective Comics decided to issue a new comic book magazine titled Action Comics and began seeking new material.  Inquiry was made of many newspaper comic strip publishers, including McClure Newspaper Syndicate.  Amongst the material submitted by McClure to Detective Comics was the previously rejected Siegel and Shuster Superman comic strip.  Detective Comics soon became interested in publishing Siegel and Shuster's now well-traveled Superman material, but in an expanded thirteen-page comic book format, for release in its first volume of Action Comics.

On February 1, 1938, Detective Comics returned the existing Superman newspaper comic strip material to Siegel and Shuster for revision and expansion into a full-length, thirteen-page comic book production. Detective Comics' desire to place Superman in a comic book required that Siegel and Shuster reformat their existing Superman newspaper material by re-cutting the strip into separate panels and then re-pasting it into a comic book format.

An issue emerged due to Detective Comics' additional requirement that there be eight panels per page in the comic book. Siegel and Shuster's existing Superman newspaper material did not have enough drawings to meet this format. In response, portions of the thirteen-page comic went forward with fewer than eight panels per page, and in the remaining pages Shuster either trimmed or split existing panels to stay within the page size, or drew additional panels from the existing dialogue to meet the eight-panel requirement. As Shuster later recounted:

> The only thing I had to do to prepare Superman for comic book publication was to ink the last three weeks of daily strips which I had previously completely penciled in detail. In addition, I inked the lettering and the dialogue and story continuity and inked in the balloons containing the dialogue. Certain panels I trimmed to conform to Detective's page size. I drew several additional pictures to illustrate the story continuity and these appear on page 1 of the first Superman release. This was done so that we would be certain of having a sufficient number of panels to make a thirteen page release. Finally, I drew the last panel appearing on the thirteenth page. Detective's only concern was that there would be panels sufficient for thirteen complete pages. Jerry told me that Detective preferred having eight panels per page but in our judgment this would hurt the property. I specifically refer to the very large panel appearing on what would be page 9 of the thirteen page release. We did not want to alter this because of its dramatic effect. Accordingly, on this page but six panels appeared.

(Decl. Michael Bergman, Ex. G at 2). Siegel similarly recollected:

> Upon receiving word from Detective that we could proceed, Joe Shuster, under my supervision, inked the illustrations, lettering and dialogue balloons in the three weeks of daily strips that had been previously penciled. In addition, he trimmed certain pictures to meet Detective's panel specifications and extended others. To assure ourselves of having the proper number of

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> panels we added several pictures to illustrate the story
> continuity, I had already written.  Added as well for this
> reason was the scientific explanation on page 1 of the
> release and the last panel at the foot of page 13.

(Decl. Michael Bergman, Ex. H at 5).

On or around February 16, 1938, the pair resubmitted the re-formatted Superman material to Detective Comics.  Soon thereafter Detective Comics informed Siegel that, as he had earlier suggested to them, one of the panels from their Superman comic would be used as the template (albeit slightly altered from the original) for the cover of the inaugural issue of Action Comics.  (Decl. Michael Bergman, Ex. I).

On March 1, 1938, prior to the printing of the first issue of Action Comics, Detective Comics wrote to Siegel, enclosing a check in the sum of $130, representing the per-page rate for the thirteen-page Superman comic book release and enclosing with it a written agreement for Siegel and Shuster's signatures.  The agreement assigned to Detective Comics "all [the] good will attached . . . and exclusive right[s]" to Superman "to have and hold forever."  (Decl. Michael Bergman, Ex. F).  Siegel and Shuster executed and returned the written assignment to Detective Comics.

This world-wide grant in ownership rights was later confirmed in a September 22, 1938, employment agreement in which Siegel and Shuster acknowledged that Detective Comics was "the exclusive owner[]" of not only the other comic strips they had penned for Nicholson (and continued to pen for Detective Comics), but Superman as well; that they would continue to supply the artwork and storyline (or in the parlance of the trade, the "continuity") for these comics at varying per-page rates depending upon the comic in question for the next five years; that Detective Comics had the "right to reasonably supervise the editorial matter" of those existing comic strips; that Siegel and Shuster would not furnish "any art copy . . . containing the . . . characters or continuity thereof or in any wise similar" to these comics to a third party; and that Detective Comics would have the right of first refusal (to be

exercised within a six-week period after the comic's submission) with respect to any future comic creations by Siegel or Shuster.

Detective Comics announced the debut of its Action Comics series with full page announcements in the issues of some of its existing publications. Specifically, in More Fun Comics, Vol. 31, with a cover date of May, 1938, Detective Comics placed the following black-and-white promotional advertisement on the comic's inside cover, which reproduced the cover of the soon-to-be published first issue of Action Comics, albeit in a greatly reduced size:



Similarly, Detective Comics, Vol. 15, with a cover date of May, 1938, had a full-page black-and-white promotional advertisement on the comic's inside cover which contained within it a reproduction of the cover (again in a reduced scale) of the soon-to-be published first issue of Action Comics:



To provide some context and contrast, the cover of the first issue of <u>Action Comics</u> is notable for its difference from the promotional advertisements both in its scale and its colorized format.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17     Superman itself was published by Detective Comics on April 18, 1938, in

18 Action Comics, Vol. 1, which had a cover date of June, 1938.  A full reproduction of

19 the original Superman comic contained in Action Comics, Vol. 1, is attached as an

20 addendum to this Order.  See Attachment A to this Order.  The Superman comic

21 became an instant success, and Superman's popularity continues to endure to this

22 day as his depiction has been transferred to varying media formats.

23     The Superman character has evolved in subsequent works since his initial

24 depiction in Action Comics, Vol. 1.  These additional works have added decades of

25 new material to further define, update, and develop the character (such as his

26 origins, his relationships, and his powers and weaknesses) in an ongoing flow of

27 new exploits and supporting characters, resulting in the creation of an entire fictional

28 Superman "universe."  For instance, absent from Action Comics, Vol. 1, was any

reference to some of the more famous story elements now associated with Superman, such as the name of Superman's home planet "Krypton."  Many of Superman's powers that are among his most famous today did not appear in <u>Action Comics</u>, Vol. 1, including his ability to fly (even through the vacuum of space); his super-vision, which enables him to see through walls ("x-ray" vision) and across great distances ("telescopic" vision); his super-hearing, which enables him to hear conversations at great distances; and his "heat vision," the ability to aim rays of extreme heat with his eyes.  The "scientific" explanation for these powers was also altered in ensuing comics, initially as owing to differences in gravity between Earth and Superman's home planet (the latter being much larger in size than the former), and later because Krypton orbited a red sun, and his exposure to the yellow rays of Earth's sun somehow made his powers possible.  In a similar Earth-Krypton connection, it was later revealed that Superman's powers could be nullified by his exposure to Kryptonite, radioactive mineral particles of his destroyed home planet.

Aside from the further delineation of Superman's powers and weaknesses, many other elements from the Superman story were developed in subsequent publications.  Some of the most famous supporting characters associated with Superman, such as Jimmy Olsen and rival villains Lex Luthor, General Zod, and Brainiac, were created long after <u>Action Comics</u>, Vol. 1, was published.  Moreover, certain elements contained in <u>Action Comics</u>, Vol. 1, were altered, even if slightly, in later publications, most notably Superman's crest.  In <u>Action Comics</u>, Vol. 1, the crest emblem was a small, yellow, inverted triangle bearing the letter "S" in the middle, shown throughout the comic as solid yellow in most instances and as a red "S" in two instances.  Thereafter, the emblem changed, and today is a large yellow five-sided shield, outlined in the color red, and bearing the letter "S" in the middle, also in the color red.

The acclaim to which the release of <u>Action Comics</u>, Vo. 1, was greeted by the viewing public quickly made Superman not only the iconic face for the comic

book industry but also a powerful super-salesman for his publisher.  Detective

Comics oversaw the creation, development, and licensing of the Superman

character in a variety of media, including but not limited to radio, novels, live action

and animated motion pictures, television, live theatrical productions, merchandise

and theme parks.  From such promotional activity, Detective Comics came to "own[]

dozens of federal trademark registrations for Superman related indicia, such as

certain key symbols across a broad array of goods and services."  (Decl. Paul Levitz

¶ 10).  The most notable of these marks that are placed on various items of

merchandise are "Superman's characteristic outfit, comprised of a full length blue

leotard with red cape, a yellow belt, the S in Shield Device, as well as certain key

identifying phrases[,]" such as "'Look! . . . Up in the sky! . . . It's a bird! . . . It's a

plane! . . . It's Superman!"  (Decl. Paul Levitz ¶ 10).

        Meanwhile, Siegel continued to submit other comic book characters to

Detective Comics that were also published.  Sometimes these submissions were

without Shuster serving as an illustrator and sometimes, such as in the case of

Superman's youthful persona "Superboy," see Siegel v. Time Warner Inc., 496 F.

Supp. 2d 1111 (C.D. Cal. 2007), without illustrations accompanying the submission.

Among these subsequent creations was "The Spectre," a comic written by Siegel

and illustrated by Bernard Baily, which first appeared in 1940 in Detective Comics'

More Fun Comics, Vol. 52.  The comic told the story about a superhero with a

supernatural bent — the character being the spirit of a police officer killed in the line

of duty while investigating a gangland overlord and who, after meeting a higher

force in the hereafter, is sent back to Earth with nearly limitless abilities but offered

eternal rest only when he has wiped out all crime.

        With Superman's growing popularity, a growing rift developed between the

parties.  Siegel and Shuster believed that Detective Comics' poached the artists

apprenticing out of Siegel and Shuster's studio in Cleveland by moving them in-

house to its New York offices, and further believed that Detective Comics had not

paid them their fair share of profits generated from the exploitation of their
Superman creation and from the profits generated from copycat characters that
they believed had their roots in the original Superman character.  As a result, in
1947, Siegel and Shuster brought an action against Detective Comics' successor in
interest in New York Supreme Court, Westchester County, seeking, among other
things, to annul and rescind their previous agreements with Detective Comics
assigning their ownership rights in Superman as void for lack of mutuality and
consideration.

After a trial, official referee J. Addison Young issued detailed findings of fact
and conclusions of law wherein he found that the March 1, 1938, assignment of  the
Superman copyright to Detective Comics was valid and supported by valuable
consideration and that, therefore, Detective Comics was the exclusive owner of "all"
the rights to Superman.  The parties eventually settled the Westchester action and
signed a stipulation on May 19, 1948, whereby in exchange for the payment of over
$94,000 to Siegel and Shuster, the parties reiterated the referee's earlier finding
that Detective Comics owned all rights to Superman.  Two days later, the official
referee entered a final consent judgment vacating his earlier findings of fact and
conclusions of law, and otherwise reiterating the recitals contained in the stipulation.

The feud between the parties did not end after the Westchester action.  In
the mid-1960s, the simmering dispute boiled anew when the expiration of the initial
copyright term for Superman led to another round of litigation over ownership to the
copyright's renewal term.[2]  In 1969, Siegel and Shuster filed suit in federal district
court in New York seeking a declaration that they, not Detective Comics' successor

---

[2]  Under the Copyright Act of 1909 (the "1909 Act"), which was in effect at
the time of Siegel and Shuster's creation of Superman and later assignment of
rights in the same to Detective Comics, an author was entitled to a copyright in his
work for twenty-eight years from the date of its publication.  See 17 U.S.C. § 24,
repealed by Copyright Act of 1976, 17 U.S.C. § 101 et seq.  Upon the expiration of
this initial twenty-eight year term, the author could renew the copyright for a
second twenty-eight year period (the "renewal term").

(National Periodical Publications, Inc.), were the owners of the renewal rights to the Superman copyright.  See Siegel v. National Periodical Publications, Inc., 364 F.Supp. 1032 (S.D.N.Y. 1973), aff'd by, 508 F.2d 909 (2nd Cir. 1974).  The end result of the litigation was that, in conformity with United States Supreme Court precedent at the time, see Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643, 656-59 (1943), in transferring "all their rights" to Superman in the March 1, 1938, grant to Detective Comics (which was reconfirmed in the 1948 stipulation), Siegel and Shuster had assigned not only Superman's initial copyright term but the renewal term as well, even though those renewal rights had yet to vest when the grant (and later the stipulation) was made.

After the conclusion of the 1970s Superman litigation, the New York Times "ran a story about how the two creators of Superman were living in near destitute conditions":

> Two 61-year-old men, nearly destitute and worried about how they will support themselves in their old age, are invoking the spirit of Superman for help. Joseph Shuster, who sits amidst his threadbare furniture in Queens, and Jerry Siegel, who waits in his cramped apartment in Los Angeles, share the hope that they each will get pensions from the Man of Steel.

Mary Breasted, Superman's Creators, Nearly Destitute, Invoke His Spirit, N.Y. TIMES, Nov. 22, 1975, at 62.

Apparently in response to the bad publicity associated with this and similar articles, the parties thereafter entered into a further agreement, dated December 23, 1975.  See id. ("'There is no legal obligation,' Mr. Emmett[, executive vice-president of Warner Communications, Inc.,] said, 'but I sure feel that there is a moral obligation on our part'").  In the agreement, Siegel and Shuster re-acknowledged the Second Circuit's decision that "all right, title and interest in" Superman ("including any and all renewals and extensions of . . . such rights") resided exclusively with DC Comics and its corporate affiliates and, in return, DC Comics' now parent company, Warner Communications, Inc. ("WCI"), provided

Siegel and Shuster with modest annual payments for the remainder of their lives; provided them medical insurance under the plan for its employees; and credited them as the "creators of Superman."  In tendering this payment, Warner Communications, Inc. specifically stated that it had no legal obligation to do so, but that it did so solely "in consideration" of the pair's "past services . . . and in view of [their] present circumstances," emphasizing that the payments were "voluntary." The 1975 agreement also made certain provisions for Siegel's spouse Joanne, providing her with certain monthly payments "for the balance of her life if Siegel" died before December 31, 1985.  Finally, Warner Communications, Inc. noted that its obligation to make such voluntary payments would cease if either Siegel or Shuster (or their representatives) sued "asserting any right, title or interest in the 'Superman' . . . copyright."  As the years went by Warner Communications, Inc. increased the amount of the annual payments, and on at least two occasions paid the pair special bonuses.

    As the time grew nearer to the December 31, 1985, cutoff date for surviving spouse benefits, Joanne Siegel wrote the CEO for DC Comics expressing her "terrible worry" over the company's refusal to provide Jerome Siegel life insurance in the 1975 agreement.  (Decl. Michael Bergman, Ex. NN).  She voiced her concern that, should anything happen to her husband after the cutoff date, she and their daughter "would be left without any measure of [financial] security."  (Decl. Michael Bergman, Ex. NN).  The parties thereafter agreed by letter dated March 15, 1982, that Warner would pay Joanne Siegel the same benefits it had been paying her husband if he predeceased her, regardless of the time of his death.  (Decl. Michael Bergman, Ex. OO).  Jerome Siegel died on January 28, 1996, and Joanne Siegel has been receiving these voluntary survival spouse benefits since that time.

    In the meantime, changes in the law resurrected legal questions as to the ownership rights the parties had to the Superman copyright.  With the passage of the Copyright Act of 1976 (the "1976 Act"), Congress changed the legal landscape

concerning artists' transfers of the copyrights in their creations.  First, the 1976 Act expanded by nineteen years the duration of the renewal period for works, like the initial release of Superman in Action Comics, Vol. 1, that were already in their renewal term at the time of the Act's passage.  See 17 U.S.C. § 304(b).

Second, and importantly for this case, the 1976 Act gave artists and their heirs the ability to terminate any prior grants of the rights to their creations that were executed before January 1, 1978, regardless of the terms contained in such assignments, e.g., a contractual provision that all the rights (the initial and renewal) belonged exclusively to the publisher.  Specifically, section 304(c) to the 1976 Act provides that, "[i]n the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, . . . is subject to termination . . . notwithstanding any agreement to the contrary . . . ."

It is this right of termination that Joanne Siegel and Laura Siegel Larson now seek to vindicate in this case.[3]  In pursuing such a claim, the two heirs, initially sought the legal assistance of a highly regarded copyright expert, Mr. Arthur J.

_____

[3]    Although the present case only concerns the Siegel heirs' efforts to terminate the 1938 grant, it has come to the Court's attention that the estate of Superman co-creator Joseph Shuster has recently filed termination notices to reclaim the rights to the Superman copyright.  According to documents filed with the United States Copyright Office, Mark Warren Peary, the son of Shuster's sister and the court-appointed representative of the Shuster estate, has given notice of the estate's intent to terminate the 1938 grant of the Superman copyright to Detective Comics and its successors effective 2013.  As executor of the Shuster estate, Peary is entitled, under changes made to the 1976 termination provisions by the 1998 Sonny Bono Copyright Term Extension Act, to make the same termination claims for the Superman copyright that Shuster or his heirs would have been entitled to bring beforehand.  See 17 U.S.C. § 304(c)(2); 3 NIMMER ON COPYRIGHT § 11.03[A][2][a] at 11-40.1 (noting that when the 1976 Act was originally passed if an author died without leaving heirs before exercising the right to termination "the result was that no one could exercise [that] right," but this "harsh result" was "ameliorated" through the passage of the 1998 Act by providing that, "instead of lapsing," the termination right could be exercised by "the author's executor, administrator, personal representative, or trustee").

Levine, in compiling the information necessary to draft the termination notice itself.[4]

On April 3, 1997, the two heirs served seven separate notices of termination under section 304(c) of the 1976 Act, purporting to terminate several of Siegel's potential grant(s) in the Superman copyright to defendants, including the March 1, 1938, assignment; the May 19, 1948, stipulation; and the December 23, 1975, agreement. The termination notices also specified that they covered hundreds of works, with the added proviso that the intent was for the termination notice to apply "to each and every work . . . that includes or embodies" Superman, and the failure to list any such work in the notice was "unintentional and involuntary." Each of the termination notices had an effective date of April 16, 1999. A flurry of settlement discussions between the parties quickly ensued, but just as quickly fizzled out. Nearly two years then passed without much discussion between the parties.

The day before the purported termination was to take effect, defendants sent a letter to Siegel's counsel, Mr. Levine, rejecting "the validity and scope" of the termination notices. (Decl. Marc Toberoff, Ex. Q at 171). The same day DC Comics Executive Vice President and Publisher Paul Levitz wrote to Joanne Siegel that his company would "continue to provide the income and insurance benefits you . . . have been receiving under the 1975 agreement, without prejudice to [the company's] rights under that agreement, as long as we all continue to pursue the goal of working together." (Decl. Michael Bergman, Ex. P).

Not long after the termination notices' effective date passed, the Siegel heirs retained new counsel and the parties re-entered into settlement discussions to resolve their respective claims to the Superman copyright. Towards that end, DC Comics (and its "successors, past and present subsidiaries or affiliates") and the Siegel heirs executed a tolling agreement on April 6, 2000, whereby it was agreed that neither would "assert any statute of limitations . . . defense[] relating to . . . the

---

[4] Before going into private practice, Mr. Levine served as General Counsel for the United States Copyright Office and also as Executive Director for the National Commission on New Technological Uses of Copyrighted Works.

[Termination] Notices" based on "the passage of time during the period from the date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7 hereof (the 'Tolling Period')" while the parties attempted "to find an amicable resolution in respect of the [Termination] Notices." (Reply Decl. Marc Toberoff, Ex. A at 1).  The agreement further provided that the tolling period would remain in effect "until 10 business days after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the [Termination] Notices, or (b) the parties reaching an amicable resolution of the disputes between them relating to the Notices."  (Reply Decl. Marc Toberoff, Ex. A at 2).

At some point the broad outline of a global settlement concerning the copyright to the Superman material, as well as to other works Siegel either authored or contributed material to Detective Comics (notably, Superboy and The Spectre properties), was reached.  Specifically, on October 19, 2001, counsel for Joanne Siegel and Laura Siegel Larson sent a six-page letter to Warner Bros.' General Counsel confirming and summarizing the substance of the settlement.  The letter concluded that "if there is any aspect of the above that is somehow misstated, please let me know by [October 22, 2001] at 2:00, as I will be out of the office — and likely difficult to reach — for the following four weeks."  (Decl. Marc Toberoff, Ex. BB).

A week later, on October 26, 2001, Warner Bros' General Counsel John Shulman responded with a letter, stating that he had "reviewed" the summary set forth in the October 19 letter, and then "enclose[d] . . . a more fulsome outline of what we believe the deal we've agreed to is"; the outline was five pages long. (Decl. Marc Toberoff, Ex. CC).  The letter concluded that Warner Bros. was "working on the draft agreement" so as to "have this super-matter transaction in document form."  (Decl. Marc Toberoff, Ex. CC).

A few months later, on February 1, 2002, outside counsel for Warner Bros. provided a copy of the promised draft agreement (spanning fifty-six pages), with the

proviso that, "[a]s our clients have not seen this latest version of the agreement, I must reserve their right to comment." (Decl. Marc Toberoff, Ex. DD). Mention was also made in the draft agreement for the need of certain "Stand Alone Assignments" that had as yet not been finalized, something which Warner's outside counsel promised would be forthcoming. (Decl. Marc Toberoff, Ex. DD).

Three months later, on May 9, 2002, Joanne Siegel wrote a letter to Time Warner's Chief Operating Officer Richard Parsons, recounting that she and her daughter had "made painful concessions and reluctantly accepted John Shulman's last [settlement] proposal [in October, 2001]," but upon reading the proposed draft agreement learned that they had been "stabbed in the back," as it "contained new, outrageous demands that were not in the [October, 2001] proposal," such as "condition[ing] recei[pt of] financial compensation for our rights on demands which were not in the proposal we accepted." (Decl. Michael Bergman, Ex. Z). The letter concluded that "[a]fter four years we have no deal and this contract makes an agreement impossible." (Decl. Michael Bergman, Ex. Z).

Time Warner's CEO quickly responded with a letter of his own on May 21, 2002, expressing shock and dismay as "each of the major points covered in the draft agreement . . . accurately represented the agreement previously reached" by the parties. (Decl. Michael Bergman, Ex. AA). The letter continued by acknowledging that, as with all lengthy negotiations, Time Warner "expected" that the submission of the draft agreement would result in further "comments and questions on the draft" by Siegel family's representatives that "would need to [be] resolve[d]." (Decl. Michael Bergman, Ex. AA). The letter concluded by reaffirming Time Warner's continued interest "that this agreement can be closed based upon the earlier discussions with [the Siegel family's] lawyers." (Decl. Michael Bergman, Ex. AA).

Not long thereafter, the Siegel heirs' lawyers submitted for the family's review and approval a re-draft of the February 4, 2002, agreement the lawyers had crafted.

(Decl. Marc Toberoff, Ex. AA).  The Siegel heirs, on September 21, 2002, rejected the redraft and fired their attorneys.  (Decl. Marc Toberoff, Ex. AA).  That same day Joanne Siegel and Laura Siegel Larson sent a letter to DC Comics' General Counsel Paul Levitz notifying the company that they were "stopp[ing] and end[ing] negotiations with DC Comics, Inc., its parent company AOL Time Warner and all of its representatives and associates concerning" their rights to, among other things, Superman.  (Decl. Michael Bergman, Ex. DD).

Joanne Siegel and Laura Siegel Larson thereafter filed the present action, with the assistance of new counsel, Marc Toberoff, on October 8, 2004.  Both sides have since filed cross-motions for partial summary judgment.

Reduced to their essentials, the legal questions at stake in the parties' cross-motions are two-fold:

(1) The validity and enforceability of the termination notices in light of (a) whether any copyrightable Superman material contained in the promotional advertisements for Action Comics, Vol. 1, lies outside the reach of the termination notice (and hence, the termination notice is not enforceable against it);  (b) whether certain portions of the Superman comic in Action Comics, Vol. 1, are in the nature of a work for hire (and hence, not subject to termination); (c) whether the failure to list the 1948 consent judgment in the notices as one of the grants sought to be terminated materially affects the notices of termination; (d) whether the post-termination receipt of benefits under the 1975 agreement acts as a novation to re-grant the Superman copyright; (e) whether the statute of limitations ran out before the instant action was instituted thereby forestalling this lawsuit; and (f) whether the settlement negotiations that took place between the parties resulted in an enforceable agreement disposing of the claims asserted in the present action; and,

(2) The parameters of what was recaptured (and the rights flowing therefrom) through the termination notices, namely, (a) whether plaintiffs have a right to defendants' post-termination foreign profits from the exploitation of the Superman

copyright; (b) whether plaintiffs are entitled to profits from any of the various

trademarks that defendants have procured since the grant in marketing Superman;

(c) whether plaintiffs are entitled to profits from the derivative works of the

Superman material published by Detective Comics and its successors in interest

prior to the termination notice's effective date; and (d) whether any recovery of

profits extends beyond those made through DC Comics' exploitation of the

Superman copyright to that of its corporate siblings and parent who are licensees to

that copyright's movie and television rights, be it based on an alter-ego theory or

other notion of equity.

I.    Validity and Enforceability of Termination Notices

The 1976 Act created a new right allowing authors and their heirs the ability

to terminate a prior grant to the copyright in their creations. See 17 U.S.C.

§ 304(c). The 1976 Act also set forth specific steps concerning the timing and

contents of the notices that had to be served to effectuate the termination of a prior

grant. One of the most important steps was placing a limit on the temporal reach

such a notice could have on what was subject to being recaptured. Specifically, the

"[t]ermination of the grant may be effected at any time during a period of five years

beginning at the end of fifty-six years from the date copyright was originally

secured." 17 U.S.C. § 304(c)(3) (emphasis added). Moreover, the notice is

required to be "served not less than two or more than ten years before" its effective

date.

Taken together, someone seeking to exercise the termination right must

specify the effective date of the termination, and that effective date must fall within a

set five-year window which is at least fifty-six years, but no more than sixty-one

years, from the date the copyright sought to be recaptured was originally secured,

and such termination notice must be served two to ten years before its effective

date. The purpose of this time window for terminating pre-1978 grants was so that

the only rights to the copyright affected thereby were those to the 19-year extension

in the renewal term created by the 1976 Act, leaving undisturbed the grantee's vested interest to the original 28-year renewal term as set forth in the 1909 Act, the governing statute at the time the grant itself was made.

Additional procedures required to be followed to make the termination notice effective were specified as well:  The author or his or her heirs had to serve "an advance notice in writing upon the grantee or the grantee's successor in title"; the notice had to be signed by the author or his or her heirs; the notice was required to "state the effective date of the termination"; and the notice must be "recorded in the Copyright Office before the effective date of termination."  17 U.S.C. § 304(c)(4).

Beyond these statutory requirements, the notice was also required to "comply, in form, content, and manner of service, with [the] requirements that the Register of Copyrights . . . prescribe[s] by regulation."  17 U.S.C. § 304(c)(4)(B).  Toward that end, the Register promulgated regulations implementing this statutory proviso.  See 37 C.F.R. § 201.10.  Among those regulations was one requiring the terminating party to identify in the notice "each work as to which the notice of termination applies."  37 C.F.R. § 201.10(b)(1)(ii).

As one noted author has commented, "[i]t is difficult to overstate the intricacies of these [termination] provisions, the result of which is that they are barely used, no doubt the result desired by lobbyists for assignees."  William Patry, Choice of Law and International Copyright, 48 AM. J. COMP. L. 383, 447 (2000); see also Burroughs v. Metro-Goldwyn-Mayer, Inc., 683 F.2d 610, 621 (2nd Cir. 1982) (commenting that the steps necessary to make a termination effective oftentimes create "difficult, technical questions").  Those intricate provisions oftentimes create unexpected pitfalls that thwart or blunt the effort of the terminating party to reclaim the full measure of the copyright in a work of authorship.  This case is no different.

1

### 1.    Promotional Announcements

Plaintiffs gave notice that the effective date of the termination notices was April 16, 1999, meaning that, backdating from that date sixty-one years, the termination notices would leave unaffected (or better said, beyond their reach) any statutory copyright that had been secured in the Superman material before April 16, 1938.  Defendants contend that the promotional announcements for <u>Action Comics</u>, Vol. 1, featuring a graphical depiction of Superman, fall just a few days outside the five-year effective window of plaintiffs' termination notices; therefore, they argue, any copyright material contained in those promotional announcements, notably the illustration of Superman on the cover of <u>Action Comics</u>, Vol. 1, is unaffected by the termination notices and remains theirs to exploit exclusively.  As defendants frame it, section 304(c)(3)'s five-year effective window "is tantamount to a statute of limitations[;] . . . if any work falls outside the five-year window established by the [termination] effective date, it <u>cannot</u> be recaptured, and the original copyright grant remains in force for that work, allowing the grantee to continue exercising the granted rights without liability."  (Defs' Mot. Partial Summ. J. at 29).  Thus, any work that was published with notice prior to April 16, 1938, <u>i.e.</u>, sixty-one years before the stated effective date, remains untouched by the termination notice.[5]

Plaintiffs do not dispute the legal consequence section 304(c)'s five-year window has in this case on the effective reach of their termination notices.  As drafters of the notice, Siegel's heirs were given <u>carte</u> <u>blanche</u> in identifying the termination notices' effective date.  Once they chose a date, certain consequences flowed therefrom, the most important of which is to cabin the five-year window

---

[5]  Defendants also contend that the promotional advertisements are not effected by the termination notices because plaintiffs failed to list those works in their notices.  As the Court finds that the promotional advertisements fall outside the five-year window during which those notices could effectively terminate the grant in the copyright contained in them, the Court will not pass on the consequences, if any, stemming from plaintiffs' additional failure to list those promotional announcements in their notices.

within which the notice can recapture any copyright secured in the material to which the grant was directed. A copyright in a work statutorily secured even just days outside this five year window is beyond the effective reach of the termination notice, in much the same way a tardily-filed renewal registration has been held to be ineffective. Cf. 3 NIMMER ON COPYRIGHT § 9.05[b][1] at 9-44 ("a variance of even several days is fatal and that the purported renewal is void to rescue the subject work from the public domain, whether filed after expiration of the one year or prior to its initiation"). A leading treatise supports such a calculation and the consequences flowing from it:

> The appropriate dates for termination notices are measured from "the date copyright was originally secured, or beginning on January 1, 1978, whichever is later." In the case of pre-January 1, 1978 works, "secured" means the actual date the work was first published with notice (or in the case of unpublished works, the date of registration), e.g., April 15, 1970, not December 31, 1970. Failure to pay attention to the differences between the date the copyright was originally secured for purposes of section 304(c) termination of transfer and section 305 expiration of term may lead to an untimely notice of termination.

2 PATRY ON COPYRIGHT § 7:43; see also 3 NIMMER ON COPYRIGHT § 11.05[B][1] at 11-40.11 ("Suppose that statutory copyright for a song were first secured on May 21, 1925. Based on the statutory provision that termination may be effected 'beginning at the end of fifty-six years from the date copyright was originally secured,' the first effective date for termination should be May 21, 1981"); 3 JAY DRATLER, JR. AND STEPHEN M. MCJOHN, INTELLECTUAL PROPERTY LAW: COMMERCIAL CREATIVE AND INDUSTRIAL PROPERTY § 6.04A[3][a] (2008) ("If the year in which a work was so published predates the current year by more than sixty-one years, then the termination right [to that work] under section 304(c) has expired. The statute apparently requires calculation of all these termination periods from the exact date of publication, rather than from the end of the publication year, as is appropriate for determining copyright terms under the 1976 Act").

1    It is in this sense that one can say whether a termination notice is timely or

2  not, a question that does not go to the notice's validity (the notice remains valid with

3  respect to a copyright in works that was secured during the five year window) but as

4  to its enforceability against a copyright in a particular work pre- or post-dating that

5  window. Thus, the key in deciding this timeliness question begins with a

6  determination of when the copyright in the work in question was secured, and not

7  when the work itself was created.

8    The determination of when the copyright in a work is secured is when the

9  material was protected by statute, meaning when the copyright in such a work

10  secured protection under this country's copyright laws.  Under the 1909 Act,  "works

11  could have obtained statutory copyright . . . , without the necessity of registration,

12  simply by the act of publishing copies of the work bearing a proper copyright notice.

13  As to such works, registration did not create the copyright, but merely recorded it."

14  2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-148 (emphasis added); see also 17

15  U.S.C. § 10 (repealed).  Thus, the initial question is whether the comic books

16  containing the promotional announcements bore such a copyright notice upon

17  them.

18    Section 19 of the 1909 Act delineated what constituted proper notice: "The

19  notice of copyright required by section 10 of this title shall consist either of the word

20  'Copyright', the abbreviation 'Copr.', or the symbol ©, accompanied by the name of

21  the copyright proprietor, and if the work be a printed literary, musical, or dramatic

22  work, the notice shall include also the year in which the copyright was secured by

23  publication."  If the comic books in question contained such a notice, then the date

24  of publication is also the date the copyright in the material contained therein was

25  secured.  If not, then any of the copyrightable material in the works (including the

26  promotional announcements) was never secured (absent evidence that the material

27  had been registered beforehand with the Copyright Office when it was in an

28  unpublished state) but instead was injected into the public domain.

1      Here, the material submitted by defendants (the cover page for the magazine

2  and the page on which the promotional announcements is displayed) does contain

3  such a notice.  At the bottom of the promotional announcement itself is the

4  following:  "Entire contents copyright 1938 by Detective Comics, Inc."  (Decl.

5  Michael Bergman, Ex. C at 10 & Ex. D at 14).  Thus, the copyright for any of the

6  works contained in the comic books in question was secured on the date they were

7  published.

8      This leads to the next question:  What are the publication dates for the two

9  comic books that contained the promotional announcements for Action Comics,

10  Vol. 1, featuring an illustration of Superman?  Defendants have submitted the initial

11  copyright registrations for these comics, which indicate that More Fun Comics,

12  Vol. 31, was published on April 5, 1938, eleven days before the effectiveness of the

13  plaintiffs' termination notices, and that Detective Comics, Vol. 15, was published on

14  April 10, 1938, six days outside the temporal reach of the termination notices.

15  Under the 1909 Act the initial (as opposed to the renewal) copyright registration

16  constituted prima facie evidence of the publication date for a work.[6]  See 17 U.S.C.

17

18      [6]  Defendants' suggestion that the addition of section 304(a)(4)(B) by the

19  Copyright Amendments Act of 1992 somehow altered this rule by extending the prima facie imprimatur to renewals like those in this case is simply mistaken.

20  (Defs' Reply at 40 & n.16).  That section provides that, so long as the renewal occurred "within 1 year before [the] expiration" of the initial term, then "the

21  certificate of such registration shall constitute prima facie evidence as to the . . . the facts stated in the certificate."  However, the 1992 Act's provisions placed one

22  very important proviso on its applicability — its provisions applied only where a party was filing a renewal registration to the "extended term of copyright in a work."

23  Thus, the amendments' provisions were limited to renewal claims to works that were still in their initial term when the 1976 Act became effective, January 1, 1978,

24  meaning for copyrights whose first term of copyright was secured on or after January 1, 1950.  That is to say, section 304(a)(4)(B)'s provisions only applies to

25  works that had yet reached the time for renewal before the 1976 Act extended the term of the renewal period (unlike Superman in Action Comics, Vol. 1, or the

26  comics containing the promotional announcements).  For those works, the 1992 amendments allowed such renewal to be made at anytime, but provided incentives

27  for prompt renewal, the most notable being the extension of the prima facie rule to

28  such promptly filed renewal claims.  See 2 PATRY ON COPYRIGHT § 7:50 ("Effective

§ 209 (repealed) (providing that a "certificate of registration" issued by the Register of Copyrights "shall be admitted in any court as prima facie evidence of the facts stated therein"); see also Epoch Productions Corp. v. Killiam Shows, Inc., 522 F.2d 737, 745-46 (2nd Cir. 1975); 5 PATRY ON COPYRIGHT § 17:115 (observing that the reason that renewal certificates issued during the 1909 Act were not accorded prima facie status was because of the "minimal attention" the Register of Copyrights paid to the information contained therein; "[a]s long as original registration for a work has been made, the Copyright Office accept[ed] it at face value").

Plaintiffs attempt to refute this prima facie evidence through expert testimony and by legal argument.

As to the latter, plaintiffs seek to discredit the value of the initial copyright registration for More Fun Comics, Vol. 31, because Detective Comics' successor did not obtain that registration until nearly 28 years after its publication, on the eve of the expiration of the initial copyright term. The 1909 Act required that, once copyright had been secured by publication with notice, "there shall be promptly deposited" the required copies of the published work and the registration claim itself. 17 U.S.C. § 13 (repealed). Plaintiffs suggest that such a "late" initial registration raises questions as to the trustworthiness of any of the information contained in that registration. (Pls' Opp. at 48-49). Plaintiffs correctly point out that Professor Nimmer in his treatise has commented that, "where there was a failure to

June 26, 1992, Congress abolished the requirements that works in their first term of copyright published or registered between 1964 and 1977 must be timely renewed in order to enjoy the (now) 67-year renewal term. Instead, these works are now automatically renewed for the full term of 75 years. Copyrights whose first term of copyright was secured between January 1, 1950, and December 31, 1963, still had to have been renewed according to the requirements of the 1909 Act. Failure to do so resulted in the work falling into the public domain. . . . Renewal claims may still be filed at any time during the renewal period, and a number of incentives have been added to encourage filing. [One such] incentive[] for renewing provided in the Copyright Act of 1992 are the prima facie status that is accorded to the validity of the work"). Given that none of the comics in question fall within the class affected by section 304(a)(4)(B), that section's expansion of the prima facie status to renewal claims does not apply here.

promptly register and deposit, under the 1909 Act, some questions as to the viability of the copyright might be raised." 2 NIMMER ON COPYRIGHT § 7.16[A][2][b] at 7-150. But Professor Nimmer's comments as to the collateral consequences flowing from such a delay were not geared toward the validity of the copyright itself, but to the existence of an impediment to bringing an action for infringement. See id. at 7-149 (noting that Supreme Court's Washingtonian decision effectively read the "words 'promptly deposited' in Section 13 . . . not . . . as a condition subsequent that, if not satisfied, would result in destruction of the copyright," but rather "[t]he deposit . . . requirement was (as it still is) clearly a condition precedent to the right to bring an infringement action").

Although the general line of reasoning plaintiffs seek to draw from such a "late-in-time" registration makes sense from a policy perspective, plaintiffs have cited no authority that such long delays in registration vitiates or otherwise diminishes the statutorily conferred prima facie presumption to which such registration claims (and the information contained therein) are entitled, especially once a registration has (as here) been tendered. Moreover, even were the Court to entertain plaintiffs' invitation, there remains the initial registration for the other comic book in question — Detective Comics, Vol. 15 — which was obtained shortly after that comic book's publication and, hence, the problem pressed by defendants with the promotional announcement contained therein falling outside the effective reach of the termination notice remains.

Plaintiffs next contend that the copies of the registration certificates submitted by defendants have not been authenticated by the declarant to whose declaration they are affixed, and hence, are not admissible as proof of the comic books' publication date. (Pls' Opp. at 48-49 ("the certificate is not properly authenticated, but is merely attached to the declaration of defendants' attorney, who appears to have no personal knowledge of it"). Such extrinsic evidence of authenticity by the declarant is unnecessary for these copyright registration

certificates.  Under Federal Rule of Evidence 902(1), a "document bearing a seal purporting to be that of the United States . . . or of a . . . department, officer, or agency thereof," with "a signature purporting to be an attestation or execution," is considered self-authenticated.  Close inspection of the copyright registration certificates submitted by defendants clearly reveals the seal issued by the United States Copyright Office, signed by the Register of Copyrights, and bearing the following legend: "[A]ttached are additional certificates for the [comics in question] which were registered in accordance with provisions of the United States Copyright Law."  (Decl. James Weinberger, Ex. B & C).  The requirements of Rule 902(1) have been met, rendering the copies of the copyright registration certificates as self-authenticated and, thus, admissible.

The obscure nature of these promotional announcements does not alter this analysis.  It is undoubtedly true that the existence of these announcements was not widely recognized even by comic book aficionados.  That, however, does not change the effect their existence has vis-à-vis the termination notices' effective reach.  Once a termination effective date is chosen and listed in the notice, the five-year time window is an unbendable rule with an inescapable effect, not subject to harmless error analysis.  See 37 C.F.R. § 201.10(e) (limiting application to "[h]armless errors in a notice" that does not "materially affect the adequacy of the information") (emphasis added).  That good cause may have existed for failing to structure the termination notices so as to sweep the announcements within its reach does not obviate application of the rule itself.

The importance such promotional announcements may have on the reach of a termination notice that has been tendered was not lost on plaintiffs' counsel, Mr. Levine, who drafted the termination notices in this case.  He also drafted plaintiffs' termination notice with respect to The Spectre copyright, and structured it in such a way so as to include among the works affected by the notice's five-year window a promotional announcement for The Spectre contained in a comic published a month

before the one containing the first comic book story of the character.  (Decl. Michael Bergman, Exs. WW-YY (termination notice describing among the works affected by the notice the promotional announcement as "Spectre character appearing in costume in an ad in issue No. 51 of <u>More Fun Comics</u>, copyrighted November 28, 1939, as Copyright Registration No. B437786, publication date January 1940") & Decl. Paul Levitz, Ex. A (containing picture of The Spectre ad)).

Having provided <u>prima facie</u> evidence of the comic books' publication dates, the burden shifts to the plaintiffs to produce some evidence calling into question those dates.  The burden of production is not a heavy one (in large measure owing to the fact that so little is proffered by the applicant or scrutinized by the Copyright Office in the application process to procure the registration in the first instance), but it is one that must be met nonetheless.  <u>See</u> 3 PATRY ON COPYRIGHT § 9:14 ("the Copyright Office has no ability to verify facts stated in the certificate, and not surprisingly makes no effort to do so. . . .  At the most, the Office can take notice of any inconsistent facts that appear on the deposit copy and request clarification from the claimant . . . .  In any event, [the opposing party] should be required to present only a small degree of evidence calling into question the fact at issue in order to rebut the certificate's presumption").

On that point all that plaintiffs have submitted is the opinion of a comic book historian, Mark Evanier, who was retained by DC Comics in the 1970s to, among other things, assist it "in attempting to determine approximate dates of past publication" of its comics.  (Decl. Mark Evaier ¶ 12).  From this particular experience, as well as his long history in the comic book industry, Mr. Evanier seeks to cast doubt on the veracity of the asserted publication dates for the comics containing the promotional announcements.  The general thrust of his expert opinion is that, outside the first printing of certain famous comic superheros such as Superman in <u>Action Comics</u>, Vol. 1,  a particular "run of the mill" comic book's exact date of publication during the 1930s and 1940s is difficult to determine, rendering

1  the dates listed on the certificates as nothing more than "mere guesstimates" by the

2  publisher.  (Decl. Mark Evanier ¶ 10).  Furthermore, Mr. Evanier downplays the

3  significance of the fact that the comic books in question contained promotional

4  announcements for <u>Action Comics</u>, Vol. 1, as necessarily meaning that their

5  publication must have preceded <u>Action Comics</u> publication.  As Mr. Evanier

6  explains, the dates provided by publishers were often the dates initially scheduled

7  or intended for publication, but the actual dates often varied with printing, delivery,

8  and other delays.  (Decl. Mark Evanier ¶ 11).

9       Mr. Evanier's expert opinion is chalk full of information on the publication of

10 comic books in general during this time period, but is void of any specific evidence

11 or opinion as to the publication of the <u>particular</u> comic books in question in this

12 case.  He offers no evidence of any specific printing, delivery, or other problems that

13 may have affected the publication of <u>More Fun Comics</u>, Vol. 31, or <u>Detective</u>

14 <u>Comics</u>, Vol. 15.  His general opinion thus does not sufficiently refute the <u>prima</u>

15 <u>facie</u> evidence set forth in the initial copyright registration certificates for these

16 particular comic books.  At most, his opinion raises some doubts as to the precision

17 of the dates contained in initial copyright registrations for comic books in general

18 from this period.  However, those copyright notices were completed at a time which,

19 by Mr. Evanier's own opinion, the copyright holder was attempting to be as accurate

20 as possible in listing those dates and long before any incentive to provide

21 inaccurate dates by virtue of contemplating this present litigation or the termination

22 provisions of the 1976 Act existed.  Plaintiffs evidence does no more than inform the

23 Court that, despite efforts to be precise about publication dates for comic books

24 during this particular period, mistakes could be made; it is not at all probative on the

25 issue of whether mistakes were in fact made with respect to the information

26 contained in the particular registration certificates at issue in this case.  The Court

27 therefore finds that the promotional announcements containing an illustration of

28 Superman from the cover of <u>Action Comics</u>, Vol. 1, are outside the effective reach

of the termination notices.

Perhaps anticipating this finding, plaintiffs next seek to downplay the significance of the promotional announcements themselves by arguing that, legally and factually, little, if any, copyrightable Superman material is contained in those announcements. Specifically, plaintiffs submit that Siegel and Shuster's material was an indivisible joint work, and that the advertisements were a derivative work of the authors' material. Thus, they claim that none of the Superman material contained in the promotional announcements (namely, the cover artwork from Action Comics, Vol. 1) could be copyrighted, and thus, defendants cannot continue to exploit the same, regardless of the termination notice. As framed by plaintiffs: "Defendants' entire argument is falsely premised on the erroneous assumption that they can take the cover of Action Comics, No. 1, one of many illustrated panels in Siegel and Shuster's first 'Superman' comic book story, rip it from this copyrighted joint work, and own a separate copyright in the illustration in the form of a mere 'in house announcement' depicting a reduced image of the illustration. [Moreover,] Detective's 'in-house announcements,' at best, are derivative works based on the pre-existing cover and interior panel of Siegel and Shuster's pre-existing 'Superman' story." (Pls' Opp. at 44, 46).

This emphasis on the joint nature of Siegel and Shuster's Superman material is rendered nugatory by the fact that Siegel and Shuster granted the copyright in their material to Detective Comics on March 1, 1938, well before the promotional advertisements were published by Detective Comics in April of that year. Thus, by the time the promotional announcements were published, Siegel and Shuster's Superman material was owned solely by Detective Comics to do with it as it saw fit, whether it be as a full-length comic or as artwork in its advertising. That Siegel and Shuster intended their work to be combined together and depicted as a unitary whole is a separate and distinct question from whether, in later using some of Shuster's artwork from that combined material it had acquired, Detective Comics

somehow unraveled the copyrightability in that portion of the work.  The manner of a work's authorship is entirely separate from the way in which an assignee may exploit that material once it has acquired exclusive ownership of the same and, correspondingly, whether there were anything copyrightable in the work the assignee subsequently published using only parts of that material.

In this respect it is important to remember that a joint work can consist of either inseparable or interdependent parts, the latter example of which include "the collaborative musical works of Gilbert and Sullivan . . . ., [t]hese works are the result of the interdependent contributions of the collaborators, i.e., one person wrote the lyrics and the other the music, either of which could on its own [stand] as an independent work, but which, when combined, form a single[, separate] 'interdependent' joint work."  2 PATRY ON COPYRIGHT § 5:6.  The original Superman material was the product of the story and dialogue written by Siegel and the art work drawn by Shuster; each on its own could have been a work in its own right subject to copyright protection, but when merged together they formed a single new and unified interdependent work.  See Siegel v. Time Warner, Inc., 496 F.Supp.2d 1111, 1145 (C.D. Cal. 2007) (where this Court held, in regard to Superboy, "the copyright to [the same] (if a joint work) would be considered comprised of interdependent parts — Siegel's dialogue and storyline . . . and Shuster's artwork giving life and color to those words").

At most, Detective Comics took a part of Shuster's independently copyrightable art work out of the joint work and utilized it, in conjunction with other material (namely, the advertising slogan), in a promotional announcement.  There is no rule preventing a publisher or others from publishing portions or excerpts of works, joint or otherwise, that it solely owns, and then seeking a separate copyright in the same.  Indeed, the opposite is true — the holder of a copyright is expressly entitled to prepare derivative works based upon a copyrighted work it owns or to utilize portions of that work in other materials.  See 17 U.S.C. § 106(2); see

generally 17 U.S.C. § 1 (repealed).  Detective Comics could just as well have decided to split up the Superman material for publication into two or three installments as it could (and did) decide to publish a portion of that material in an advertisement to promote the comic.

This leads to plaintiffs' contention that the "derivative nature" of the promotional advertisement itself works to exclude any of the copyright in the pre-existing Superman material (notably, the art work for the Action Comics, Vol. 1 cover) contained therein from enuring to the benefit of the defendants to continue to exploit.  Generally, if an author contributes additional original material to a pre-existing work so as to recast, transform, or adapt that work, then the copyright protection afforded to the author of that derivative work extends only to that additional material and in no way extends to the underlying, pre-existing material. See 17 U.S.C. § 103(b) (specifying that a derivative work's copyright does not extend to any part of that work using "preexisting material in which copyright subsists"); 1 NIMMER ON COPYRIGHT § 3.03, at 3-10.  Thus, it is asserted that the author of the pre-existing material work (here Siegel and Shuster) would continue to retain ownership in the same despite its use in the derivative work (the promotional announcement).

Even assuming that the changes made to the cover page for Action Comics, Vol. 1, in the promotional announcements is not merely a reproduction, but sufficiently "recast, transform, or adapts" the pre-existing material so as to be considered a derivative work thereof (e.g, the cover is shown in black and white instead of color, the scale of the artwork itself is diminished, and text is placed alongside the artwork), there remains a complicating wrinkle.  At the time the promotional announcements were placed in Detective Comics' existing comic book publications, the underlying pre-existing Superman material from which a portion of the announcements were derived (again the artwork for the cover) had yet to be published, and, hence, copyright in the same was protected at the time under state

common law.  See 17 U.S.C. § 2 (repealed).

Given that the portion of the pre-existing material at issue had yet to achieve statutory copyright protection when it was first published in More Fun Comics, Vol. 31, and Detective Comics, Vol. 15, it was injected into the public domain upon the publication of the promotional announcements themselves, absent investiture of statutory copyright protection through its publication.  See 17 U.S.C. § 10 (repealed).  That is to say, the copyright in the cover of Action Comics, Vol. 1, itself first achieved statutory protection, if at all, upon its publication in the announcements, not its later publication in Action Comics, Vol. 1.  See 2 PATRY ON COPYRIGHT § 6:35 ("where an investitive publication occurs, the derivative work copyright covers the unpublished material").

This fact has repercussions on plaintiffs' derivative works argument, as it alters the general rule described above.  Once Detective Comics published a portion of the previously unpublished pre-existing material — as was its right as owner of the material at that time — its continued protection resided exclusively under statutory copyright in the derivative work itself lest that portion of the pre-existing material (the art work for the cover) be injected into the public domain.  See Batjac Productions Inc. v. GoodTimes Home Video Corp., 160 F.3d 1223, 1233 (9th Cir. 1998); 2 PATRY ON COPYRIGHT § 6:35 ("to the extent that previously unpublished material is included in an authorized published derivative work, the derivative work publishes the previously unpublished material").  As Professor Nimmer explains:

> Because a derivative work by definition to some extent incorporates a copy of the pre-existing work, publication of the former necessarily constitutes publication of the copied portion of the latter.  Of course, an article that merely describes a pre-existing work but does not incorporate any substantial portion of it is not a derivative work and hence, does not publish the pre-existing work.  Unless the basic work is reproduced in the published work, it is not published.  If only the broad outlines or other fragmentary portion of the pre-existing work are copied and published in the derivative work, then only to that extent is the pre-existing work published.

1 NIMMER ON COPYRIGHT § 4.12[A] at 4-59 to 4-60; see also id. § 4.13[A] at 4-73

("any work published prior to January 1, 1978, was not only thereby divested of

common law copyright; it was also injected into the public domain, unless at the

moment of publication copies of the work bore a proper copyright notice").

Thus, included in defendants' right to continue to exploit the copyright in the

derivative work (the promotional announcements) is the right to the copyright in that

part of the pre-existing work (the illustration from the cover) that was published for

the first time in that derivative work.

The cases cited by plaintiffs as standing for the contrary are all

distinguishable, as either the act of publication in question fell within the "limited"

publication exception because the material was distributed for promotional purposes

to members in the trade and not, as here, the general public itself, see Rushton v.

Vitale, 218 F.2d 434 (2nd Cir. 1955); Hub Floral Corp. v. Royal Brass Corp., 454

F.2d 1226 (2nd Cir. 1972); or because the underlying work reproduced in the

derivative work was itself in the public domain (unlike here where the underlying

material was in an unpublished state protected by common law copyright), thereby

mooting any question about divestiture of the underlying work through publication.

See Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99 (2nd Cir. 1951).

Here, the promotional announcements represent the first time Superman

appeared to the public, and consequently, the first time any of Siegel and Shuster's

Superman material was protected by statutory copyright, albeit in conjunction with

the other material contained in the advertisement itself.  Thus, all of the material in

the promotional announcement (which included the graphic depiction of Superman

later portrayed on the cover of Action Comics, Vol. 1) obtained statutory copyright

protection before the earliest possible date covered by the plaintiffs' termination

notices.  The Court therefore finds that the publication date for at least one of the

comics containing the promotional announcements falls outside the reach of the

termination notice and, therefore, any copyrightable material contained therein

(including that found in the cover to <u>Action Comics</u>, Vol. 1, <u>as</u> <u>depicted</u> in those announcements) remains for defendants to exploit.

This leads to the question of the <u>scope</u> of the copyrighted material remaining in defendants' possession by way of the promotional announcements, a question that defendants themselves acknowledge "is most obviously answered by [looking at] the ads which speak for themselves" and that does not require some "special 'lens'" to resolve.  (Defs' Reply at 44).

The Court begins by observing what is <u>not</u> depicted in the announcements. Obviously, nothing concerning the Superman storyline (that is, the literary elements contained in <u>Action Comics</u>, Vol. 1) is on display in the ads; thus, Superman's name, his alter ego, his compatriots, his origins, his mission to serve as a champion of the oppressed, or his heroic abilities in general, do not remain within defendants sole possession to exploit.  Instead the only copyrightable elements left arise from the pictorial illustration in the announcements, which is fairly limited.

The person in question has great strength (he is after all holding aloft a car). The person is wearing some type of costume, but significantly the colors, if any, for the same are not represented, as the advertisement appears only in black and white.  The argument that the "S" crest is recognizable in the promotional advertisement is not persuasive.  What is depicted on  the chest of the costume is so small and blurred as to not be readily recognizable, at best all that can be seen is some vague marking or symbol its precise contours hard to decipher.  The Court thus concludes that defendants may continue to exploit the image of a person with extraordinary strength who wears a black and white leotard and cape.  What remains of the Siegel and Shuster's Superman copyright that is still subject to termination (and, of course, what defendants truly seek) is the entire storyline from <u>Action Comics</u>, Vol. 1, Superman's distinctive blue leotard (complete with its inverted triangular crest across the chest with a red "S" on a yellow background), a red cape and boots, and his superhuman ability to leap tall buildings, repel bullets,

1  and run faster than a locomotive, none of which is apparent from the

2  announcement.

3       2.    Work Made for Hire Aspect of Portions of Action Comics, Vol. 1

4       Under the 1976 Act, an author's (or his or her heirs') ability to terminate a

5  prior grant in the copyright to a creation does not apply to a "work made for hire,"

6  because the copyright in such a creation was never the artist's to grant, belonging

7  instead to the one who employed the artist to create the work.  See 17 U.S.C.

8  § 304(c); Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554 (2nd Cir. 1995)

9  ("Once it is established that a work is made for hire, the hiring party is presumed to

10 be the author of the work").  The manner in which Siegel and Shuster's Superman

11 material was submitted, then re-submitted in a reformatted version, and finally

12 accepted for publication by Detective Comics raises questions about the work for

13 hire status of the re-formatted material (but not the initial material submitted to the

14 publisher) later published in Action Comics, Vol. 1.

15      Defendants argue that portions of the copyrightable material contained in

16 Action Comics, Vol. 1, are unaffected by the termination notice because those

17 portions belong exclusively to them as "works for hire," arguing that certain material

18 found in the comic book was created by Detective Comics' in-house employees, or

19 that the material was added to the underlying Superman material by Siegel and

20 Shuster at the publisher's direction.  (Defs' Opp. at 27).  Specifically, the alleged

21 "additional" material provided by Detective Comics' in-house employees is the color

22 choices made throughout the comic, notably, the red color of the letter "S" on

23 Superman's crest and the art work for the cover to the magazine itself (albeit

24 modeled after a interior panel in the Superman comic illustrated by Shuster).

25 Similarly, the additional material supplied in response to the publisher's February 1,

26 1938, letter is Shuster's admitted (and as acknowledged by Siegel) drawing of

27 "several additional pictures to illustrate the story continuity" appearing "on page 1 of

28 the first Superman release" and "the last panel appearing on the thirteenth page."

(Decl. Michael Bergman Ex. G at 2 & Ex. H at 5).

The thrust of defendants' argument was made and rejected by the Second Circuit in the 1970s Superman copyright renewal litigation, and is thus precluded as a matter of collateral estoppel here.  In that litigation, defendants' predecessors-in-interest presented much of the same evidence now submitted in this case to argue that this additional material transformed the entirety of Siegel and Shuster's pre-existing Superman material published in Action Comics, Vol. 1, into a work made for hire.  The Second Circuit rejected this argument, elaborating:  "In the case before us, Superman and his miraculous powers were completely developed long before the employment relationship was instituted.  The record indicates that the revisions directed by the defendants were simply to accommodate Superman to a magazine format.  We do not consider this sufficient to create the presumption that the [comic book] strip was a work for hire."  Siegel, 508 F.2d at 914.  This conclusion forecloses any further litigation on the point of whether Shuster's additional drawings when reformatting the underlying Superman material into a comic book format or other facts related to such a theory such as the colorization process for Action Comics, Vol. 1, or the party responsible for the illustration of the cover to the magazine, rendered all or portions of the resulting comic book a work made for hire.

Defendants seek to avoid the collateral estoppel effect of the Second Circuit's decision by arguing that the only issue concerning the work for hire status of Action Comics, Vol. 1, related to Siegel and Shuster's 1934-1935 "contributions," and not what was "added to the first Superman story by Detective's employees," amongst whom defendants count Siegel and Shuster after they executed the December, 1937, contract.  (Defs' Opp. at 36).  Such a reading conflicts with the record.  The evidence that was proffered during the 1970s litigation in the trial court on the work for hire question included declarations from Siegel and Shuster discussing what took place during the reformatting process.  This is the same

1  evidence that defendants now seek to use in this case to argue that the reformatted

2  material was a work made for hire.

3      Moreover, the circumstances surrounding the reformatting of the underlying

4  Superman material was not only mentioned by the Second Circuit, but discounted

5  by that court in passing on the work for hire nature of Action Comics, Vol. 1, itself,

6  not just the initial contributions made by Siegel and Shuster back in 1934 and 1935.

7  It would be incongruous for the Court, in respecting as it must the Second Circuit's

8  judgment, to now hold that, while that reformatted material did not transform the

9  entirety of the material in Action Comics, Vol. 1, into a work made for hire, some

10 subpart thereof (and, indeed, a very limited subpart, consisting of but a few panels)

11 was somehow excised out and should be accorded work made for hire status.  The

12 litigation of the larger question sweeps within it defendants' opportunity to litigate a

13 subpart thereof.

14     A contrary holding would transgress certain core principles of collateral

15 estoppel:  "A new contention is not necessarily a new issue.  If a new legal theory or

16 factual assertion raised in the second action is relevant to the issues that were

17 litigated and adjudicated previously, the prior determination of the issue is

18 conclusive on the issue despite the fact that new evidence or argument relevant to

19 the issue was not in fact expressly pleaded, introduced into evidence, or otherwise

20 urged."  18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 132.02[2][c] at 132-25

21 (3rd ed. 2007).  Significantly, much of the evidence underlying defendants'

22 arguments was presented in the Second Circuit litigation (notably Siegel and

23 Shusters' declarations submitted in that litigation) or, if not, was certainly available

24 to be used in that case (the colorization process for the initial printing of

25 Action Comics, Vol. 1, or that in-house employees supposedly drew the cover to the

26 magazine).  "A party may be precluded from re-litigating an issue if evidence

27 supporting the party's position on the issue could have been submitted in previous

28 litigation but, for whatever reason, was not properly raised.  Evidence that is not the

result of a different factual situation or changed circumstances, but is instead historical in nature and could have been admitted at the first trial if properly submitted, cannot be introduced in subsequent litigation of the same issue." Id. § 132.02[2][d] at 132-25 to 132-26 (citing Yamaha Corp. v. United States, 961 F.2d 245, 257 (D.C. Cir. 1992)).

Nowhere have defendants explained why they did not bring up the question of the colorization process for Action Comics, Vol. 1, or the cover art work for the magazine, before the courts handling the 1970s Superman litigation. The question about the legal effect the reformatting of the underlying Superman material had on the work for hire question was litigated by the parties and resolved by the courts during the 1970s Superman matter. Similarly, the question about the colorization and cover art work (and who was responsible for the same) could have been raised in conjunction with the work for hire question, but defendants failed or decided not to do so. Having litigated the question and having the opportunity to present all the evidence that pressed on the issue, defendants are now barred from seeking to relitigate it anew even under the purported limited guise that it is now being offered.

Some noted treatise writers have commented that the Second Circuit's analysis focusing on the work for hire nature of the additional reformatted material should have been analyzed as a derivative work, that is, that the additional material was derivative of the underlying Superman material. See 1 NIMMER ON COPYRIGHT § 5.03[B] [1][b][I] at 5-33 n.92. ("The Siegel decision . . . may be understood as holding that the first expression of the Superman character was the underlying work, and the later development of the character was a derivative work. Because only the derivative work was produced in a for-hire relationship, the underlying work remains the property of the creators"). However, this analysis does not benefit defendants.

First, no additional literary material was supplied in re-formatting the underlying Superman material into a comic book format.   All the dialogue and

storyline contained in Action Comics, Vol. 1, was present before Detective Comics requested the pair to provide a reformatted version of the material, and that literary material remained unchanged through the reformatting process. All that is left was supplying some additional illustrations by Shuster, the precise ones specified in his declaration. From the Court's review of these additional illustrations, it appears that the material is completely derivative of other panels in the Action Comics, Vol. 1, comic, with its origins in the underlying Superman material. Thus, for instance, while the final panel on page 13 shows Superman's crest with a red "S" on a yellow background, so, too, does another panel containing the underlying, pre-existing material. Similarly, while the panels on the first page to the comic show Superman leaping skyscapers, running at high rates of speed, and demonstrating feats of great strength, so, too, do other panels containing the pre-existing material. Indeed, the earliest sketches by Shuster from 1934 and 1935 demonstrate that the graphical depiction of Superman was well on its way to being completely developed before the re-formatted material in question was created some three years later. Thus, even if the additional material in question was tendered as a derivative work that was made for hire by Shuster, all the potentially copyrightable material contained therein is completely derivative of the pre-existing material and, hence, is not subject to independent copyright protection in the first instance. This, then, lends strong support to the Second Circuit's observation: "Superman and his miraculous powers were completely developed long before the employment relationship was instituted." Siegel, 508 F.2d at 914.

Defendants also argue that the coloring for Action Comics, Vol. 1, was not created or chosen by Siegel or Shuster, but was instead the product of some of Detective Comics' in-house employees working in the printing department. Even if this argument was not otherwise precluded by collateral estoppel, the evidence produced in support is less than persuasive. According to "eye-witness" Jack Adler, the material contained in comic books "at the time" was provided by artists to the

Detective Comics' production staff in black and white. (Decl. Jack Adler ¶ 3). "Typically," members of the staff then decided upon the color that would be applied throughout the magazine, something that defendants argue is an additional element added to the underlying Superman material that is itself subject to copyright protection. (Decl. Jack Adler ¶ 3). Defendants' argument depends entirely upon Mr. Adler's declaration, which is not as clear as they suggest.

Mr. Adler does not state that he worked on the colorizing of Action Comics, Vol. 1, itself. Instead he states that he "worked for the engraving company that made the metal plates for printing of, among other things, comic books for Detective Comics." (Decl. Jack Adler ¶ 3). He then states that, "[a]t the time, comic book artists . . . submitted drawn and inked comic book work in black and white." (Id.). Mr. Adler further states that the black-and-white pages "were then photographed by the engraver and a photo print was hand[-]colored by staff at Detective and by the engravers." (Id.). Of course, nothing in this statement precludes the possibility that, even if the Superman material was so submitted, Siegel and Shuster may have also placed certain color directions with their material to be utilized in the engraving process. In fact, that the earlier incarnation of Superman as hulking strongman in the tradition of Tarzan was created by the pair as a comic book with color illustrations lends to the possibility that they already had pre-conceived color choices in mind for the later comic if it were later reformatted into a comic book, rather than a newspaper comic strip.

Moreover, viewed in context, Mr. Adler's declaration appears to describe procedures generally employed in the printing process, not as evidence of what actually occurred with respect to the printing of Action Comics, Vol. 1, itself. His statement (and, in fact, the entire Adler declaration) is of dubious evidentiary value in light of his candid admission that he has "no knowledge of Siegel and Shuster selecting any of the color in Action Comics, No.1." (Id. ¶ 4). Mr. Adler attempts to temper his admission of lack of knowledge by stating, without any basis, that he is

"aware that Detective staff member, Ed Eisenberg, selected the color for Superman's 'S' in Shield on his costume." (Id.) Of course, Mr. Adler's statement on this point is inadmissible as it is based on hearsay. Without any direct link between Mr. Adler's work and the printing of Action Comics, Vol. 1, in particular, there exists an insufficient evidentiary foundation for his conclusions concerning the manner in which the Superman material was supplied to the printer and the colorization of the same was handled.

Finally, defendants argue that the cover for Action Comics, Vol. 1, was drawn by Detective Comics' in-house artists. However, the scant evidentiary basis provided in support of this argument is ambiguous. In a letter sent to Jerome Siegel dated February 22, 1938, Detective Comics' editor, Vin Sullivan, enclosed "a silverprint of the cover of Action Comics," with the observation that Detective Comics "used one of those panel drawings of SUPERMAN, as you suggested in your recent letter." (Decl. Michael Bergman, Ex. I). The inference sought to be drawn by defendants is that when Mr. Sullivan stated that the publisher "used" an interior illustration from the Superman comic for the cover artwork he was stating that one of the publisher's in-house artists saw the interior panel in question and then drew the cover using the interior panel as inspiration. Of course, given the limited nature of the information contained in the passage it could also be argued that, in his earlier letter, Siegel enclosed an illustration by Shuster as a suggestion for the comic book's cover and Detective Comics decided to "use" this suggestion. This alternative reading is not implausible. As demonstrated by the pair's attempt to have their earlier incarnation of Superman published by Detective Dan, Shuster had in the past drawn exemplars for the cover illustration for his comics well before they were ever accepted for publication.

In conclusion, the Court finds that the question of the work-for-hire nature of certain portions of the Superman material published in Action Comics, Vol. 1, is precluded from further litigation by operation of the 1974 Second Circuit decision.

Accordingly, the binding nature of that court's decision leads to the conclusion that all the Superman material contained in <u>Action Comics</u>, Vol. 1, is not a work-made-for-hire and therefore is subject to termination.

        3.    <u>Failure to Include 1948 Consent Judgment</u>

Among the regulatory requirements promulgated by the Register of Copyrights concerning the termination notice's "form, content, and manner of service," 17 U.S.C. § 304(c)(4)(B), is the requirement that the notice must "reasonably" identify "the grant" to which it applies.  37 C.F.R. § 201.10(b)(1)(iv).  Thus, if the author entered into five separate grants of rights for the same work, and a notice of termination identifies only four of those grants, the fifth grant remains "intact," and the grantee's rights thereunder remain unaffected.  <u>See</u> 3 NIMMER ON COPYRIGHT § 11.06[B] at 11-40.22(1) n.63 ("if a grant was not effectively terminated, then the rights licensed under such grant remain").

Here, defendants argue that plaintiffs' failure to identify the 1948 consent judgment from the Westchester action is fatal to their attempts to terminate their grant to the copyright in Superman, as that consent judgment was among the grants leading to the transfer of ownership from the artists to Detective Comics.  Such argumentation is predicated upon the notion that, notwithstanding the plaintiffs' act of identifying the stipulation between the parties from the Westchester litigation that resulted in the consent judgment, identification of the consent judgment from the Westchester action itself as (or part of) a "grant" was necessary because it constituted the final step in "effectuat[ing] the transfer to [Detective Comics] of the sole and exclusive ownership of all rights relating to 'Superman'"; "without it the rights identified in the Stipulation would not have been transferred." (Defs' Opp. at 39).  The Court disagrees.

Although the 1976 Act nowhere defines the term "grant," the central question raised is plainly one of transfer:  Did Siegel and Shuster transfer any rights to Superman through or in conjunction with the 1948 consent judgment?  If so, then it

operated as a grant by the artists in the same.

On that point, the 1976 Act is helpful as it defines a "transfer of copyright ownership" as "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright."  17 U.S.C. § 101; see Melville B. Nimmer, Termination of Transfers under the Copyright Act of 1976, 125 U. PA. L. REV. 947, 951-52 (1977) ("In general, the termination provisions apply to any 'transfer' of copyright and to nonexclusive licenses of copyright or of any right comprised in a copyright. [Thus, a] 'transfer' includes not only assignments (as understood under the [1909] Act), but also exclusive licenses and any other conveyance of copyright or of any exclusive right comprised in a copyright").

The consent judgment at issue did not effectuate any transfer of rights from Siegel and Shuster to Detective Comics.  If any rights were transferred as a result of the Westchester action, such a transfer was effectuated by the execution of the earlier stipulated agreement of the parties, not a document created two days later which simply memorialized the transfer that the stipulation itself had accomplished. The binding nature of the transfer contained in the stipulation was completed the moment that agreement was executed.  The consent judgment was a mere formality whose execution (or lack thereof) did not detract from the otherwise binding nature of the parties' earlier agreement.  It merely parroted what was already agreed to by the parties in the stipulation itself.

Finally, even if the 1948 consent judgment is a "grant" separate and apart from (or part and parcel with) the 1948 stipulation, the regulations recognize that not all errors in compliance with its terms impact the validity of the termination notice: "Harmless errors in a notice that do not materially affect the adequacy of the information required to serve the purposes of . . . section 304(c) . . . shall not render the notice invalid."  37 C.F.R. § 201.10(e)(1).  Here, viewing the issue in the light most favorable to the defendants, the 1948 consent judgment simply served to culminate or otherwise finalize the transfer of the Superman copyright achieved

through the stipulation the parties reached two days earlier.  That plaintiffs only identified the latter rather than the former does not materially affect defendants' understanding of the "grant" sought to be affected by the notice.  Indeed, courts have required much less in meeting the regulation's requirement of providing "a brief statement reasonably identifying the grant being terminated."  See Music Sales Corp. v. Morris, 73 F.Supp.2d 364, 378 (S.D.N.Y. 1999) (holding that description of the grant in the termination notice as the "grant or transfer of copyright and the rights of the copyright proprietor " was sufficient as "it appears to be boilerplate on termination notices customarily accepted by the Register of Copyrights"); see also 2 PATRY ON COPYRIGHT § 7:45 (approving Music Sales).  Nowhere do defendants argue why the harmless error rule should not apply in a situation such as this where one document that is a part in the process leading to the "transfer" of rights is identified, but its necessary corollary was not.

Accordingly, the Court concludes that, even if the consent judgment is viewed as integral to the transfer of rights, plaintiffs' failure to identify it as a grant subject to the termination notice was a harmless error that did not diminish the notice defendants received regarding the nature of the grant (and resulting transfer of rights) that plaintiffs intended to terminate.

4.    Continued Acceptance of Benefits Under 1975 Agreement

Defendants argue that Joanne Siegel's continued acceptance of benefits under the parties' 1975 agreement constitutes, "as a matter of equity," a de facto post-termination grant of rights in the Superman copyright to defendants under the terms of that agreement (or as phrased by defendants, plaintiffs have "effectively re-accepted the terms of the grant").  (Defs' Opp. at 41).  The legal premise of their argument is that the 1976 Act recognizes that, once a termination notice has been served and thereby vested, see 17 U.S.C. § 304(c)(6)(B), the terminating party is free to make "a further grant . . . of any right covered by a terminated grant" to the original grantee or its successor in title.  17 U.S.C. § 304(c)(6)(D).  The Court

1   ultimately rejects this argument as unpersuasive because it mistakenly assumes the
2   1975 agreement was a "grant" to the Superman copyright.

3       A look at the context leading up the execution of the 1975 agreement
4   illuminates in what way the parties believed (and just as importantly did not intend)
5   for that agreement to bind them.  The 1975 agreement appears to have been
6   drafted in response to bad publicity (apparently due to the juxtaposition of the
7   creators' misfortune and the Superman character's commercial success), and not
8   as a means to transfer or convey the party's rights to the Superman copyright.  The
9   agreement observed that nothing therein should be construed as undermining the
10  rights defendants had been conferred by virtue of the March 1, 1938, assignment,
11  rights which were later vindicated in the Westchester action and the 1970s Second
12  Circuit litigation.  Indeed, the agreement reaffirmed defendants' existing rights to
13  Superman and provided plaintiffs with annual payments, medical insurance, and
14  screen credits.  Such conferral of benefits was identified in the agreement as a
15  "voluntary" act by defendants in recognition of Siegel and Shuster's "past services."
16  The 1982 codicil, in turn, removes the condition for the promised benefits to Siegel's
17  widow on the timing of her husband's death.

18      This context and the language in the agreement itself demonstrate that the
19  1975 agreement was not a "grant."  The agreement's execution did not result in the
20  transfer or assignment of the Superman copyright.  Indeed, the agreement itself
21  expressly disavows such an interpretation by including language that the conferring
22  of benefits by defendants to Siegel and Shuster was simply a "voluntary" act in
23  recognition of the pair's "past services," and that nothing therein should be
24  construed as undermining the rights defendants had been conferred in the March 1,
25  1938, assignment as vindicated in the Westchester action and the 1970s Second
26  Circuit litigation.   Thus, by its own terms, no rights were transferred through the
27  execution of that agreement.  A reaffirmation of existing rights without more is no
28  more "an assignment" or "conveyance" of rights to a copyright than it would if

Detective Comics had instead issued a press release declaring that previous court rulings had recognized its existing ownership rights to that copyright.

Similarly, the 1982 codicil under which Joanne Siegel continued to receive annual payments and benefits did not transfer any rights. The codicil consists of five paragraphs. The first merely notes that the letter is in response to a letter written by Joanne Siegel to the company's executive officer regarding her concern over how she would provide for herself after her husband's death. The second referenced the 1975 agreement, noted the increase in the amount of the annual payments from $20,000 to $50,000 thereunder, and the payment of an additional bonus. The third clarified a royalty policy that applied to creators other than Siegel and Shuster. The fourth set forth the agreement to continue to pay benefits to Joanne Siegel for the balance of her life in the event her husband predeceased her before 1985. The fifth and final paragraph merely wishes Joanne Siegel and her family well. Nowhere in these five humble paragraphs is a transfer of rights to be inferred, much less explicitly found.

Thus, even if Joanne Siegel's continued receipt of the benefits of the bargain contained in the 1975 agreement post-termination somehow operated as a de facto re-acceptance of the agreement itself (and the obligations flowing thereunder), nowhere among those re-accepted "obligations" or "commitments" in that agreement was there a grant to the Superman copyright. Defendants protest the Court drawing this conclusion, arguing that plaintiffs have admitted in their pleadings (their complaint, and by filing a termination notice directed at the 1975 agreement) that the 1975 agreement contained a grant to the Superman copyright. It certainly is true that "[f]actual assertions in pleadings and pre-trial orders . . . are considered judicial admissions" that bind the party who made them. American Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988). That being said, "courts still have discretion not to apply the doctrine in particular cases." 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 134.33[6] at 134-84 (3rd. ed. 2007)

(citing <u>New Hampshire v. Maine</u>, 532 U.S. 742, 750 (2001) ("Because the rule is intended to prevent 'improper use of judicial machinery,' judicial estoppel 'is an equitable doctrine invoked by a court at its discretion'")).

As noted at the outset, the termination provisions contained in the 1976 Act are among the most complex and technical ones in the statute.  Given this complexity, it is not surprising that a party seeking to harness its machinery may, out of an abundance of caution, be more "over-inclusive" in terms of listing the possible "grants" it seeks to terminate.  To penalize a party for being over-inclusive rather than under-inclusive is all the more inequitable given the high hurdles the termination provisions put in place.  Here, plaintiffs were represented by highly experienced counsel who decided to list the 1975 agreement as a "grant" so as to leave no stone unturned; an approach all the more justified given the extremely technical and arcane arguments that have been advanced in this litigation concerning the efficacy and enforceability of the termination notices themselves.  The Court therefore concludes that in these circumstances discretion counsels against applying the judicial estoppel doctrine in the manner advocated by defendants.

Accordingly, the Court concludes that Joanne Siegel's continued receipt of payments and benefits under the 1975 agreement and 1982 codicil thereto does not constitute a "further grant" or "an agreement to make a further grant" pursuant to 17 U.S.C. § 304(c)(6)(D).

5.    <u>Statute of Limitations</u>

Defendants contend that the present action was filed untimely.  The statute of limitations itself is clear enough.  The Copyright Act of 1976 provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."  17 U.S.C. § 507(b).  The issue raised by defendants implicates the latter clause and requires the Court to determine when plaintiffs' claims accrued.

At the outset, a clarification of terms is in order.  The instant matter, although couched in terms of terminating the 1938 grant, is in effect one for co-ownership of the copyright in the Superman material contained in Action Comics, Vol. 1, because, if successful, plaintiffs would gain only a joint ownership interest in that material with DC Comics, owing to the fact that Shuster left no heirs who could simultaneously seek to terminate his half of the grant in the material.  Claims of co-ownership accrue when there is a "plain and express repudiation of co-ownership . . . communicated to the claimant."  Zuill v. Shanahan, 80 F.3d 1366, 1369 (9th Cir. 1996).

Here, defendants assert that such a repudiation was expressed by a letter submitted to plaintiffs' counsel dated December 18, 1997, during the whirlwind of negotiations that took place between the parties shortly after the submission of the termination notices.  The Court finds to the contrary.  As explained more fully below, although the letter stated a position that the termination notices were "defective," the letter addressed only the scope of the rights that could be recaptured by the termination notices and left unchallenged the notices' validity and enforceability, thus falling short of the required repudiation.[7]

---

    [7] One could quibble with whether any date other than the termination effective date itself can serve as the accrual date in a case involving the right to termination of a grant.  Much like having to await a judicial determination whether one is a heir (as opposed to instances when an ownership claim is based on whether or not someone is a creator) has been held to be the earliest instant for an accrual date, see Stone v. Williams, 970 F.2d 1043 (2nd Cir. 1992) (Hank Williams' putative daughter's claim to be an owner had to await judicial determination that she was in fact his daughter and heir, thus accrual date was not triggered when Hank Williams' first contested her putative status but instead when state court made determination that she was his heir), so too a claim of ownership by way of termination of a grant cannot be realized unless and until after the termination's effective date.  Stated another way, a party's status as a creator is a factual question subject to being challenged by the other putative co-owner at any time, and hence, the accrual date for the same would begin at that instant.  The same, however, is not true of a putative co-owner by way of termination.  Their status as co-owner is not predicated upon a pre-existing factual scenario, like whether they were involved in jointly creating the material per se.  Instead, their status as a co-owner is predicated upon a legal mechanism — the exercise of a

1    Specifically, the letter upon which defendants rely notified plaintiffs' counsel,

2   Mr. Levine, that they considered "the Superman Notices to be defective in several

3   respects." (Defs' Opp. at 50). What is telling is that the areas of defect elaborated

4   upon in the letter did not relate to the validity or enforceability of the termination

5   notices themselves, but pointed to areas curtailing the scope of what could be

6   recaptured even assuming the notice to be properly presented. These defects thus

7   did not call into question plaintiffs asserted right to termination contained in the

8   notices. For example, the letter remarks that defendants would still retain its rights

9   in trademarks that it had secured over the years to certain Superman-related

10   material, and that the termination would not give plaintiffs access to an accounting

11   of the foreign profits defendants gained from exploiting the copyright. Far from

12   repudiating plaintiff's co-ownership to the copyright, the letter acknowledged the

13   validity of that ownership interest. Thus, the letter remarked that, "if the Siegels do

14   not execute a re-grant to DC, beginning in April of 1999, DC and the Siegels will be

15   joint owners of the United States copyright in the 'Superman' comic published in

16   Action Comics No. 1 in June, 1938." (Decl. Michael Bergman, Ex. U at 2).

17    Even more telling was DC Comics' subsequent conduct. The parties'

18   negotiations quickly broke down and not much of substance was communicated

19   between the parties thereafter. Then, the day before the termination effective date,

20   DC Comics sent a letter to plaintiffs' counsel denying the validity of the termination

21

22   new statutory right revoking an earlier transfer in the copyright in question, be it
23   one they solely or jointly created — that takes place at a certain defined point in
     time. Unless and until that legal triggering point is passed, there is nothing for the
24   other co-owner to reject or challenge. This is particularly the case given that
     termination notices can be served up to ten years before the effective termination
25   date. Defendants' position would, as a matter of logic, countenance scenarios
     where due to an early "rejection" of the termination notice, the passage of the
26   limitations period would occur well before the termination effective date even
     arrived (and with it the putative co-owner's rights even vested). Nonetheless, the
27   Court need not resolve this question as the letter in question does not constitute a
     plain and express repudiation of plaintiffs' termination notice (and, hence, its right
28   to co-ownership to the copyright in the Siegel and Shuster Superman material).

notice, proclaiming:

> The absence of any steps towards negotiation for two years, particularly on the 'eve' of the April 16, 1999 purported 'effective' date of the termination, leaves us concerned.  Thus our client has no alternative but to move to the stage of <u>putting your clients on clear notice</u>, as set forth below, of DC Comics' rights and of its determination, if it becomes necessary, to take all appropriate and necessary steps to protect those rights. First, <u>your clients are hereby put on notice that DC Comics rejects both the validity and scope of the Notices</u>
> . . . .

(Decl. Marc Toberoff, Ex. Q (emphasis added)).

If, as defendants contend, such notice of intent had been so clearly and unmistakably communicated over a year and half earlier, it is odd for them to have to repeat it and then state that they were "putting" plaintiffs "on notice" about it. Accordingly, the Court finds that the present action seeking declaratory relief regarding plaintiffs' termination of the 1938 grant accrued on April 16, 1999, the effective date of that termination.  DC Comics' submission of the letter the day before that date denying the validity of the termination notice gave a plain and express indication to plaintiffs that a claim for declaratory relief vis-à-vis the validity of their termination notice was now ripe.  <u>See</u> 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.")

Applying both the date of the accrual of the claim, the parties' tolling agreement to the three-year statute of limitations, and the filing date of this action, the Court concludes that it is timely.  The effective date of the termination notice, and therefore the date of accrual, is April 16, 1999.  The parties entered into a tolling agreement on April 6, 2000, which amounts to nine days less than one year

1  that the limitations clock ran before being tolled.[8]  The tolling agreement lasted until

2  ten business days after plaintiffs' September 21, 2002, letter providing written notice

3  that they were ending settlement negotiations, that is, October 4, 2002, at which

4  time the limitations clock started ticking once more.[9]  The present action was filed

5  two years and four days later, on October 8, 2004.  Adding the periods of time the

6  limitations period was running together, it is clear that they add up to a period of

7  time just short of the three-year period set forth in § 507(b).

8           Accordingly, the Court concludes that the present action is timely.

9           6.      The 2001-2002 Settlement Negotiations

10          Defendants contend that plaintiffs' termination notice is no longer effective as

11  the parties' settlement negotiations led to them entering into a binding post-

12  termination agreement that resolved the issues presently before the Court.  A brief

13  review of the time line regarding those negotiations is helpful to the Court's analysis

14  of the present issue:

15      October 19, 2001    Pursuant to the parties' negotiations, plaintiffs' counsel
                            sent to defendants' counsel a six-page letter outlining
16                          the substance of a settlement offer from defendants that

---

[8]  Defendants' argument that the tolling agreement does not apply to
plaintiffs' claims against Time Warner, Inc., and Warner Bros. Entertainment, Inc.,
because neither was a "party to" or bound by that agreement is disingenuous.
(Defs' Opp. at 52).  The tolling agreement expressly provides that its terms bound
not only DC Comics but also its "past and present subsidiaries or affiliates." (Decl.
Marc Toberoff, Ex. Z).  Being the parent company (Time Warner, Inc.) or corporate
sibling (Warner Bros. Entertainment, Inc.,) of another (DC Comics) certainly
qualifies as a corporate affiliate to the same; a point defendants later admit when
speaking to the alter ego question presented in the pleadings. (Defs' Mot. Summ.
J. at 79 ("the following is a chart of the current corporate structure and affiliations
between DC, WBEI and TWI")).  Moreover, representatives for both companies
were actively involved in the settlement negotiations themselves, further
undermining any suggestion that they were bystanders to the process.

[9]  Defendants argue that the tolling period concluded much earlier based on
the parties earlier having reached "an amicable resolution of the dispute." (Defs'
Opp. at 51 (emphasis in original)).  Given that the Court finds that no such
"resolution," as opposed to a naggingly close potential for the same, occurred
through the parties settlement discussion post-termination, see infra A.6, their
argument is without merit.

was "accepted" by the plaintiffs.

| October 26, 2001 | Defendants responded, noting they were working on a draft agreement and enclosing "a more fulsome outline" of "what" they "believe the deal" they have "agreed" to is. |

| February 1, 2002 | Defendants' counsel provided a fifty-six page draft agreement that reserved the right to have their clients comment upon it and noted that certain, related "stand alone" assignments were in the process of being finalized. |

| May 5, 2002 | Plaintiffs responded to defendants' draft by stating that the proposed agreement contained new, unacceptable terms to which they had not agreed. |

| May 21, 2002 | Defendants sent a letter to plaintiffs stating that they believed that each of the major points in the settlement had already been agreed upon. |

| Sept 21, 2002 | Plaintiffs rejected their counsel's proposed draft agreement and advised defendants in writing that they were ending negotiations. |

The parties are in agreement that California law should be applied in deciding this question, but disagree as to its application. "California law is clear that there is no contract until there has been a meeting of the minds on all material points." Banner Entertainment v. Superior Court, 62 Cal.App.4th 348, 358 (1998). The failure to reach a meeting of the minds on all material points prevents the formation of a contract even if the parties have orally agreed upon some of the terms, or have taken some action related to the contract. Grove v. Grove Valve & Reg. Co., 4 Cal.App.3d 299, 311-12 (1970). Similarly, the terms proposed in an offer must be met exactly, precisely, and unequivocally for its acceptance to result in the formation of a binding contract. See Panagotacos v. Bank of America, 60 Cal.App.4th 851, 855-56 (1998); Apablasa v. Merritt & Co., 176 Cal.App.2d 719, 726 (1959). A qualified acceptance constitutes a rejection terminating the original offer and the making of a counteroffer to the original offeror, which must also be unequivocally accepted by the former offeror for a binding contract to form. See Panagotacos, 60 Cal.App.4th at 855-56; Glende Motor Co. v. Superior Court, 159 Cal.App.3d 389, 396 (1984) ("California law has generally held that a qualified

acceptance . . . affects the viability of the offer itself, so that 'a qualified acceptance amounts to a new proposal or counteroffer putting an end to the original offer'"); In re Pago Pago Air Crash, 637 F.2d 704, 706 (9th Cir. 1981); see also CAL. CIV. CODE § 1585 ("A qualified acceptance is a new proposal.").

The parties disagree over whether the terms contained in plaintiffs' October 19, 2001, letter differ in substance from those set forth in defendants' later letter of October 26, 2001 (and accompanying outline), such that there was no unequivocal acceptance of an offer and, thus, no agreement. As with much in both life and law, materiality is in the eye of the beholder. From the Court's reading of the parties' correspondence, it is clear that the parties went well beyond reaching a settlement in principle regarding their respective positions to the Superman property. Rather, as suggested by the time line above, the parties' correspondence, and the actions taken in response thereto, illustrates that they found themselves in the all-too-familiar situation in which verbal settlement negotiations result in what the parties believe to be an agreement on all the major points of dispute, but which, upon further discussion, falls short of the agreement needed to resolve their dispute. The devil, as it often is, was in the details.

That material details remained is evidenced by defendants' response to plaintiffs' initial letter, enclosing "a more fulsome outline" of what it "believed the deal" they had "agreed to." Moreover, defendants' February, 2002, draft agreement was not even considered final by its authors, who reserved the right for their clients to "comment" on it, and would also require the further submission of a number of "stand alone" agreements yet to be finalized. Indeed, Time Warner's CEO later commented that submission of the draft agreement was "expected" to result in further "comments and questions" from the Siegel heirs that "would need to be resolved."

This give and take reveals that the parties, while close to agreeing to a complete and comprehensive settlement of their dispute, had not passed the

1    threshold where they had finalized and assented to all material terms of such a

2    settlement.  Rather, as they attempted to sketch in the finer details of a settlement

3    from the broad outlines contained in the October 19 letter, more and more issues

4    arose upon which they could not reach agreement, resulting in the negotiations

5    falling apart.  In this respect, the present case is not unlike Callie v. Near, 829 F.2d

6    888 (9th Cir. 1987), and Weddington Prods. v. Flick, 60 Cal.App.4th 793 (1998), in

7    which the courts held that no enforceable agreement was reached when the parties

8    had agreed to a rough outline of an agreement, but were thereafter unable to reach

9    agreement on the finer details and the negotiations fell apart.

10        Defendants' argument to the contrary is premised on the notion that they can

11   limit the scope of the legal analysis to the October 19, 2001, letter and call it a

12   contract, regardless of their materially different October 26, 2001, letter in reply ("I

13   enclose . . . a more fulsome outline of what we believe the deal . . . is") and their

14   vastly different February 1, 2002, draft, which were both part and parcel of the same

15   settlement negotiation.  Ignoring these contemporaneous communications is at

16   odds with the requirement in contract formation that courts must consider "all the

17   surrounding circumstances."  Donovan v. RRL Corp., 26 Cal.4th 261, 271 (2001).

18   These subsequent efforts to sketch in a more fulsome outline of the parties' alleged

19   agreement provides context and meaning as to the understanding the parties had

20   about the effect of the October 19 letter itself.

21        Defendants further seek to create issues of fact through post hoc testimony

22   and rationalizations.  None of this subjective belief is sufficient to defeat the

23   objective manifestation of the parties' intent relayed in the documents referenced

24   above that aptly demonstrate that there was no "meeting of the minds" on all

25   material terms.  See Meyer v. Benko, 55 Cal.App.3d 937, 942-43 (1976) ("The

26   existence of mutual consent is determined by objective rather than subjective

27   criteria, the test being what the outward manifestations of consent would lead a

28   reasonable person to believe.  Accordingly, the primary focus in determining the

existence of mutual consent is upon the acts of the parties involved"); <u>Stewart v. Preston Pipeline Inc.</u>, 134 Cal.App.4th 1565, 1587 (2005) ("mutual assent to a contract is based upon objective and outward manifestations of the parties"); CAL. CIV. CODE § 1639.

One need only review the language of the parties' correspondence, their conduct in reaction thereto, and the numerous material differences between the terms relayed in the October 19 and 26, 2001, letters and the February 1, 2002, draft to reach the conclusion that the parties failed to come to an agreement on all material terms. <u>See</u> <u>Grove v. Grove Valve & Reg. Co.</u>, 4 Cal.App.3d 299, 311-12 (1970) (failure to reach meeting of the minds on all material points prevents contract formation even though parties orally agreed on many terms, or have taken action relating to the contract). Far from signifying that the parties' "negotiations . . . result[ed] in a binding contract" leaving nothing more than the drafting of more formal documentation memorializing that agreement, <u>see</u> <u>Louis Lesser Enterprises, Ltd. v. Roeder</u>, 209 Cal.App.2d 401, 404 (1962), these submissions between the parties went far beyond that by adding in or further refining areas from what was contained in the October 19 letter. That after the submission of the October 19 letter defendants began the process of creating a settlement trust account and the parties negotiated about providing Siegel and Shuster screen credits in the then upcoming movie <u>Superman</u> <u>Returns</u> could as much be seen as goodwill gestures on defendants' part while the negotiations continued as it could reflect an indication on their part that they thought they were contractually bound to do the same.

From all of this there is no document or set of documents reflecting agreement by the parties to singular, agreed terms. Defendants cannot explain to the Court what from the parties' differing exchange constitutes this purported contract; rather, it appears that defendants wish to take the plaintiffs' "acceptance" reflected in the October 19 letter and either festoon upon it all the terms contained in the February 1, 2002, draft settlement agreement (even though Joanne Siegel

1
2
3
4
5
6

clearly and unequivocally rejected that latter draft agreement), or have the Court perform that task.  The Court's responsibility is not to create a patch-quilt agreement by stringing together certain expressions of assent made at one point (October 19), and attaching to it material terms spelled out later in time (and to which the supposedly assenting party promptly rejected).  See Industrial Indemnity v. Superior Court, 224 Cal.App.3d 828, 832 (1990) ("courts will not write a new contract").

7
8
9

Accordingly, the Court concludes that the parties' settlement negotiations did not result in an enforceable agreement resolving the issues presently before the Court.

10

B.    Limitations on Scope of Recaptured Rights

11
12
13
14
15
16
17

The principal purpose behind the creation of the termination right was to give authors (and their heirs) a chance to retain the extended renewal term in their work and then re-bargain for it when its value in the marketplace was known.  See H.R. REP. NO. 1476, 94th Cong., 2d Sess. 124 (recognizing as the justification for the termination right "safeguarding authors against unremunerative transfers . . . because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's prior value until it has been exploited").

18
19
20
21
22
23
24
25
26
27
28

The need for such a second bite at the apple flowed from the fact that the 1909 Act created a dual term in the copyright to a work, one realized upon the work's publication and the second occurring twenty-eight years later with the copyright's renewal.  Justification for this splitting of terms was based, in part, on the understanding that an author's ability to realize the true value of his or her's work was often not apparent at its creation, but required the passage of time (and the marketing efforts by a publisher) to materialize.  The renewal term in the copyright to the work thus served as a mid-course re-valuation tool allowing the author, by giving him or her the right of renewal in the work, leverage in re-negotiating a better deal with the original grantee or any other suitor who desired to continue to market the copyright.  See Patry, Choice of Law, 48 Am. J. Comp. L. at 446 ("The main

theory behind a dual system of term was that it gave the author or the author's heirs a 'second bite at the apple;' when the renewal term came around, the value of the copyright would be better known than at the time of initial publication.  With this information, a new bargain could be struck that would more accurately reflect the market rate").  This re-valuation mechanism provided by the renewal term under the 1909 Act was largely frustrated by the Supreme Court's decision in Fred Fisher Music, 318 U.S. at 656-59, allowing authors to assign away at the outset all of their rights to both the initial and the renewal term.

Although the termination right contained in the 1976 Act sought to correct the damage done by Fred Fisher to an author's ability to renegotiate through the reversion of rights, it did not revert to the author the full panoply of rights he or she would have enjoyed upon renewal under the 1909 Act.  Owing in large measure to objections by publishers seeking to minimize the disruption to "existing contracts and authorized derivative works already in distribution" that such a recapture right would engender, see 2 PATRY ON COPYRIGHT § 7:43, Congress placed certain limitations on what authors (or their heirs) gained from exercising the termination right.  It is to these limits on the termination right that the Court now turns.

1.    Foreign Profits

Section 304(c)(6)(E) to the 1976 Act provides that "[t]ermination of a grant under this subsection affects only those rights covered by the grant that arise under this title[, Title 17 of the United States Code, governing copyrights], and in no way affects rights arising under any other Federal, State, or foreign laws."  Defendants read from this a statutory limitation on the scope of any accounting arising from the termination notices in this case to those profits realized by the domestic exploitation of the Superman copyright contained in Action Comics, Vol. 1, excluding those realized from foreign sources.  The Court finds this argument persuasive.

Although the Court can locate no case that has specifically addressed the issue of accounting profits from the foreign exploitation of a copyright that is subject

to a valid termination notice, the statutory text could not be any clearer on this subject.  Through this section, Congress expressly limited the reach of what was gained by the terminating party through exercise of the termination right; specifically, the terminating party only recaptured the domestic rights (that is, the rights arising under title 17 to the United States Code) of the grant to the copyright in question.  Left expressly intact and undisturbed were any of the rights the original grantee or its successors in interest had gained over the years from the copyright through other sources of law, notably the right to exploit the work abroad that would be governed by the copyright laws of foreign nations.  Thus, the statute explains that termination "in no way affects rights" the grantee or its successors gained "under foreign laws."

Such a reading is supported by leading commentators, who are in agreement as to the effect of § 304(c)(6)(E) has in a case such as this.

Professor Nimmer states:

> A grant of copyright "throughout the world" is terminable only with respect to uses within the geographic limits of the United States.  Because copyright has no extraterritorial operation, arguably American law is precluded from causing the termination of rights based upon foreign copyright laws.  A response to this argument is that the nonextraterritoriality of copyright is irrelevant because the question here is one of contract law, not copyright law, in that it concerns the effect of a contract granting certain rights.  The contract law of one nation may be applicable in another nation under the latter's conflict-of-laws rule.  The conclusive answer to this problem lies in the text of the termination provisions of the Copyright Act, which expressly provide that statutory termination "in no way affects rights arising under . . . foreign laws" — that is, under foreign copyright (not contract) laws.  Thus, even if the conflicts rule of a foreign nation were to call for application of the American termination rule as a rule of contract law, that rule by its own terms excepts from termination the grant of those rights arising under foreign copyright laws.

3 NIMMER ON COPYRIGHT § 11.02[B][2] at 11-19.

Professor Patry agrees:  "Accordingly, where a U.S. author conveys worldwide rights and terminates under either section, grants in all other countries

remain valid according to their terms or provisions in other countries' laws." 7 PATRY ON COPYRIGHT § 25:74.

Plaintiffs argue, however, that the section also allows for the possibility that the terminating party gains not only the domestic rights to the copyright in question (the "rights covered by the grant that arise under this title"), but also retains whatever other rights it may have under "Federal, State, or foreign laws."  From this premise, plaintiffs argue that, because an accounting between co-owners in a copyright is governed by state law, and California state law allows for the sharing of foreign profits between tenants in common, so, too, should defendants be forced to account for their foreign profits.  This argument misses the fact that all plaintiffs have gained from the termination right is a recapturing of the <u>domestic</u> copyright in the Superman material published in <u>Action Comics</u>, Vol. 1.  Defendants continue to hold, unaffected, separate rights to that copyright arising under <u>foreign</u> copyright laws.  This distinction is important for two reasons.

First, such an open effort to extend the reach of U.S. copyright law overseas, as plaintiffs' reading of the statute avows, would be in direct contradiction to not only the plain terms of the statute (stating that termination does <u>not</u> affect another parties' rights arising under the copyright laws of "foreign" nations), but stands in stark juxtaposition to the longstanding rule "that the copyright laws [of this country] have no application beyond the U.S. border." <u>Los Angeles News Serv. v. Reuters TV Intern.</u>, 340 F.3d 926, 931 (9th Cir. 2003).  If Congress contemplated the ability to attach or otherwise force the accounting of foreign profits to which the original grantee or its successors are legally entitled under the copyright laws of other nations through the backdoor of applying state law tenant in common principles, one would have expected such an intention to have been made expressly, and certainly with some explanation given the incongruity that arises from the statutory language's notation that termination did <u>not</u> affect another's rights under "foreign laws."

Second, the cases cited by plaintiffs requiring one co-owner to account to the other for both domestic and foreign profits involved parties who were co-owners to the "world-wide" copyright in the work and, not as with the termination right, to only the domestic copyright.  See Goodman v. Lee, 78 F.3d 1007, 1010 (5th Cir. 1996) (noting that declaratory action was filed after other co-owner obtained a "renewal of the copyright" listing himself as the sole author in the song "Let the Good Times Roll").  Plaintiffs have directed the Court to no case wherein a co-owner of the domestic copyright in a work was allowed an accounting of a co-owner's foreign profits.  See 3 NIMMER ON COPYRIGHT § 11.02[B][1] at 11-17 ("Only such rights as were originally the subject of a grant will revert upon the termination of that grant. [T]o the extent that a grant includes rights based upon federal law other than the Copyright Act, state law, or foreign law, such rights are not subject to termination").

Accordingly, the Court holds that the termination notice affects only the domestic portion of Siegel's and Shuster's 1938 worldwide grant ("all rights") to Detective Comics of the copyright in the Superman material contained in Action Comics, Vol. 1.  The termination notice is not effective as to the remainder of the grant, that is, defendants exploitation of the work abroad under the aegis of foreign copyright laws.  Thus, although defendants retain the unfettered right to exploit the works (and retain the profits derived therefrom) in foreign nations, they may do so domestically only as a co-owner (through Shuster's share) of the works.  See Oddo v. Ries, 743 F.2d 630, 632-33 (9th Cir. 1984) (""[E]ach co-owner has an independent right to use or license the use of the copyright. . . . . A co-owner of a copyright must account to other co-owners for any profits he earns from licensing or use of the copyright . . . .").  As such, defendants must account to plaintiffs only for the profits from such domestic exploitation of the Superman copyright.

2.    Trademark Rights and Ownership of Pre-Termination Derivative
       Works

As noted in the previous section, the right to termination leaves undisturbed

the original grantee or its successors in interests rights arising under "federal law." 17 U.S.C. § 304(c)(6)(E). Among the rights based on federal law that defendants secured over the years were several trademarks that utilized or incorporated portions of the copyrighted material found in Action Comics, Vol. 1. Defendants seek a declaration from the Court that, even if successful in terminating the Superman copyright contained in Action Comics, Vol. 1, plaintiffs cannot share in defendants' profits "purely attributable to [Superman] trademark rights." (Defs' Reply at 11). Plaintiffs admirably concede the point in their briefs, but argue that they are "entitled to profits from mixed trademark uses to the extent such exploit recaptured copyright elements (e.g., 'Superman costume')." (Pls' Reply at 49 n.28).

Similarly, defendants seek a declaration that, to the extent plaintiffs are entitled to an accounting as a result of their successfully terminating the 1938 grant, it should not include any profits attributable to the "post-termination exploitation of derivative works [of Action Comics, Vol. 1,] prepared prior to termination." (Defs' Mot. Summ. J. at 28). Again, plaintiffs concede, as they should, this point. (Pls' Reply at 49 n.28). Section 304(c)(6)(A) provides that derivative works created during the grant (meaning up until the termination effective date) may continue to be exploited after termination. Again, however, plaintiffs hold out as a separate question the existence of pre-termination derivative works that are "altered so as to become post-termination derivative works." (Pls' Reply at 49 n.28).

Given that these contentions by plaintiffs — the recapture or accounting from the mixed use of trademark and copyright and what to do with any alteration in pre-termination derivative works — are not the subject of the present motion, the Court will not address them in this Order. Even though it is clear that these issues will impact the accounting of profits in some manner, they cannot be fully adjudicated based on the narrow record currently before the Court and absent a full briefing of the particular mixed uses or altered pre-termination derivative works that are specifically at issue.

Accordingly, the Court holds that the profits defendants garner from the use of Superman trademarks that "are purely attributable to [those] trademark rights," and from its use of unaltered pre-termination derivative works are not subject to accounting.

3. <u>Accounting for Profits of Warner Bros. Entertainment, Inc., and Time Warner, Inc.</u>

The parties are in disagreement over whether plaintiffs may directly share in the profits from the exploitation of the works by DC Comics corporate sibling, Warner Brothers Entertainment, Inc. ("WBEI"), and its corporate parent, Time Warner, Inc. ("TWI").  The genesis for this claim stems from certain inter-corporate transactions amongst these actors concerning the Superman copyright.  In the same year that plaintiffs' termination notices became effective, DC Comics executed an exclusive license in favor of WBEI (and a year later a separate exclusive license with WBEI's television division) to exploit the Superman copyright for the remainder of its extended renewal term in certain media formats, notably movies, television, and home video.  (Decl. Marc Toberoff, Exs. E & F).  Defendants contend that, as co-owners of the joint works at issue, plaintiffs are entitled to an accounting of the profits made by DC Comics (in the form of the licensing fees it has collected), but that plaintiffs are not entitled to an accounting of the profits WBEI has made pursuant to the license.[10]

Defendants' argument is not without support.  The Court  starts with the general principle that "each co-owner has an independent right to use or license the use of the copyright[, but that a] co-owner of a copyright must account to other co-owners for any profits he earns from licensing or use of the copyright." <u>Oddo</u>, 743 F.2d at 633.  Licensees, on the other hand, are accountable only to their

---

[10]  It appears to the Court that because TWI is not a licensee of the works, it may not have any profits to account for; however, absent evidence of this fact from either side (or the representation that such is not the case), the Court cannot rule on this issue at this time.

licensors, and owe no duty of accounting to the non-licensor co-owner of a copyright the licensee exploits.  See Ashton-Tate Corp. v. Ross, 916 F.2d 516, 523 (9th Cir. 1990).

Plaintiffs, however, take a different view of the licenses, arguing that "Warner has stepped exclusively into DC's shoes with respect to such motion picture and television copyrights."  (Pls' Opp. at 30).  In other words, the exclusive license had the net effect of substituting WBEI for DC Comics as a joint owner with plaintiffs (assuming the successful termination of the 1938 grant) insofar as the exploitation of the copyright in the mediums in which those licenses are concerned.

This theory, however, requires large legal leaps that are not countenanced by current law.  To begin, in order for an exclusive license in the entirety of the interest in a joint work itself (such as Superman) to be effective, the consent of both joint owners in the copyrighted work is required.  See 2 PATRY ON COPYRIGHT § 5:7 ("A joint author (or co-owner) may not, however, transfer all interest in the work without the other co-owner's express (and written) authorization, since that would result in an involuntary transfer of the other joint owner's undivided interest in the whole"). The same requirement for prior consent holds true even with respect to the wholesale transfer of exclusive licenses in subparts to a copyright, such as a license transferring all the stage rights (not just the joint owner's rights) to a novel but not the movie or literary rights. Cf. 1 NIMMER ON COPYRIGHT § 6.12[C][3] at 6-38.8 to 6-39.

Such consent simply did not occur here.  DC Comics unilaterally sought to give an exclusive license to the entirety in the Superman property's movie and television rights to WBEI post-termination.  As a result, the attempt to provide an exclusive license was ineffective.  At best, all that was conveyed was a non-exclusive license, and, at worst, a license agreement whose terms are null and void absent ratification by plaintiffs.  See 3 NIMMER ON COPYRIGHT § 10.03[A][7] at 10-51.

Applying these principles in a vacuum, the Court would readily reach the

conclusion championed by defendants:  WBEI, as a licensee, is answerable only to
DC Comics as its licensor; that DC Comics is the only entity that must account for
profits to plaintiffs; and, absent exploitation of the works by DC Comics itself, that
DC Comics' accounting to plaintiffs is limited to those profits derived from licensing
the Superman copyright to WBEI.

However, the Court's analysis does not occur in vacuum; rather, it must take
into account the relevant facts of this case, particularly given that the accounting
sought by plaintiffs in this action is an equitable remedy, and the Court must
conduct its inquiry accordingly.  See Oddo, 743 F.2d at 633 ("A co-owner of a
copyright must account to other co-owners for any profits he earns from licensing or
use of the copyright, . . . but the duty to account does not derive from the copyright
law's proscription of infringement.   Rather, it comes from equitable doctrines
relating to unjust enrichment and general principles of law governing the rights of
co-owners.") (internal quotation marks and citations omitted).

Here, the relatedness of the transferor and the transferee entities cannot be
ignored.  The evidence before the Court reveals that the relevant entities are all
closely related entities — parent corporations, wholly and partially-owned
subsidiaries, partners, sibling business entities (owned directly or indirectly by the
same parent) — although it is not entirely clear to the Court exactly what those
relationships have been at all relevant times.  This fact alone raises a specter of a
"sweetheart deal" entered into by related entities in order to pay a less than market
value fee for licensing valuable copyrights.  If such were the case, the related entity
might be able to exploit the copyrights without the responsibility of answering to the
co-owner of a joint work, and the licensor co-owner would thereby be relieved of the
responsibility of accounting for any profits (other than a greatly reduced licensing
fee) to the non-licensor co-owner.  This result would be inequitable.

This concern is bolstered by the declaration of Paul Levitz, President and
Publisher for DC Comics, which states that under the post-2003 corporate

restructuring of Time Warner's business, "for operating management purposes, DC reports" not to immediate corporate parent WCI, but to its sibling corporation "WBEI," the licensee of the rights at issue in this action.  (Decl. Paul Levitz ¶ 17).  As Levitz explains, "I report to and obtain approvals from WBEI's President and Chief Operating Officer before making significant acquisitions or certain financial decisions or investments that are outside the scope of DC's customary acquisitions and investments; before implementing meaningful strategic changes; and before embarking on something substantially outside DC's normal course of business."  (Id.).  Although this is not evidence of what occurred at the time of the license, it is still probative evidence of the relatedness of the licensee and licensor that could result in an extremely favorable licensing arrangement that works to the detriment of the non-licensor co-owner.  These open issues also touch upon factors to be considered in analyzing alter ego claims.  See Sonora Diamond Corp. v. Superior Court, 83 Cal.App.4th 523 (2000); Mesler v. Bragg Management Co., 39 Cal.3d 290 (Cal.1985) ("The essence of the alter ego doctrine, in which it is claimed that an opposing party is using the corporate form unjustly, is that justice be done. What the formula comes down to, once shorn of verbiage about control, instrumentality, agency and corporate entity, is that liability is imposed to reach an equitable result").

Whether the license fees paid represents the fair market value therefor, or whether the license for the works between the related entities was a "sweetheart deal," are questions of fact that are not answered on summary judgment, certainly not without the benefit of expert testimony which has not been presented by either party on this topic.  The Court therefore concludes that summary judgment on this issue is inappropriate at this time.[11]

---

[11]  Because the Court concludes that defendants' motion for summary adjudication of this issue must be denied for the reasons stated above, the Court does not at this time resolve other arguments raised by plaintiffs regarding this issue.

**CONCLUSION**

After seventy years, Jerome Siegel's heirs regain what he granted so long ago — the copyright in the Superman material that was published in <u>Action Comics</u>, Vol. 1.  What remains is an apportionment of profits, guided in some measure by the rulings contained in this Order, and a trial on whether to include the profits generated by DC Comics' corporate sibling's exploitation of the Superman copyright.

DATE:  March 26, 2008

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE