**O**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,

Plaintiff,

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS, and DOES 1–10,

Defendants.

Case No. 2:04-cv-08776-ODW(RZx)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE: SUPERBOY AND THE SUPERMAN ADS**
**[04-cv-8776, ECF No. 222]**

LAURA SIEGEL LARSON, individually and as personal representative of the ESTATE OF JOANNE SIEGEL,

Plaintiff,

v.

TIME WARNER INC., WARNER COMMUNICATIONS INC., WARNER BROS. ENTERTAINMENT INC., WARNER BROS. TELEVISION PRODUCTION INC., DC COMICS, and DOES 1–10,

Defendants.

/ / /

/ / /

/ / /

## I. INTRODUCTION

On March 20, 2013, this Court granted Defendants' February 7, 2013 Motion for Summary Judgment in part, holding on remand from the Ninth Circuit that the parties' October 19, 2001 settlement agreement remained binding and enforceable. The Court also ordered the parties to file supplemental briefs addressing how that holding affected the parties' respective rights to Superboy and the Superman ad works. The Court now holds that the 2001 settlement agreement encompassed those works. The remainder of Defendants' Motion is therefore **GRANTED**, and this litigation of superhero proportions now draws to a close.

## II. FACTUAL BACKGROUND

On March 1, 1938, writer Jerome Siegel and artist Joe Shuster signed an agreement selling Superman to DC Comics for $130. *Siegel v. Warner Bros. Entm't Inc.*, 542 F. Supp. 2d 1098, 1107 (C.D. Cal. 2008). DC intended to publish Superman in the inaugural issue of *Action Comics*, which it promoted in advance in black-and-white advertisements in two of its other magazines (the "Ads"). *Id.* The Ads reproduced the cover of the forthcoming *Action Comics No. 1* with accompanying text:

BRAND NEW!
AND JUST WHAT YOU'VE BEEN WAITING FOR . .
ACTION COMICS
Look for this dandy new magazine filled with original adventure features and pictures in
Color!
Written and drawn especially for you by your favorite artists!
You'll miss the treat of a lifetime if you fail to buy a copy!
10c at all Newsstands
SPECIAL PRIZES AND AWARDS!
MORE FUN COMICS
VINCENT A. SULLIVAN

In 1938, following Superman's successful debut, Siegel "pitched the idea to [DC] of serializing a comic concerning the exploits of Superman as a young man." *Siegel v. Warner Bros. Entm't Inc.*, 496 F. Supp. 2d 1111, 1114 (C.D. Cal. 2007.) DC twice declined to publish Siegel's proposed Superboy comic. *Id.* at 1115. But while Siegel was stationed abroad with the U.S. Army in 1943, DC published a five-page "Superboy" comic strip without Siegel's consent and without giving him notice. *Id.* Several rounds of litigation ensued, but suffice it to say for present purposes that the parties continue to dispute ownership, publication, and copyrightability of various aspects of Superboy.

In 1997, Laura Siegel Larson and Joanne Siegel (Siegel's daughter and now-deceased widow, respectively) served DC with a "nearly six-pound, 546-page termination notice" of Siegel's Superman copyright grants under 17 U.S.C. § 304(c). (Petrocelli Decl. in Support of Def.'s Supp. Br. ("Petrocelli Decl.") Ex. 11); *Siegel v. Warner Bros. Entm't Inc.*, 658 F. Supp. 2d 1036, 1095 (C.D. Cal. 2009). This 1997 termination notice "applie[d] to each and every work (in any medium whatsoever, whenever created) that include[d] or embodie[d] any character, story element, or indicia reasonably associated with SUPERMAN or the SUPERMAN stores, such as, without limitation, Superman . . . Superboy, . . . [or] Smallville." (Petrocelli Decl. Ex. 11, at 93 n.1; *see also* Pl.'s Supp. Br. 3 ("[T]he 1997 Terminations applied to Siegel's Superman works published between 1938 and 1943, although they listed derivative works outside this 'window' out of an abundance of caution.").) In other words, the Notice purported on its face to cover not only Superman, but also Superboy and the Superman Ads.

Shortly before the termination's 1999 effective date, DC contested the scope and validity of 1997 termination notice and subsequently entered settlement negotiations with the Siegels. After four years, these negotiations culminated in the October 19, 2001 letter that the Ninth Circuit and this Court have found constitutes the operative agreement between the parties. The 2001 agreement, like the 1997 notice of

termination, purported to cover Superboy and the Superman Ads. (*See* Petrocelli Decl. Ex. 12, at 647 (defining "The Property" subject to the settlement as "all Superman, Superboy and related properties (including, for example, Supergirl, Steel, Lois & Clark and Smallville), and the Spectre property, and includes all pre- and post-termination works (including the so-called Superman library, characters, names and trademarks relating to the property").)

But then efforts to reduce the 2001 agreement to a long-form contract broke down. As a result, the Siegels repudiated the agreement, served an additional notice of termination in 2002 purporting to recover the Superboy works, and sued DC in 2004 for declaratory relief with respect to the 1997 and 2002 notices of termination. The Siegels later served a subsequent 2012 notice of termination regarding the Ads, after Judge Larson held earlier in this litigation that the 2001 agreement was not binding and that the 1997 notice of termination failed to capture the Ads. The parties now dispute the effect of the 2001 settlement agreement on the Superboy and Ad works in light of the 2002 and 2012 notices of termination.

## III. DISCUSSION

DC maintains that the October 19, 2001 agreement constituted a revocation and re-grant of the Siegels' copyright interests (if any) in the Superboy and Superman Ad works that precluded the Siegels' 2002 and 2012 termination notices for those works. (DC's Supp. Br. 3–4.) The Siegels respond that the October 19, 2001 agreement cannot constitute a revocation and re-grant, because it "contains *no language of revocation*, let alone the requisite express revocation." (Pl.'s Supp. Br. 9 (citing *Milne*, 430 F.3d at 1040–41, 1047–48; *Mewborn*, 532 F.3d at 980–81, 986, 988–89).)

Two important appellate decisions undergird the parties' revocation-and-re-grant arguments: *Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005) and *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008). *Milne* concerned author A.A. Milne's classic *Winnie the Pooh* works. *Milne*, 430 F.3d at 1039. In 1930, Milne granted producer Stephen Slesinger certain copyright

interests in Pooh in exchange for royalties. *Id.* Slesinger then transferred his Pooh rights to Stephen Slesinger, Inc. (SSI), which in turn granted its rights exclusively to Disney. *Id.* at 1039–40. Milne later died in 1956, survived by his widow and son, Christopher Robin. *Id.*

Twenty years later, Congress passed the 1976 Copyright Act, which (among other things) extended the 1909 Act's renewal term and created a new termination right so that authors or certain of their heirs could take advantage of that extended term. *Id.* In 1983, faced with the possibility that Christopher Robin might seek to terminate his 1930 grant to SSI (but before any termination right had been exercised), Disney proposed that the parties renegotiate the rights to the Pooh works. *Id.* "Christopher accepted Disney's proposal and, using the bargaining power conferred by his termination right, negotiated and signed on April 1, 1983 a more lucrative deal with SSI and Disney that would benefit" Milne's heirs. *Milne*, 430 F.3d at 1040.

In 1998, Congress passed the Sonny Bono Copyright Term Extension Act ("CTEA"), Pub. L. No. 105-298, 112 Stat. 2827 (1998) (codified at 17 U.S.C. §§ 108, 203, 310–304). Of particular importance here, the CTEA further extended the term of copyright protection, granted an extended termination window *only for pre-1978 copyright grants*, and provided more favorable treatment to authors' heirs. *See* 17 U.S.C. § 304(c)–(d); *Milne*, 430 F.3d at 1038–39, 1041.

Years later, Christopher's daughter, Clare, attempted to terminate Milne's 1930 grant. The Ninth Circuit rejected this effort, holding that Christopher's 1983 grant revoked the pre-1978 grant and re-granted the same rights, thereby pulling the 1930 agreement from the grasp of the CTEA's extended termination provisions. *Id.* at 1048.

The Ninth Circuit further held that Christopher's 1983 grant did not constitute an ineffective "agreement to the contrary" under 17 U.S.C. § 304(c)(5). *Id.* at 1046. In so holding, the Ninth Circuit reasoned that Congress had "anticipated that parties may contract, as an alternative to statutory termination, to revoke a prior grant by

replacing it with a new one." *Id.* But more importantly for this case, the Ninth Circuit found that Christopher's 1983 grant had effectively fulfilled Congress's objectives in disallowing authors or their heirs from entering into an agreement contrary to the future exercise of their newly granted statutory termination rights:

> The rationale behind [the CTEA] was to 'safeguard[] authors against unremunerative transfers' and improve the 'bargaining position of authors' by giving them a second chance to negotiate with more advantageous grants in their works after the works had been sufficiently 'exploited' to determine their 'value.' *Congress sought to foster this purpose by permitting an author's heirs to use the increased bargaining power conferred by the imminent threat of statutory termination to enter into new, more advantageous grants.* This is exactly what Christopher and the other beneficiaries of the Pooh Properties Trust did in 1983." *Milne*, 430 F.3d at 1046 (emphasis added) (quoting H.R. Rep. No. 94-1476 at 124, 1976 U.S.C.C.A.N. at 5740).

*Steinbeck* mirrored the *Milne* scenario. In 1938, author John Steinbeck executed a publishing agreement covering several of his best-known works; the agreement was extended in 1939 to cover four additional works. *Steinbeck*, 537 F.3d at 196. The agreements were later assigned to Penguin Group, and Steinbeck thereafter properly renewed the copyrights subject to those agreements. *Id.* Steinbeck died in 1968, survived by his widow, Elaine, and two sons from a previous marriage, Thomas and John IV. *Id.*

In 1994, Elaine and Penguin entered into a new agreement for continued publication of all works subject to the 1938 agreement, plus additional other Steinbeck works. *Id.* The 1994 agreement also altered the economic terms of the 1938 agreement to Elaine's benefit and expressly "cancel[ed] and supersede[d] the previous agreements, as amended, for the [works] covered [t]hereunder." *Id.*

Elaine then died in 2003, and in 2004 Thomas and John IV's son jointly served a notice of termination purporting to terminate the grants made by the 1938 agreement. *Id.* Citing *Milne* with approval, the Second Circuit in *Steinbeck* held that

Elaine's 1994 agreement (1) "terminated and superseded" the 1938 agreement, *id.* at 200; and (2) was not an invalid "agreement to the contrary," "even if the agreement had the effect of eliminating a termination right that Congress did not provide until 1998." *Id.* at 202. Similar to the Ninth Circuit in *Milne*, the Second Circuit noted that Elaine had renegotiated and canceled the 1938 agreement "while wielding the threat of termination" and found that "this kind of renegotiation appears to be exactly what was intended by Congress." *Id.*

The Siegels' 1997 Termination notice and subsequent 2001 settlement agreement with DC presents this Court with an even clearer case than either *Milne* or *Steinbeck*. At the outset, the Court notes that this case does not—despite the parties' many pages of argument on the issue—implicate a revocation and re-grant scenario. In both *Milne* and *Steinbeck*, the courts began their analyses with the recognition that the CTEA's extended termination rights, which became effective in 1999, only applied to grants made *before* January 1, 1978. *Steinbeck*, 537 F.3d at 200; *Milne*, 430 F.3d at 1042. Thus, because the Milne and Steinbeck heirs had entered into post-1978 agreements that terminated and superseded the pre-1978 grants, those heirs were statutorily precluded from exercising the CTEA's new grant of termination rights.

Here, in contrast, DC and the Siegels entered into the 2001 agreement *after* the CTEA became effective in 1999. Because the extended termination rights the CTEA bestowed had already vested by the time the 2001 agreement was consummated, the Court need only concern itself with whether the 2001 agreement constituted an "agreement to the contrary" under § 304(c)(5).

Both *Milne* and *Steinbeck* preclude a finding that the 2001 settlement agreement constituted an "agreement to the contrary" under § 305(c)(5). In finding that the post-1978 revocation-and-re-grant agreements did not constitute agreements to the contrary, the courts in both *Milne* and *Steinbeck* ardently emphasized the fact that the heirs had vindicated Congress's intent by wielding their termination rights to extract more lucrative deals. The Ninth Circuit in *Classic Media, Inc. v. Mewborn* has since

expressly relied on this point in contrasting the facts of that case with those in *Milne*: "When the Milne heir chose to use the leverage of imminent vesting to revoke the pre-1978 grant and enter into a highly remunerative new grant of the same rights, it was tantamount to following the statutory formalities, and *achieved the exact policy objectives for which § 304(c) was enacted.*" 532 F.3d 978, 987 (9th Cir. 2008) (emphasis added); *see also id.* at 988 (the subject agreement was consistent with and "fully honored Christopher's right of termination which could vest immediately if he served notice"; "[t]he avenue chosen by Christopher and the studio secured the exact equivalent result for him and his fellow heirs, and in no way subverted the termination rights and the congressional purpose underlying them."). Christopher, the Ninth Circuit noted, had chosen "to avoid the statutory formalities whereby the rights would actually vest in him and then he would have to renegotiate with the studio." *Id.* at 988. Further, "the deal resulted in a net gain of hundreds of millions of dollars to [the Milne heirs], landing the studio and [the heirs] in the same place had [they] followed the formalities." *Id.*

By the 1997 termination notice and 2001 settlement agreement, the Siegels here went a step further than the heirs in *Milne* by actually engaging in the statutory formalities: While Christopher simply *could have* served a termination notice, the Siegels actually *did* serve a termination notice listing a vast spectrum of Superman and Superboy works. Sure, DC disputed the validity and scope of the Siegels' 1997 notice. And the Siegels served another termination notice in 2002 targeting Superboy in particular. When Judge Larson later held that the Ads fell outside the scope of the 1997 termination notice, the Siegels apparently felt compelled to file a 2012 termination notice with respect to the Ads. But in construing the parties' October 2001 settlement agreement, the Court must focus on the subject of the settlement negotiations—the 1997 notice of termination that encompassed Superman, Superboy, and the Ads. As of the date of the 1997 notice, it was an open question between the parties whether and to what extent any of these works were within the ambit of the

1997 notice. This uncertainty resulted in a lengthy four-year negotiation process that culminated in an October 19, 2001 settlement agreement whereby the Siegels *explicitly* granted DC their rights to "*all* Superman, *Superboy*, and related properties (including, for example, . . . *Smallville*," as well as "all pre- and post-termination works (including the so-called Superman library), characters, names and trademarks relating to" these rights. (Petrocelli Decl. Ex. 12, at 647.) In exchange for this grant, the Siegels received a $2 million advance, a $1 million non-recoupable signing bonus, forgiveness of a previous $250,000 advance, a guarantee of $500,000 per year for 10 years, a 6% royalty of gross revenues, and various other royalties. Simply put, the Siegels entered into a *highly* remunerative new deal with DC as a *direct result* of their 1997 notice of termination that purported to encompass the Superboy and Superman Ad works now at issue. "[T]his kind of renegotiation appears to be exactly what was intended by Congress." *See Steinbeck*, 537 F.3d at 202.

Later decisions holding that Superboy and the Ads were not properly terminated by the 1997 notice do not change this result. The course of litigation in this matter teaches that the Superboy and the Superman Ads were likely not properly terminated by the 1997 notice of termination, notwithstanding the fact that those works were listed in the notice. The Court will therefore assume without deciding that absent the 2001 Agreement, the Siegels would have properly terminated Superboy through their 2002 notice of termination and the Ads through their 2012 notice of termination. Under this presumption, the Siegels would have settled away their termination rights to Superboy and the Ads by way of the 2001 settlement agreement. On the surface, this would appear to be an agreement to the contrary. But the Siegels freely and intelligently entered into the 2001 agreement as a direct result of their 1997 attempt to terminate the Superboy and Ad works. In 2001, they knew full well that the CTEA had been effective for more than two years. And like Christopher, the Siegel heirs here had very much "in hand with which to bargain" in 2001 when they negotiated the settlement stemming from their 1997 termination notice. *Mewborn*, 532 F.3d at 989.

The import of the 2001 agreement could not possibly have been lost on the Siegels at the time: they had already served a termination notice purporting to recapture the rights to the entire universe of Superman works. They had used that termination as leverage "to obtain considerably more money as a result of [their increased] bargaining power." *Id.* at 988. Clearly the 2001 agreement was not *contrary* to the Siegels' termination rights at all; "it was an agreement consistent with, and which fully honored [the Siegels'] right of termination" they undoubtedly *intended* to exercise as to Superboy and the Ads by the 1997 termination. *Id.*

Given that the Siegels settled their rights to Superboy and the Ads well before any court decided the 1997 termination notice did not in fact encompass those works, the Court cannot see how the 2001 settlement agreement could be an "agreement to the contrary" simply because it had the effect of eliminating certain termination rights the Siegels believed they had already exercised.

## IV. CONCLUSION

The Court holds that the 2001 settlement agreement between DC and the Siegels re-granted the Siegels' Superman, Superboy, and Superman Ad works to DC in return for substantial advances and royalties. Because the agreement leveraged the Siegels' all-encompassing 1997 termination notice to extract a highly remunerative new grant of the same rights, it was tantamount to following the statutory formalities and thus does not constitute an "agreement to the contrary" under 17 U.S.C. § 303(c)(5).

DC's February 7, 2013 Motion for Summary Judgment is therefore **GRANTED** in its entirety. To recap, the October 19, 2001 agreement (embodied in Kevin Marks' letter of the same date) remains binding and enforceable solely under the terms embodied in that agreement. That agreement encompasses all of the works subject to the related Superman and Superboy actions. *Siegel v. Warner Bros. Entm't Inc.*, No. 2:04-cv-08400-ODW-RZ (C.D. Cal. filed Oct. 8, 2004); *Siegel v. Time Warner Inc.*, No. 2:04-cv-08776-ODW-RZ (C.D. Cal. filed Oct. 22, 2004). Whether and how that

right has been affected by the parties' actions after October 19, 2001, is not now before the Court, as DC has voluntarily dismissed its third counterclaim for breach of contract, and the Siegels do not assert any contract claims related to the October 19 agreement. Thus, to the extent that any party contends any delay in performance or other breach gives rise to any damages, such a claim is properly subject to a separate state-court action for breach of contract.

A judgment will issue.

**IT IS SO ORDERED.**

April 18, 2013

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**